# Attachment 1

IN THE ~~DISTRICT~~/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

ALASKA INTERSTATE CONSTRUCTION, LLC )
                                    )
                    Plaintiff(s),   )
                                    )
vs.                                 )
                                    )
CRUM & FORSTER SPECIALTY INSURANCE  )     CASE NO. 3AN-14-07142      CI
COMPANY, INC.                       )
                                    )     SUMMONS AND
                    Defendant(s).   )     NOTICE TO BOTH PARTIES
                                    )     OF JUDICIAL ASSIGNMENT

To Defendant: CRUM & FORSTER SPECIALTY INSURANCE COMPANY, INC.

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) David K. Gross                      , whose address is: 1127 W. 7th Ave.,            .
Anchorage, AK 99501

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at www.courts.alaska.gov/forms.htm, to inform the court. -  OR  - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

[✓] This case has been assigned to Superior Court Judge _Marston_
    and Master _____

[ ] This case has been assigned to District Court Judge _____

                                        CLERK OF COURT

_May 28, 2014_                          By: _____
     Date                                         Deputy Clerk

I certify that on _5/28/14_ a copy of this Summons was    [ ] mailed  [✓] given to
[ ] plaintiff  [✓] plaintiff's counsel along with a copy of the
[ ] Domestic Relations Procedural Order  [ ] Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk _____

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (6/10)(st.3)                          Civil Rules 4, 5, 12, 42(c), 55
SUMMONS

Original Received

MAY 2 8 2014

Clerk of the Trial Courts

| | |
|---|---|
| ALASKA INTERSTATE CONSTRUCTION, LLC, | ) ) ) |
| Plaintiff, | ) ) Case No.: 3AN-14-07142 CI |
| vs. | ) ) |
| CRUM & FORSTER SPECIALTY INSURANCE COMPANY, INC., | ) ) ) |
| Defendant. | ) ) ) |

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

## COMPLAINT

COMES NOW, Plaintiff Alaska Interstate Construction, LLC ("AIC"), by and through counsel of record, and for its claim for relief, states and alleges as follows:

(1)     AIC is an Alaska Limited Liability Company doing business in the State of Alaska and is qualified in all respects to bring this action.

(2)     Defendant Crum & Forster Specialty Insurance Company, Inc. ("C&R") is an insurance company incorporated in a state other than Alaska with its corporate offices in New Jersey.

(3)     This Court has subject matter jurisdiction over this case and personal jurisdiction over the relevant parties.

(4)     AIC purchased an insurance policy from C&R.  A true and correct copy of the policy is attached hereto as Exhibit 1.

(5)     This insurance policy provided that C&R would defend and indemnify AIC from any and all claims or actions alleging that AIC engaged in wrongful acts in

the course of professional services provided, subject to the policy limits and other policy provisions.

(6) On June 14, 2013, a complaint was filed in the Superior Court for the State of Alaska, Third Judicial District, by VC Sellers Reserve, LLC ("VC Sellers") alleging, among other things, that AIC used an uncertified scale to charge for services related to the remediation of soil on the North Slope of Alaska; that AIC engaged in unfair and deceptive conduct in the course of the soil remediation work; that AIC violated industry standards by "double-burning" and "re-burning" soil; that the work being done by AIC as the project manager was done in a negligent manner; that all of said wrongful acts resulted in overbilling; and that such wrongful acts resulted in damages in excess of $12,000,000. A true and correct copy of the complaint is attached hereto as Exhibit 2.

(7) Upon receiving a copy of the complaint, AIC promptly and timely tendered the above-referenced lawsuit to C&R.

(8) C&R responded on August 9, 2013 rejecting the tender and alleging that it had no duty to defend or indemnify due to the lack of coverage. A true and correct copy of the August 9, 2013 letter is attached hereto as Exhibit 3.

(9) AIC proceeded to defend the case, but on April 2, 2014, after it had exhausted the self-insured retention; AIC again tendered the lawsuit to C&R seeking a defense and indemnification. A true and correct copy of the April 2, 2014 letter is attached hereto as Exhibit 4.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

(10) On May 12, 2014, C&R again denied the tender and asserted that it had no obligation to defend or indemnify the suit filed by VC Sellers. A true and correct copy of the May 12, 2014 letter is attached hereto as Exhibit 5.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

(11) AIC re-states the allegations set forth above to the same extent as if fully set forth.

(12) C&R is contractually obligated to defend and indemnify AIC in relation to the lawsuit brought by VC Sellers.

(13) C&R has refused to defend and indemnify AIC in relation to the VC Sellers lawsuit.

(14) C&R's refusal to defend and indemnify AIC is a breach of the insurance contract.

(15) Said breach has and will cause damage to AIC, the exact amount to be proven at time of trial, but in excess of the policy limits.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

(16) AIC re-states the allegations set forth above to the same extent as if fully set forth.

(17) C&R is contractually obligated to defend and indemnify AIC in relation to the lawsuit brought by VC Sellers.

(18) Because there is an implied-in-law covenant of good faith and fair dealing inherent in the insurance contract, C&R must act in good faith towards AIC.

(19) C&R has refused to defend and indemnify AIC in relation to the VC Sellers lawsuit.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

Case 3:14-cv-00126-RRB   Document 1-1   Filed 06/30/14   Page 5 of 159   Attachment 1, p. 4

(20)    C&R's refusal to defend and indemnify AIC is bad faith conduct and a violation of the implied-in-law covenant.

(21)    Said bad faith conduct has caused damage to AIC, the exact amount to be proven at time of trial, but in excess of the policy limits.

## THIRD CAUSE OF ACTION – DECLARATORY JUDGMENT

(22)    AIC re-states the allegations set forth above to the same extent as if fully set forth.

(23)    C&R is contractually obligated to defend and indemnify AIC in relation to the lawsuit brought by VC Sellers.

(24)    C&R has refused to defend and indemnify AIC in relation to the VC Sellers lawsuit.

(25)    C&R's refusal to defend and indemnify AIC is a breach of the insurance contract and is a violation of the implied-in-law covenant of good faith and fair dealing.

(26)    Said breach and said bad faith conduct will cause damage to AIC in the future, the exact amount to be proven at time of trial, but in excess of the policy limits.

(27)    The court has jurisdiction to declare the rights and legal relations between the interested parties pursuant to AS 22.10.020(g), including the determination that the insurance contract provides coverage requiring C&R to defend and indemnify AIC in relation to the lawsuit filed by VC Sellers.

WHEREFORE, AIC prays for the following relief:

1.    Judgment against C&R for damages caused as a result of its breach of the insurance contract and bad faith conduct;

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 · FACSIMILE (907) 276-3680

AIC V. CRUM & FORSTER
COMPLAINT
F:\506541\45\00391017.DOCX

CASE NO. 3AN-14-_____ CI
PAGE 4 OF 5

2. A declaratory judgment that C&R is contractually obligated to defend and indemnify AIC.

3. An award of costs, fees, and interest; and

4. Such other relief as the court may deem just and equitable.

DATED this 28th day of May, 2014.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Alaska Interstate Construction, LLC

By: _____
David K. Gross, ABA # 9611065

LAW OFFICES OF TIMOTHY PETUMENOS
Attorneys for Alaska Interstate Construction, LLC

By: _____
Timothy J. Petumenos, ABA #76111747

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 · FACSIMILE (907) 276-3680

"This is evidence of insurance procured and developed under the Alaska Surplus Lines Law AS21.34. It is not covered by the Alaska Insurance Guarantee Association Act, AS21.80."
Worldwide Facilities, Inc. – License #9718



## ENVIRONMENTAL PACKAGE POLICY DECLARATIONS

**POLICY NUMBER: EPK-101290**
**RENEWAL OF: EPK-100301**

| ITEM | | |
|---|---|---|
| 1. | **NAMED INSURED & ADDRESS:** Alaska Interstate Construction, LLC<br>301 West Northern Lights Boulevard, Suite 600<br>Anchorage, AK 99503<br><br>Named Insured's Business: Oilfield Prep & Maintenance Contractor   Form of Business: Limited Liability Company | |
| 2. | **POLICY PERIOD: FROM:** 05/01/13    **TO:** 05/01/14<br><br>12:01 a.m. Standard Time at the Named Insured's address stated above | |
| 3. | **COVERAGE IS PROVIDED BY:**<br><br>Crum & Forster Specialty Insurance Company<br>( A Stock Company )<br>305 Madison Avenue<br>Morristown, NJ 07960 | **REPRESENTATIVE:**<br>Producer Number: 79360<br>Worldwide Facilities, Inc.<br>213-236-4500<br>725 South Figueroa Street, 19th Floor<br>Los Angeles, CA 90017 |

**IN RETURN FOR THE PAYMENT OF PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| 4. | **LIMITS OF INSURANCE:** (The Limits of Insurance are the amounts shown below.) | |
|---|---|---|
| | GENERAL AGGREGATE LIMIT (Other Than Products/Completed Operations) | $2,000,000 |
| | PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $2,000,000 |
| | PERSONAL & ADVERTISING INJURY LIMIT | $2,000,000 |
| | EACH OCCURRENCE LIMIT | $2,000,000 |
| | DAMAGE TO PREMISES RENTED TO YOU LIMIT | $300,000 |
| | MEDICAL EXPENSE LIMIT | $25,000 |
| | CONTRACTORS POLLUTION LIABILITY EACH POLLUTION CONDITION LIMIT | $2,000,000 |
| | ERRORS AND OMISSIONS EACH CLAIM LIMIT | $2,000,000 |
| | THIRD PARTY POLLUTION LIABILITY EACH POLLUTION CONDITION LIMIT | Not Covered |
| | ONSITE CLEANUP POLLUTION LIABILITY EACH POLLUTION CONDITION LIMIT | Not Covered |

*Alaska Surplus Lines Tax & Fee Breakdown*
Premium:  $ 91,947.00
Company Fee:  $
Processing Fee:  $ 250.00
Inspection Fee:  $
2.7% State Tax:  $ 2,482.57
1.0% AK Filing Fee:  $ 919.47

| 5. | **RETROACTIVE DATE APPLICABLE TO:** Contractors Pollution Liability: 12/01/04<br>Errors and Omissions Liability – $1MM/$2MM limits: 05/23/09<br> – $2MM/$2MM limits: 05/23/12 |
|---|---|
| 6. | **DEDUCTIBLE/SELF INSURED RETENTION:** See Self Insured Retention Endorsement EN0105 |
| 7. | **FORMS AND ENDORSEMENTS ATTACHED TO THIS POLICY:**<br>See Schedule of Forms and Endorsements EN0002 |
| 8. | **PREMIUM:** — $91,947<br>**TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT (TRIPRA):** — Excluded<br>**TOTAL ANNUAL PREMIUM:** — $91,947 |
| 9. | **AUDIT PERIOD: FLAT PREMIUM:    AUDITABLE PREMIUM: X** |

_____
Authorized Representative

THESE DECLARATIONS, TOGETHER WITH POLICY JACKET, MASTER FORMS LIST, SCHEDULES AND ENDORSEMENTS, IF ANY, ARE ISSUED AS PART OF, AND IN THE COMPLETION OF THE ABOVE NUMBERED POLICY.

EN0001-0211

This is evidence of insurance procured and developed under Alaska Surplus Lines Law, AS 21.34. It is not covered by the Alaska Insurance Guaranty Association Act, AS 21.80.

Exhibit 1 Page 1 of 95
AIC V. CRUM & FORSTER



## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| FORM NUMBER | TITLE |
| --- | --- |
| EN0001-0211 | Environmental Package Policy Declarations |
| EN0002-0211 | Schedule of Forms and Endorsements |
| EN0003-0211 | Crum & Forster Specialty Insurance Company Signature Page |
| EN0020-1212 | Common Provisions |
| EN0021-0211 | Commercial General Liability Occurrence Coverage Part |
| EN0024-0611 | Contractors Pollution Liability Claims Made Coverage Part |
| EN0025-0611 | Errors and Omissions Liability Coverage Part |
| EN0004-0211 | Claims Reporting |
| EN0005-0211 | Service of Process Clause |
| EN0007-0211 | Certified Acts of Terrorism and Other Acts of Terrorism Exclusion |
| EN0010-0211 | Minimum Premium and Minimum Retained Premium |
| EN0011-0211 | Crum & Forster Privacy Principles |
| EN0050-1011 | Emergency Response Hotline |
| EN0051-1011 | Spill Letter |
| EN0105-0211 | Self Insured Retention |
| EN0107-0211 | Punitive Damages Where Allowable by Law |
| EN0109-0211 | Amended Waiver of Transfer of Rights of Recovery Against Others To Us |
| EN0111-0211 | Additional Insured – Owners, Lessees Or Contractors |
| EN0118-0211 | Primary and Non-Contributory Additional Insured with Waiver of Subrogation |
| EN0134-0211 | Cancellation By Us |
| EN0136-0211 | Notice of Cancellation – Certificate Holder(s) |
| EN0137-0211 | General Change Endorsement – Named Insured Schedule |
| EN0138-0211 | Earned Premium and Composite Rate Endorsement |
| EN0301-0211 | Aggregate Limits of Insurance Per Project |
| EN0302-0211 | Employee Benefits Liability Coverage |
| EN0312-0211 | Boats |
| EN0320-0211 | Additional Insured – Owners, Lessees Or Contractors – Completed Operations |
| EN0346-0313 | Amendment to Damage to Your Work Exclusion |
| EN0405-0611 | Transportation Pollution Liability Blanket Endorsement |
| EN0412-0211 | Mold Definition Giveback |
| EN0701-0511 | Alaska Policy Holders Notice |
| EN0711-0511 | Alaska Changes – Cancellation and Non-Renewal |

**Crum & Forster Specialty Insurance Company**
**An Arizona Corporation**
**Home Office: Phoenix, AZ**

(A Capital Stock Company)

SIGNATURE                                        SIGNATURE

Mary Jane Robertson                              James Kraus
President                                        Secretary

EN0003-0211



part of the FAIRFAX group

**THIS POLICY MAY CONTAIN BOTH CLAIMS-MADE AND OCCURRENCE COVERAGE.
PLEASE READ THE ENTIRE FORM CAREFULLY.**

# COMMON PROVISIONS

This Policy consists of: (1) these Common Provisions; (2) one or more Coverage Parts that have been purchased by one or more Named Insured(s); and (3) the Declarations Page(s) associated with such Coverage Part(s). Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered by this Policy.

There are separate Coverage Parts that you may purchase separately. They are subject to these Common Provisions. Some of the Coverage Parts provide occurrence based coverage and others provide claims made coverage. Some Coverage Parts have defense expenses within limits, some do not. Some Coverage Parts do not provide for any defense obligation. Each Coverage Part has a section setting forth its own exclusions and conditions. The Common Provisions also contain definitions, exclusions and conditions that apply to all Coverage Parts. The Common Provisions also provide for defense obligations, where applicable, limits of liability, who is insured and, with respect to claims made coverage parts, extended reporting period provisions. With respect to definitions, any word or phrase in quotes is a defined term that will appear in the definitions section of the Common Provisions. Certain words (such as, but not limited to, Policy, Declarations, Deductible and Self Insured Retention) are used with initial capitalization. Such words are not defined terms and do not appear in the definitions section of the Common Provisions.

Throughout this Policy the words "you" and "your" refer to the First Named Insured

shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Policy. The words "we", "us" and "our" refer to the Company providing this insurance. The word "insured" means any person or organization qualifying as such under Section III Who Is An Insured.

In consideration of payment of the premium, in reliance upon the statements in the application for this insurance and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, you agree with us as follows:

## SECTION I - DEFENSE

1. **Commercial General Liability**

   If either of the following Coverage Parts: Commercial General Liability Occurrence or Commercial General Liability Claims Made, is purchased and is attached to these Common Provisions, then the following provisions apply to Insuring Agreement **A** - Bodily Injury And Property Damage and Insuring Agreement **B** - Personal And Advertising Injury:

   a. We have the right and duty to defend the insured against any "suit" seeking "damages" to which this insurance applies. We will pay "defense expenses" with respect to any "suit" against an insured that we defend. However, we have no duty to defend the insured against any "suit" seeking "damages" for "bodily injury", "property damage" or

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 4 of 95
AIC V. CRUM & FORSTER

"personal and advertising injury" to which this insurance does not apply.

b. Our right and duty to defend end when we have used up the applicable limit of liability in the payment of judgments or settlements and "defense expenses" included within your Deductible Amount under Insuring Agreements **A** and **B** or medical expenses under Insuring Agreement **C**. "defense expenses" incurred by us under the Commercial General Liability Occurrence Coverage Part or the Commercial General Liability Claims Made Coverage Part will not reduce the Limits of Insurance, except for "defense expenses" which are included within your Deductible Amount.

2. **Contractors Pollution Liability, Errors And Omissions Liability And Third Party Pollution Liability**

If one or more of the following Coverage Parts: Contractors Pollution Liability Occurrence Coverage, Contractors Pollution Liability Claims Made Coverage, Errors And Omissions Liability Coverage or Third Party Pollution Liability Coverage are purchased and the corresponding Coverage Part is attached to these Common Provisions, then the following provisions will apply to the Insuring Agreement under the Coverage Part. :

a. We have the right and duty to defend the insured against any "suit" seeking "damages" to which this insurance applies. We will pay "defense expenses" with respect to any "suit" against an insured that we defend. However, we have no duty to defend the insured against any "suit" seeking: (1) "damages" for "bodily injury" or "property damage" to which this insurance does not apply; or (2) "cleanup costs" to which

this insurance does not apply.

b. Our right and duty to defend end when we have used up the applicable Limits of Insurance in the payment of any combination of judgments, settlements or "defense expenses".

c. "Defense expenses" applicable to the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts, the Errors and Omissions Liability Coverage Part and the Third Party Pollution Liability Coverage Part are included within the Limits of Insurance and will reduce the Limits of Insurance provided by each such Coverage Part.

3. **Claims Arising Out Of The Same or Related Acts or Events**

The following provision applies only to the Commercial General Liability Claims Made Coverage Part, the Contractors Pollution Liability Claims Made Coverage Part, the Errors and the Omissions Liability Coverage Part and the Third Party Pollution Liability Coverage Part:

Two or more "claims" arising out of the same or related acts, errors, omissions, circumstances, transactions or events shall be deemed to be first made and reported on the earliest date on which any such "claim" was first made and reported. Such "claims" shall be deemed to be a single "claim".

**SECTION II – DEFENSE EXPENSES**

If one or more of the following Coverage Parts: Commercial General Liability Occurrence or Claims Made, Contractors Pollution Liability Occurrence or Claims Made, Errors and

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 5 of 95
AIC V. CRUM & FORSTER

Omissions Liability or Third Party Pollution Liability Coverage Parts are purchased, then the following provisions apply to all Coverage Parts except the Onsite Cleanup Coverage Part:

1. We will pay "defense expenses" with respect to any "claim", "occurrence", "wrongful act" or "pollution condition" that we investigate or settle, or any "suit" against an insured we defend. We do not have any duty to defend or pay "defense expenses" under the Onsite Cleanup Coverage Part.

2. If we defend an insured against a "suit" and an indemnitee of that insured is also named as a party to the "suit", we will defend that indemnitee and pay "defense expenses" on behalf of that indemnitee if all of the following conditions are met:

   a. the "suit" against the indemnitee seeks "damages" for which such insured has assumed the liability of the indemnitee in an "insured contract";

   b. this insurance applies to the liability assumed by such insured;

   c. the obligation to defend, or the cost of the defense of that indemnitee, has also been assumed by such insured in the same "insured contract";

   d. the allegations in the "suit' and the information we know about the "occurrence", offense, "wrongful act" or "pollution condition" are such that no conflict appears to exist between the interests of such insured and the interests of the indemnitee;

   e. the indemnitee and such insured ask us to conduct and control the defense of that indemnitee against such "suit' and agree that we can assign the same counsel to defend

such insured and the indemnitee; and

   f. the indemnitee:

      (1) agrees in writing to:

         (a) cooperate with us in the investigation, settlement or defense of the "suit";

         (b) immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) promptly notify any other insurer whose coverage is available to the indemnitee; and

         (d) cooperate with us with respect to obtaining other applicable insurance that may be available to the indemnitee; and

      (2) provides us with written authorization to:

         (a) obtain records and other information related to the "suit"; and

         (b) conduct and control the defense of the indemnitee in such "suit".

3. The "defense expenses" in **2a.** through **2f.**: (i) will not reduce the Limits of Insurance for the Commercial General Liability Occurrence Coverage Part and the Commercial General Liability Claims Made Coverage Part, except for "defense expenses" included within your Deductible Amount; but (ii) will reduce the Limits of Insurance for the Contractors Pollution Liability Occurrence Coverage Part, the Contractors Pollution Liability Claims

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 6 of 95
AIC V. CRUM & FORSTER

Made Coverage Part, the Errors and Omissions Liability Coverage Part, and the Third Party Pollution Liability Coverage Part.

4. Our obligation to pay "defense expenses" on behalf of that indemnitee ends when either:

   a. we have used up the applicable limit of insurance in the payment of judgments or settlements and "defense expenses" included within your Deductible Amount under the Commercial General Liability Occurrence or Claims Made Coverage Part; or

   b. we have used up the applicable limit of insurance in the payment of any combination of "defense expenses" or judgments or settlements, or any of them, under the Contractors Pollution Liability Occurrence or Claims Made Coverage Part, the Errors and Omissions Liability Coverage Part, or the Third Party Pollution Liability Coverage Part; or

   c. the conditions set forth above, or the terms of the agreement described in Paragraph 2.f. above, are no longer met.

## SECTION III - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. an individual, then you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. a partnership or joint venture, then you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. a limited liability company, then you

are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. an organization other than a partnership, joint venture or limited liability company, then you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. a trust, then you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "bodily injury" or "personal and advertising injury":

         (a) to you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 7 of 95
AIC V. CRUM & FORSTER

course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) to the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

(c) for which there is any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

(d) arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) owned, occupied or used by; or

(b) rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as

your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However, with respect to such organization:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the "policy period", whichever is earlier;

b. Insuring Agreement A of the Commercial General Liability Coverage Part does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization;

c. Insuring Agreement B of the Commercial General Liability Coverage Part does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization;

d. The Insuring Agreement of the

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 8 of 95
AIC V. CRUM & FORSTER

Contractors Pollution Liability Coverage Part does not apply to "bodily injury", "property damage" or "cleanup costs" resulting from a "pollution condition" that occurred before you acquired or formed the organization;

e. The Insuring Agreement of the Errors and Omissions Liability Coverage Part does not apply to "bodily injury", "property damage" or "cleanup costs" resulting from a "wrongful act" committed before you acquired or formed the organization;

f. The Insuring Agreement of the Third Party Pollution Liability Coverage Part does not apply to "bodily injury", "property damage" or "cleanup costs" resulting from a "pollution condition" that occurred before you acquired or formed the organization; and

g. The Insuring Agreement of the Onsite Cleanup Coverage Part does not apply to "pollution conditions" existing before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION IV - LIMITS OF INSURANCE AND DEDUCTIBLE**

1. The Limits of Insurance shown below fix the most we will pay regardless of the number of:

    a. Insureds;

    b. "claims" made or "suits" brought; or

    c. Persons or organizations making "claims" or bringing "suits".

2. The General Aggregate Limit stated in the Declarations is the most we will pay under this Policy for the sum of all:

    a. "Damages" for "bodily injury", "property damage" and "personal and advertising injury" under all Coverage Parts, except "bodily injury" and "property damage" under the Commercial General Liability Occurrence or Claims Made Coverage Parts, that fall within the "products-completed operations hazard";

    b. Medical Expenses and "cleanup costs"

    c. "Defense expenses" under all Coverage Parts except the Commercial General Liability Occurrence or Claims Made Coverage Parts and the Onsite Cleanup Coverage Part, other than "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Insuring Agreement **A** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for "damages" because of "bodily injury" and "property damage" included in the "products-completed operations hazard" and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

4. Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under the Insuring Agreement **B** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for the sum of all "damages" because of all "personal and advertising injury" arising out of any one

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 9 of 95
AIC V. CRUM & FORSTER

offense and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

5. Subject to Paragraph **2.** or **3.** above, whichever is applicable, the Each Occurrence Limit is the most we will pay under the Commercial General Liability Occurrence or Claims Made Coverage Parts for the sum of all:

   a. "Damages" for "bodily injury" and "property damage" under Insuring Agreement **A**; and

   b. Medical Expenses under Insuring Agreement **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence" and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under the Insuring Agreement **A** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for "damages" because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under the Insuring Agreement **C** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for all medical expenses because

of "bodily injury" sustained by any one person.

8. Subject to Paragraph **2.** above, the Each Pollution Condition Limit is the most we will pay under the Insuring Agreement of the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts for the sum of all:

   a. "damages", because of "bodily injury" and "property damage";

   b. "cleanup costs"; and

   c. "defense expenses"

   arising out of any one "pollution condition".

9. Subject to Paragraph **2.** above, the Errors and Omissions Liability Each Claim Limit is the most we will pay under the Insuring Agreement of the Errors and Omissions Liability Coverage Part for the sum of all:

   a. "damages" because of "bodily injury" and "property damage";

   b. "cleanup costs"; and

   c. "defense expenses"

   arising out of any one "wrongful act" or series of related "wrongful acts".

10. Subject to Paragraph **2.** above the Third Party Pollution Liability Each Pollution Condition Limit is the most we will pay under the Insuring Agreement of the Third Party Pollution Liability Coverage Part for the sum of all:

   a. "damages" because of "bodily injury" and "property damage";

   b. "cleanup costs"; and

   c. "defense expenses"

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 10 of 95
AIC V. CRUM & FORSTER

arising out of any one "pollution condition".

11. Subject to Paragraph **2.**, Onsite Cleanup Coverage Each Pollution Condition Limit is the most we will pay under the Onsite Cleanup Coverage Part for the sum of all "cleanup costs" arising out of any one "pollution condition".

12. The Limits of Insurance of this policy apply while this policy is in effect.

13. Subject to the terms and conditions of any separate deductible endorsement(s), which, if inconsistent with the provisions of this section, shall control, the Deductible Amount as stated in the Declarations shall apply as follows:

    **a.** With respect to the Commercial General Liability Coverage Parts:

        (1) if the Deductible Amount is on an each "claim" basis, the Deductible Amount shall apply to all payments for "damages", medical expenses and "defense expenses" made because of "bodily injury" sustained by any one person or "property damage" sustained by any one person or organization, as a result of any one "occurrence", or, in the case of medical payments, arising out of any one accident; and, with respect to "personal and advertising injury", to all payments for "damages" and "defense expenses" made because of "personal and advertising injury" sustained by any one person or organization;

        (2) if the Deductible Amount is on an each "occurrence" basis, the deductible amount shall apply to all payments for "damages", medical expenses and "defense expenses" made because of all "bodily injury" or "property

damage" as a result of any one "occurrence", or, in the case of medical expenses, arising out of any accident; and with respect to "personal and advertising injury", to all payments for "damages" and "defense expenses" made because of "personal and advertising injury" sustained by any one person or organization; and

        (3) The Deductible Amount shall first be applied to "defense expenses". Any remaining amount of the Deductible after payment of "defense expenses" shall be applied to "damages" and medical expenses.

    **b.** With respect to the Insuring Agreement(s) of the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts, and the Third Party Pollution Liability Coverage Part :

        (1) the Deductible Amount applies to all payments for "damages" because of "bodily injury" or "property damage", "cleanup costs" and "defense expenses" made because of each "pollution condition"; and

        (2) the Deductible Amount can be applied, at our option, to any combination of "defense expenses", "cleanup costs" or "damages" arising out of such "pollution condition".

    **c.** With respect to the Insuring Agreement of the Errors and Omissions Liability Coverage Part;

        (1) the Deductible Amount applies to all payments for "damages" because of "bodily injury" or "property damage", "cleanup costs" and "defense expenses"

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 11 of 95
AIC V. CRUM & FORSTER

made because of each "wrongful act" or series of related "wrongful acts";

    (2) the Deductible Amount can be applied, at our option, to any combination of "defense expenses", "cleanup costs" or "damages" arising out of such "pollution condition".

**d.** With respect to the Insuring Agreement of the Onsite Cleanup Coverage Part, the Deductible Amount applies to all payments for "cleanup costs" because of each "pollution condition".

**e.** All Deductible Amounts, including any "defense expense" component, are included within and reduce the Limits of Insurance set forth above. With respect to the Commercial General Liability Coverage Parts, "defense expenses" are included within and reduce the Deductible Amount, but once the Deductible Amount has been exhausted, "defense expenses" thereafter incurred are no longer within and do not reduce the Limits of Insurance.

With respect to any of the Deductible Amounts described above, we, at our sole election and option, may:

    (1) Pay any part or all of the Deductible Amount to effect settlement of any "claim" or "suit", and upon notification of the action taken, you shall promptly reimburse us for such the Deductible Amount that has been paid by us; and

    (2) Upon receipt of notice of any "claim" or at any time thereafter, call upon you to pay or deposit with us all or any part of the Deductible Amount, to be held

and applied by us as herein provided.

**SECTION V - COMMON EXCLUSIONS**

The following exclusions apply to all Coverage Parts attached to this Policy except where specifically noted:

This Policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

**1. Aircraft, Auto Or Watercraft**

Based upon or arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the "claim" against any insured alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of another by that insured, or if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

a. A watercraft while ashore on premises you own or rent;

b. A watercraft you do not own that is:

    (1) Less than twenty-six (26) feet long; and

    (2) Not being used to carry persons or property for a charge;

c. Parking an "auto" on, or on the

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 12 of 95
AIC V. CRUM & FORSTER

roadway near premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

d.   Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

e.   "Bodily injury" or "property damage" arising out of:

(1) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(2) The operation of any of the machinery or equipment listed In Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

2.  **Contractual Liability**

Based upon or arising out of any liability for which the insured is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages":

a.   That the insured would have in the absence of the contract or agreement; or

b.   Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable

attorney's fees and necessary litigation expenses incurred by or for a party other than an insured shall be deemed to be "damages" because of "bodily injury" or "property damage", and not "defense expenses" if:

(1) Liability to such party for, or for the cost of, that party's defense has also been assumed by the insured in the same "insured contract"; and

(2) Such attorney's fees and litigation expenses are: (i) for defense of that party against a "suit"; and (ii) recovered in a "suit" by that party against the insured.

3.  **Criminal, Fraudulent Or Dishonest Acts**

Based upon or arising out of:

a.   Any criminal, fraudulent, or dishonest act, omission or offense committed by the insured. But with respect to only the Errors and Omissions Liability Coverage Part, we shall defend any allegations concerning this item a., against the insured, if such allegations involve a "claim" to which this insurance otherwise applies, until judgment or other final adjudication establishes, or if such insured admits, that such act, omission or offense was committed, or personally acquiesced in, by such insured;

b.   Any act, omission or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage;

c.   The obtaining by the insured of any profit, gain or advantage to which the insured is not legally entitled; or

d.   Violation of the provisions of the

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 13 of 95
AIC V. CRUM & FORSTER

Racketeer Influenced and Corrupt Organization Act 18 U.S.C. Sections 1961 et seq. by the insured.

**4. Capital Expenditure**

Based upon or arising out of any expenditure or improvement that would qualify as a "capital expenditure".

**5. Expected Or Intended Injury**

Except as provided in **3.** above, based upon or arising out of "bodily injury" or "property damage" or any "pollution condition" that was expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**6. Cross Suits**

Brought by any Named Insured against any other Named Insured.

**7. Employer's Liability**

Based upon or arising out of "bodily injury" to:

**a.** An "employee" of the insured arising out of and in the course of:

**(1)** Employment by the insured; or

**(2)** Performing duties related to the conduct of the insured's business; or

**b.** The spouse, child, parent, brother or sister of that "employee" identified in Paragraph **a.** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and this exclusion also applies to any obligation to share "damages" with or repay another who may be liable to pay "damages"

because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**8. Employment-Related Practices**

Based upon or arising out of any:

**a.** Refusal to employ a person;

**b.** Termination of a person's employment; or

**c.** Employment-related practices, policies, acts or omissions, including, but not limited to, allegations of discrimination by any insured against any person on the basis of age, color, race, sex, creed, national origin, marital status, handicap, physical disability, sexual preference, or allegations of coercion, demotion, negative performance evaluation, reassignment, discipline, defamation, harassment, humiliation, assault, or battery; or

**d.** Liability to the spouse, child, parent, brother or sister of that person as a consequence of an injury to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and this exclusion also applies to any obligation to share "damages" with or repay another who may be liable to pay "damages" because of the injury.

**9. Executive Officer**

Based upon or arising out of the serving by any insured as an "executive officer", director, partner, trustee or "employee"

EN0020-1212

Page 11 of 30

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 14 of 95
AIC V. CRUM & FORSTER

of an organization, partnership, joint venture, limited liability company, trust or other business enterprise that is not named in the Declarations.

**10. Nuclear Energy Liability**

   a. Involving any insured who is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   b. Involving the "hazardous properties" of "nuclear material" and with respect to which:

      (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

      (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   c. Under any medical payments coverage, involving expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   d. Under any liability coverage, involving "bodily injury" or "property damage" resulting from "hazardous

properties" of "nuclear material", if:

   (1) The "nuclear material":

      (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

      (b) has been discharged or dispersed therefrom;

   (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

   (3) The "bodily injury" or "property damage" arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this item **c.** applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion only, "property damage" includes all forms of radioactive contamination of property.

**11. Other Enterprises**

   Against any organization, partnership, joint venture, limited liability company, trust or other business enterprise that is not named in the Declarations, or included Section III – Who Is An Insured, or otherwise included by endorsement to this policy.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 15 of 95
AIC V. CRUM & FORSTER

**12. Workers Compensation And Similar Laws**

    a. Based upon or arising out of any obligation of any insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law, including without limitation, "bodily injury" to any person, whether or not an "employee" of any insured.

Exclusions **1.**, **7.** and **12.** above, do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **IV** - Limits Of Insurance And Deductible within the Common Provisions and indicated in the Declarations.

**13. Distribution or Disclosure of Material in Violation of Statutes**

Based upon or arising out of any act or omission that violates or is alleged to violate:

    a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

    b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

    c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information;

    d. The Fair and Accurate Credit Transactions Act of 2003 (FACTA), including any amendment of or addition to such law; or

    e. Any statute, ordinance or regulation other than FACTA that prohibits, restricts or governs the disclosure of material to prevent or minimize identity theft.

**14. Punitive or Multiplied Damages**

For punitive damages or the multiplied portion of treble or other multiplied damages, or that arise out of that portion of any "claim" or "suit" seeking or awarding punitive damages or the multiplied portion of treble or other multiplied damages.

**SECTION VI -COMMON CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Policy, but in no event shall such bankruptcy or insolvency obligate us to pay any part or all of any applicable Deductible or Self Insured Retention, **or** otherwise impose any obligation on us under this Policy before the Deductible or any Self Insured Retention is satisfied.

**2. Cancellation And Nonrenewal**

The following provisions regarding cancellation and nonrenewal apply except to the extent that they, or any of them, are inconsistent with state laws or regulations applicable to surplus lines insurers, in which event, they will be deemed amended to be in conformity with such laws or regulations. This Policy may be cancelled by the First Named Insured by surrender thereof to us or by mailing to us written notice stating when thereafter the cancellation shall be effective. We may cancel or decide not to renew this Policy by mailing a written notice to the First Named Insured at the address shown in the Declarations of this Policy. The mailing of notice of cancellation shall be sufficient notice, and the effective date of cancellation stated in such notice

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 16 of 95
AIC V. CRUM & FORSTER

shall be deemed to constitute the end of the "policy period". The effective dates of such cancellation shall be not less than thirty (30) days (ten (10) days for non-payment of premium) following mailing of the notice of cancellation to the First Named Insured.

Hand delivery of such written notice either by the First Named Insured or by us (or by either's designee) shall be equivalent to mailing. If this Policy is issued to comply with any law or regulation that requires notice of cancellation or nonrenewal to any governmental body, cancellation or nonrenewal shall not be effective until the required notice has been provided by you or us.

This Policy is subject to a ten percent (10%) short rate penalty if you cancel the Policy or if we cancel the Policy because of your non-payment of premium. We will treat your failure to timely reimburse us for any Deductible Amount to constitute non-payment of premium. Subject to such short-rate penalty, the applicable unearned premium shall be returned to the First Named Insured as soon as practicable following the effective date of the cancellation. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of the effective date of the cancellation. If we cancel this Policy for any reason other than for non-payment of premium, we will return to you the pro rata amount of the unearned premium.

3. **Changes**

   This Policy contains all the agreements between you and us concerning the insurance afforded. The First Named Insured shown in the Declarations is the only insured authorized to request

changes in the terms of this Policy. Any changes in the terms of this Policy must be made with our consent. This Policy's terms can be amended or waived only by an endorsement issued by us and made a part of this Policy.

4. **Duties In The Event Of An Occurrence, Offense, Wrongful Act Or Pollution Condition**

   You and any other involved insured must see to it that we are notified, in writing, as soon as practicable of an "occurrence", offense, "wrongful act" or "pollution condition" which may result in a "claim" or "suit" against any insured. To the extent possible, such written notice to us should include:

   **(1)** How, when and where the "occurrence", offense, "wrongful act" or "pollution condition" took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

   **(3)** The nature and location of any injury or damage arising out of the "occurrence", offense, "wrongful act" or "pollution condition".

5. **Duties In The Event Of A Claim Or Suit**

   The duties outlined in this Condition apply only to the following Coverage Parts: Commercial General Liability Occurrence, Commercial General Liability Claims Made, Contractors Pollution Liability Occurrence, Contractors Pollution Liability Claims Made, Errors and Omissions Liability, and Third Party Pollution Liability, respectively:

   a. If a "claim" is received by, or "suit" is brought against, any insured, you and any other involved insured must:

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 17 of 95
AIC V. CRUM & FORSTER

(1) Immediately record the specifics of the "claim" or "suit" and the date received;

(2) Notify us, in writing, as soon as practicable of the receipt of the "claim" or the bringing of the "suit";

(3) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(4) Authorize us to obtain records and other information;

(5) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(6) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured.

b. No insured may, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**6. Duties In The Event Of A Potential Claim**

If: (1) during the "policy period" you first become aware of an "occurrence", offense, "wrongful act" or "pollution condition" that reasonably may result in a "claim" against you; and (2) such "occurrence", offense, "wrongful act" or "pollution condition" did not occur before the Retroactive Date, then you must provide written notice to us about that "occurrence", offense, "wrongful act" or "pollution condition" during the "policy period". If such notice is received by us during the "policy period", and this Policy has not been renewed upon

expiration of the "policy period", then any "claim" made against you after the "policy period" resulting from that "occurrence", offense, "wrongful act" or "pollution condition" shall be deemed, for the purposes of the Commercial General Liability Claims Made Coverage Part, the Contractors Pollution Liability Claims Made Coverage Part, the Errors and Omissions Liability Coverage Part and the Third Party Pollution Liability Coverage Part, to have been made on the date such written notice is received by us. This provision shall not apply to "occurrences", offenses, "wrongful acts", "pollution conditions" or potential "claims" of which you or any insured first became aware or reported during any Extended Reporting Period.

If you notify us of that "occurrence", offense, "wrongful act" or "pollution condition", then such notice must include:

a. A description of the "occurrence", offense, "wrongful act" or "pollution condition" that took place including the date and where it occurred;

b. The names and addresses of any persons involved and any witnesses;

c. The nature and location of any damage that has or may result from the "occurrence", offense, "wrongful act" or "pollution condition"; and

d. Why any insured believes that the "occurrence", offense, "wrongful act" or "pollution condition" may result in a "claim".

**7. Headings**

The description contained within the headings and subheadings of this Policy are provided solely for convenience. The headings form no part of the terms and conditions of coverage provided hereunder.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 18 of 95
AIC V. CRUM & FORSTER

**8. Inspections And Surveys**

    a. We have the right to:

       (1) Make inspections and surveys at any time;

       (2) Give you reports on the conditions we find; and

       (3) Recommend changes.

    b. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to our assessment of insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

       (1) Are safe or healthful; or

       (2) Comply with laws, regulations, codes or standards.

**9. Legal Action Against Us**

No person or organization has a right under this Policy:

    **a.** To join us as a party or otherwise bring us into a "suit" asking for "damages" from an insured; or

    **b.** To sue us on this Policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement, or on a final judgment against an insured; but we will not be liable for "damages" that are not payable under the terms of this Policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**10. Multiple Coverages Limitation**

If one or more of the Contractors Pollution Liability Occurrence Coverage Part, the Contractors Pollution Liability Claims Made Coverage Part, the Errors and Omissions Liability Coverage Part, the Third Party Pollution Liability Coverage Part or the Onsite Cleanup Coverage Part of this Policy apply to an "occurrence", offense, "wrongful act" or "pollution condition" or related "occurrences", offenses, "wrongful acts" or "pollution conditions", then the Commercial General Liability Occurrence or Claims Made Coverage Part shall not apply to the same or related "occurrences", offenses, "wrongful acts" or "pollution conditions".

If more than one Coverage Part of this Policy, or any other policy issued to any insured by us or any of our affiliated companies, applies to the same "occurrence", offense, "wrongful act" or "pollution condition", or applies to related "occurrences", offenses, "wrongful acts" or "pollution conditions", then the maximum limit of insurance under all such Coverage Parts and policies shall not exceed the highest applicable limit of insurance available under any one applicable Coverage Part and the corresponding deductible for that Coverage Part.

This condition does not apply to any insurance policy or Coverage Part issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Part.

Subject to the terms, conditions and limits of individual Coverage Parts or policies, if we provide coverage to you under successive or overlapping Coverage Parts or policies that apply to

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 19 of 95
AIC V. CRUM & FORSTER

more than one policy period, under no circumstances will we or any affiliated company be liable for coverage under more than one such Coverage Part or policy with respect to any continuous, progressive, repeated, intermittent or related "occurrence", offense, "wrongful act" or "pollution condition".

**11. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under one or more of the Commercial General Liability Occurrence or Claims Made Coverage Parts, the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts, the Errors and Omissions Liability Coverage Part, the Third Party Pollution Liability Coverage Part or the Onsite Cleanup Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

(1) Where any Coverage Part or coverage form attached hereto provides coverage on a claims-made and reported basis, such coverage is excess over, and shall not contribute with, any other insurance, whether primary, excess, contingent or on any other basis:

(a) That is effective prior to the beginning of the "policy period" shown in the Declarations of this

insurance and applies to "bodily injury" or "property damage" on other than a claims-made basis, if:

(i) No Retroactive Date is shown in the Declarations of this insurance; or

(ii) The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations of this insurance;

(b) That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

(c) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(d) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(e) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion 1.

(2) Where any Coverage Part or coverage form attached hereto provides coverage on other than a claims-made and reported basis, such coverage is excess over, and shall not contribute with, any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 20 of 95
AIC V. CRUM & FORSTER

Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use if aircraft, "autos" or watercraft to the extent not subject to Exclusion 1.

(3) Any other primary insurance available to you covering liability for "damages" arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty, under any Coverage Part, to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Policy.

c. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

12. **Premium Audit**

a. We will compute all premiums for this Policy in accordance with our rules and rates.

b. Premium shown in this Policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the First Named

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 21 of 95
AIC V. CRUM & FORSTER

Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the "policy period" is greater than the earned premium, we will return the excess to the First Named Insured.

c. Audits will not reduce the minimum retained premium. The due date for audit premiums is the date shown as the due date on the bill.

d. The First Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### 13. Premiums

This policy is subject to a minimum retained premium. The First Named Insured shown in the Declarations:

a. Is responsible for the payment of all premiums; and

b. Will be the payee for any return premiums we pay.

### 14. Representations

By accepting this Policy, you agree that:

a. All of the information and statements provided to us by you are true, accurate and complete. This Policy has been issued in reliance upon the truth and accuracy of those representations;

b. No concealment, misrepresentation or fraud in the procurement of this Policy shall avoid or defeat recovery under this Policy unless such concealment, misrepresentation or fraud was material. Concealment, misrepresentation or fraud in the procurement of this Policy which, if

known by us, would have led us to refuse to enter into this contract with its current terms, conditions or pricing, or to provide coverage for a "claim" hereunder, will be deemed material; and

c. Material concealment, misrepresentation or fraud may result in the denial of all insurance benefits under this Policy.

### 15. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Policy to the First Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured who becomes legally obligated to pay "cleanup costs" or against whom "claim" is made or "suit" is brought.

### 16. Transfer Of Rights And Duties Under This Policy

The insured's rights and duties under this Policy may not be transferred without our written consent except in the case of death of an individual named insured.

If any insured dies, that insured's rights and duties will be transferred to that insured's legal representative but only while acting within the scope of duties as legal representative. Until that insured's legal representative is appointed, any one having proper temporary custody of that insured's property will have that insured's rights and duties but only with respect to that property.

EN0020-1212

Page 19 of 30

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 22 of 95
AIC V. CRUM & FORSTER

**17. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover from others all or part of any payment we have made under this Policy, those rights are transferred to us, and may, at our discretion, be enforced by us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them, but we do not have any obligation to enforce those rights.

**18. Fraudulent Acts**

If the insured commits fraud in proffering any "claim", this insurance shall become void from the date such fraudulent "claim" is proffered.

**19. Assignment of Interest Limitation**

Assignment of interest under this Policy shall not bind us unless we agree and endorse the assignment onto this Policy.

**SECTION VII-COMMON DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or the specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or electronic means of communication; and

   b. Only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters are considered an "advertisement".

2. "Applicable laws" means the Comprehensive Environmental

Response, Compensation and Liability Act, commonly known as CERCLA, (42 U.S.C. § 9601 et seq.); the Resource Conservation and Recovery Act, commonly known as RCRA, (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act, (33 US.C. § 1251 et seq.); the Clean Air Act, (42 U.S.C. § 7401 et seq.), the Occupational Safety and Health Act of 1970, (29 U.S.C. § 651 et seq.), and all other federal, state and local laws that regulate "pollution conditions" or the handling of "pollutants".

3. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; and

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

4. "Bodily injury" means physical injury, sickness or disease sustained by a person, including mental anguish and death resulting from any of these at any time.

5. "Capital expenditure" means either money voluntarily spent or a charge voluntarily incurred, for additions or improvements to, or equipment for, your "location" or any part thereof. "Capital expenditure" includes, but is not limited to, money spent or a charge incurred for the purpose of complying with any order or request of any regulatory agency that is intended, in whole or in part, to prevent or mitigate future "pollution conditions".

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 23 of 95
AIC V. CRUM & FORSTER

6. "Claim":

   a. With respect to the Commercial General Liability Occurrence Coverage Part, the Commercial General Liability Claims Made Coverage Part and the Errors and Omissions Liability Coverage Part, means a demand for "damages".

   b. With respect to the Contractors Pollution Liability Occurrence and Claims Made Coverage Parts and the Third Party Pollution Liability Coverage Part, means a request or a demand for "damages" or "cleanup costs". "Claim" also includes any directive, order, or requirement of, court order issued by, or "suit" brought by the Government of the United States, Canada, or any local, State or Provincial Government entity of the United States of America or Canada duly acting under the authority of any law related to the protection of the environment.

7. "Cleanup costs" means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of any "pollutants".

   The cleanup is deemed to be complete, and we will have no further obligation to pay for "cleanup costs" upon final approval from the supervising governmental authority or upon satisfaction of the requirements identified within the American Society of Testing and Materials Guide For Risk Based Corrective Action, which ever first occurs.

   "Cleanup costs" does not include a "capital expenditure".

8. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

9. "Damages" means the monetary amount of any judgment, award or settlement that an insured becomes legally obligated to pay as a result of a "claim" or "suit". "Damages" does not include "cleanup costs", equitable or non-pecuniary relief, disgorgement of profits, sanctions, fines or penalties.

10. "Defense expenses" means, with respect to any "claim", "occurrence", "wrongful act" or "pollution condition" that we investigate or settle, or any "suit" against an insured we defend:

    a. all expenses we incur;

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 24 of 95
AIC V. CRUM & FORSTER

b. the cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds;

c. all reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work;

d. all costs taxed against the insured in the "suit";

e. prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer;

f. all interest on the amount of any judgment that we pay which accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

g. those amounts paid by us under **2a.** through **2f.** of Section II – Defense Expenses.

"Defense expenses" do not include:

a. Any fines or penalties whether administrative, civil or criminal;

b. Salary costs of our employees; or

c. Those sums that are deemed to be "damages" because of "bodily injury" or "property damage", and not "defense expenses" under Section **V**- Common Exclusions, paragraph **2.** -- Contractual Liability.

11. "Electronic data" means information,

facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CDROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

12. "Employee":

a. With respect to the Commercial General Liability Occurrence and Claims Made Coverage Parts, the Contractors Pollution Liability Occurrence and Claims Made Coverage Parts and the Third Party Pollution Liability Coverage Part, "employee" includes "leased workers". "Employee" does not include "temporary workers".

b. With respect to the Errors and Omissions Liability Coverage Part, "employee" includes "leased workers" and "temporary workers" but solely for "professional services" performed on your behalf and under your direct supervision.

13. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

14. "Hazardous properties" includes radioactive, toxic or explosive properties.

15. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

16. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or suspected to be defective, deficient, inadequate or dangerous; or

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 25 of 95
AIC V. CRUM & FORSTER

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

17. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the lease that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within fifty (50) feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that

part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within fifty (50) feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, opinions, reports, surveys, field orders, change orders, or drawings or specifications; or

(b) Giving directions or instructions, or failing to give them; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render "professional services", including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

18. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

19. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 26 of 95
AIC V. CRUM & FORSTER

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

20. "Location(s)" means the specific location(s) designated in an endorsement to the Third Party Pollution Liability Coverage Part or the Onsite Cleanup Coverage Part.

21. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical explorations, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility

EN0020-1212

Page 24 of 30

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 27 of 95
AIC V. CRUM & FORSTER

law or other motor vehicle insurance law are considered "autos".

**22.** "Mold" means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents, or byproducts resulting therefrom regardless of whether they are proved to cause disease, injury or damage.

**23.** "Nuclear facility" means:

**a.** Any "nuclear reactor";

**b.** Any equipment or device designed or used for:

    **(1)** Separating the isotopes of uranium or plutonium;

    **(2)** Processing or utilizing "spent fuel"; or

    **(3)** Handling, processing or packaging "waste";

**c.** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**24.** "Nuclear material" means "source material", "special nuclear material" or "by-product material".

**25.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**26.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**27.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**28.** "Policy period" means the period shown in the Declarations, unless cancelled, in which event, the "policy period" ends on the date that such cancellation is effective.

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 28 of 95
AIC V. CRUM & FORSTER

29. "Pollutants" mean any solid, liquid, gaseous, thermal or biological irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and any matter that by its presence, corrupts, defiles, contaminates or is harmful to the soil, air, or water, living things or the environment. Waste includes materials to be recycled, reconditioned or reclaimed.

It is understood that any substance or matter that is a "pollutant" does not lose its status as a "pollutant" because: (1) such substance or matter has, or may have, a useful function or purpose; or (2) the release, threatened release or presence of such substance or matter in any locale is not regulated, prohibited, remedied by, or the subject of, one or more "applicable laws".

30. "Pollution condition" means the discharge, dispersal, seepage, migration, release, escape, presence or movement of "pollutants".

Two or more "pollution conditions" arising out of the same or related acts of discharge, dispersal, seepage, migration, release, escape or movement of "pollutants" shall be deemed to be a single "pollution condition".

31. "Products-completed operations hazard":

   a. With respect to the Commercial General Liability Coverage Part, includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"; or

   b. With respect to the Contractors Pollution Liability Coverage Part, includes all "bodily injury" and "property damage" occurring away from premises you own or rent and caused by "pollution conditions" arising out of "your product" or "your work";

Except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   c. Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials;

      (3) Products or operations for which

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 29 of 95
AIC V. CRUM & FORSTER

the classification, listed in the Declarations or in a policy schedule, states that products-- completed operations are subject to the Policy Aggregate limit.

32. "Professional services" means those functions performed for others by you or by others on your behalf that are related to your practice as a consultant, engineer, architect, surveyor, laboratory or construction manager.

33. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

34. "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any amendment thereof.

35. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

36. "Suit" means a civil proceeding in a court of a state or the United States in which the person instituting such proceeding seeks "cleanup costs" or "damages" for "bodily injury", "property damage", or "personal and advertising injury". "Suit" includes:

a. An arbitration proceeding in which such "damages" or "cleanup costs"

are sought and to which the insured submits with our consent; or

b. Any other alternative dispute resolution proceeding in which such "damages" or "cleanup costs" are sought and to which the insured submits with our consent.

Solely as it relates to the Third Party Pollution Liability Coverage Part, "suit" does not include:

a. Any request or demand that is not presented in the course of a civil proceeding before a court acting as an adjudicatory body; or

b. Any notice from any governmental agency stating that any insured is or may be a party responsible for "damages" or "cleanup costs".

37. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

38. "Your Product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 30 of 95
AIC V. CRUM & FORSTER

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

39. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

40. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for such person's work performed for you.

41. "Waste" means any waste material:

a. Containing "by-product material" other than the tailings or wastes produced by the extraction or

concentration of uranium or thorium from any are processed primarily for its "source material" content; and

b. Resulting from the operation by any person or organization of any "nuclear facility" included under subparts (a) and (b) of the definition of "nuclear facility".

42. "Wrap-up or Owner Controlled Insurance Plan" means a single insurance and loss control program for parties involved in a project, including the owners, administrators, contractors and subcontractors, which is controlled and authorized by the owner, construction manager, general contractor or financing administrator, and is applicable to one or more defined work sites. Such program includes, but is not limited to, workers' compensation and employers' liability, commercial general liability, umbrella and excess liability, builders' risk, architects' and engineers' errors and omissions liability, and environmental liability.

43. "Wrongful act" means an act, error or omission in the rendering or failure to render "professional services" by any insured covered under the Insuring Agreement of the Errors and Omissions Liability Coverage Part (EN0025).

**SECTION VIII - EXTENDED REPORTING PERIODS**

The following provisions apply only to the following Claims Made Coverage Parts: Commercial General Liability Claims Made, Contractors Pollution Liability Claims Made, Errors and Omissions Liability, and Third Party Pollution Liability:

1. We will provide one or more Extended Reporting Periods, as described below, if:

a. This insurance is canceled or not renewed by us for any reason except non-payment of premium; or

EN0020-1212

Page 28 of 30

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 31 of 95
AIC V. CRUM & FORSTER

**b.** We renew or replace this Coverage Part with other insurance that:

    **(1)** Has a Retroactive Date later than the date shown in the Declarations applicable to this Coverage Part; and

    **(2)** Provides claims-made coverage for "bodily injury", "property damage" and "personal and advertising injury"; or

**c.** We replace this Coverage Part with other insurance that applies to "bodily injury", "property damage", "personal and advertising injury", or "cleanup costs" on other than a claims-made basis.

However, there shall be no entitlement to this extension if cancellation or non-renewal is due to your:

**a.** Failure to comply with the terms and conditions of this Policy; or

**b.** Misrepresentation, concealment or fraud.

**2.** Extended Reporting Periods do not extend the "policy period", or change the scope of coverage provided, or reinstate or increase the Limits of Insurance. Extended Reporting Periods apply only to "claims" for:

**a.** "Bodily injury" or "property damage" that occurs before the end of the "policy period", but not before the Retroactive Date, if any, and shown in the Declarations;

**b.** "Personal and advertising injury" caused by an offense committed before the end of the "policy period", but not before the Retroactive Date, if any, and shown in the Declarations; or

**c.** "Cleanup costs" caused by a "pollution condition" existing before the end of the "policy period", but not existing before the Retroactive Date, if any, and shown in the Declarations.

Once in effect, Extended Reporting Periods may not be canceled.

**3.** A ninety (90) day Basic Extended Reporting Period is automatically provided without additional charge. The Basic Extended Reporting Period starts with the end of the "policy period". In order to benefit from the Basic Extended Reporting Period or the Supplemental Extended Reporting Period, if purchased, all "claims" must be duly reported to us, in writing, in accordance with Section VI – Common Conditions, **5.** Duties In The Event Of A Claim Or Suit within the Common Provisions, and reported to us within the Basic Extended Reporting Period or the Supplemental Extended Reporting Period, if purchased.

The Basic Extended Reporting Period does not apply to "claims" for "damages" or "cleanup costs" that are covered under any subsequent insurance you purchase, or that would apply but for exhaustion of the amount of insurance applicable to such "claims".

**4.** A Supplemental Extended Reporting Period is available, but only by endorsement and for an extra charge. We will determine the additional premium in accordance with our rules and rates. In doing so we may take into account, without limitation, the following:

**a.** The risks to be insured;

**b.** Previous types and amounts of insurance;

**c.** Amounts paid or reserved under this Policy;

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 32 of 95
AIC V. CRUM & FORSTER

d. Your "claims" history; and

e. Other factors that, in our judgment, may be appropriate.

The additional premium will not exceed two hundred percent (200%) of the total annual premium for this Coverage Part to which the Endorsement for the Supplemental Extended Reporting Period would be attached and will be fully earned and non-refundable when the Endorsement takes effect.

5. This Supplemental Extended Reporting Period starts when the Basic Extended Reporting Period, set forth in Paragraph 3. above, ends, and terminates twenty-four (24) months after the end of the Basic Extended Reporting Period.

You must give us a written request for the Supplemental Extended Reporting Period Endorsement prior to the end of the "policy period". The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium within thirty (30) days of making your request for the Supplemental Extended Reporting Period Endorsement.

6. The Supplemental Extended Reporting Period endorsement shall set forth the terms, not inconsistent with this section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectable insurance available to the insured, whether primary, excess, contingent or on any other basis whose policy period begins or continues after the Supplemental Extended Reporting Period starts.

7. Once purchased, we are not obligated to extend or renew any Supplemental Extended Reporting Period.

Neither the Basic Extended Reporting Period nor the Supplemental Extended Reporting Period, if purchased, reinstates or increases the Limits of Insurance.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 33 of 95
AIC V. CRUM & FORSTER

Exhibit 1 Page 34 of 95
AIC V. CRUM & FORSTER



# COMMERCIAL GENERAL LIABILITY
# OCCURRENCE COVERAGE PART

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

## SECTION I - INSURING AGREEMENTS

1. **Insuring Agreement A - Bodily Injury And Property Damage**

   a. We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "bodily injury" or "property damage" to which this insurance applies. We may, at our discretion, investigate any "occurrence" and settle any "claim" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section I – Defense or Section

   II – Defense Expenses within the Common Provisions.

   b. This insurance applies to "bodily injury" and "property damage" only if all of the following conditions are met:

   (1) Before the "policy period", no insured had knowledge of any "occurrence" that could reasonably give rise to a "claim" under this Policy;

   (2) Neither the "claim" for that "bodily injury" or "property damage", nor the "occurrence" resulting in that "bodily injury" or "property damage" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

   (3) No fact, incident or circumstance involving an "occurrence" or offense that reasonably would have resulted in a "claim" for that "bodily injury" or "property damage" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

   (4) That "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

EN0021-0211

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 35 of 95
AIC V. CRUM & FORSTER

(5) That "bodily injury" or "property damage" first occurs during the "policy period"; and

(6) A "claim" for "damages" for that "bodily injury" or "property damage" is made against any insured and reported to us in accordance with the provisions set forth in Section VI Common Conditions, **5.** Duties In The Event Of A Claim Or Suit within the Common Provisions.

## 2. Insuring Agreement B - Personal And Advertising Injury

**a.** We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "personal and advertising injury" to which this insurance applies. We may, at our discretion, investigate any offense and settle any "claim" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section **IV** -Limits Of Insurance And Deductible within the Common Provisions.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section **I** – Defense or Section **II** – Defense Expenses within the Common Provisions.

**b.** This insurance applies to "personal and advertising injury" only if all of the following conditions are met:

(1) Before the "policy period", no insured had knowledge of any offense that could reasonably give rise to a "claim" under this Policy;

(2) The "claim" for that "personal and advertising injury" was not reported under any policy in

effect before the "policy period" or disclosed in the application for this Policy;

(3) No fact, incident or circumstance involving an "occurrence" or offense that reasonably would have resulted in a "claim" for that "personal and advertising injury" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(4) The offense out of which the "claim" arises first took place during the "policy period";

(5) The "personal and advertising injury" is caused by an offense committed in the "coverage territory"; and

(6) A "claim" for "damages" for the "personal and advertising injury" is made against any insured and reported to us in accordance with the provisions set forth in Section VI -Common Conditions, **5.** Duties In The Event Of A Claim Or Suit within the Common Provisions.

## 3. Insuring Agreement C - Medical Payments

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

Provided that:

(a) The accident takes place in the "coverage territory" and during the "policy period";

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 36 of 95
AIC V. CRUM & FORSTER

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the limits of insurance stated in the Declarations. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

Medical Payments do not apply to any medical expenses for patients, clients, or residents of the Named Insured.

## SECTION II - ADDITIONAL EXCLUSIONS

**1.** The following additional exclusions apply to Insuring Agreement **A** - Bodily Injury And Property Damage and Insuring Agreement **B** - Personal And Advertising Injury in addition to those contained within the Common Provisions:

This Policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

**a. Mold**

**(1)** Based upon or arising out of any actual, alleged or threatened

contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal seepage, migration, release, escape, presence, growth or reproduction of "mold";

**(2)** Involving any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, abate, mitigate, remediate, dispose of, contain, treat, detoxify or neutralize, or in any way respond to, or assess the concentration or effects of "mold"; or

**(b)** Testing for, monitoring, cleaning up, removing, abating, mitigating, remediating, disposing of, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the concentration or effects of "mold".

Items **(2)(a)** and **(2)(b)** above apply, without limitation, to any actual or alleged supervision, instructions, recommendations, warnings or advice given or which should have been given by any insured or others with respect to the actions described in **(2)(a)** and **(2)(b)** above.

This Exclusion applies to:

**(a)** "Bodily injury", "property damage" and "personal and advertising injury" regardless of whether such coverage is included within the "products-completed operations hazard";

**(b)** Any obligation to share "damages" with or repay

EN0021-0211

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 37 of 95
AIC V. CRUM & FORSTER

someone else who must pay "damages"; and

(c) "Mold" existing, emanating from or moving anywhere indoors or outdoors.

b. **Recall Of Products, Work or Impaired Property**

Based upon or arising out of the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition therein.

This Exclusion does not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions and indicated in the Declarations.

c. **Professional Services**

Based upon or arising out of any insured's rendering or failure to render "professional services".

d. **Electronic Data**

Based upon or arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

e. **Pollution-Related**

(1) For "bodily injury", "property damage" or "personal and advertising injury" based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured, However, this subparagraph does not apply to:

i "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

ii "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured,

EN0021-0211

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 38 of 95
AIC V. CRUM & FORSTER

other than that additional insured; or

iii "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

i Any insured; or

ii Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

i "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the

normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

ii "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

iii "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(e) At or from any premises, site or location on which any insured or any contractors or

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 39 of 95
AIC V. CRUM & FORSTER

subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Based upon or arising out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(3)** By or on behalf of a governmental authority for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Paragraphs **(2)** and **(3)** do not apply to liability for "damages" because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such "claim" or "suit" by or on behalf of a governmental authority.

**2.** The following additional exclusions apply to Insuring Agreement A - Bodily Injury And Property Damage in addition to those contained within the Common Provisions:

Insuring Agreement A does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit" for:

**a. Asbestos**

"bodily injury" or "property damage" based upon or arising out of:

**(1)** Asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc, or exposure to asbestos, asbestos fibers or asbestiform talc in any form, or any asbestos related injury, including but not limited to, asbestosis mesothelioma and bronchogenic carcinoma; or

**(2)** The use, exposure, presence, existence, detection, removal, elimination or avoidance, in any building or structure, the atmosphere or any other part of the environment, building or structure of asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc.

**b. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or any one acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

EN0021-0211

Page 6 of 10

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 40 of 95
AIC V. CRUM & FORSTER

c.  **Damage To Property**

"Property damage" arising out of:

(1) Property you own, rent, or occupy, including, without limitation, any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, or the prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of such premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven (7) or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **IV** - Limits Of Insurance And Deductible within the

Common Provisions and stated in the Declarations.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

d.  **Damage To Your Product**

"Property damage" to "your product", or any part of it.

e.  **Damage To Your Work**

"Property damage" to "your work" or any part of it and included in the "products-completed operations hazard".

f.  **Lead Contamination**

(1) "Bodily injury" arising out of the ingestion, inhalation or absorption of lead;

(2) "Property damage" arising out of lead;

(3) Any loss, cost or expense arising out of any request, demand or order that any insured or any person test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

(4) Any loss, cost or expense arising out of any "claim" or "suit" for "damages" because of testing for, monitoring, cleaning up,

EN0021-0211

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 41 of 95
AIC V. CRUM & FORSTER

removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

g. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

h. **Personal And Advertising Injury**

"Personal and advertising injury".

i. **War**

"Bodily injury" or "property damage", however caused, arising out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. **Wrap-up**

"Bodily injury" or "property damage" arising out of any project in which the insured participated for which a "Wrap-up or Owner Controlled Insurance Plan" was provided.

3. The following additional exclusions apply to Insuring Agreement **B** - Personal And Advertising Injury in addition to those contained within the Common Provisions:

Insuring Agreement **B** does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit":

a. **Breach Of Contract**

Based upon or arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

b. **Electronic Chatrooms Or Bulletin Boards**

Based upon or arising out of electronic chatroom or bulletin board that the insured hosts, owns, or over which the insured exercises control.

c. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

Based upon or arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights, including, without limitation, false patent marking and provisional or royalty rights from or during any period from the date of filing of the application for patent to the date of issuance as a patent.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

d. **Insureds In Media And Internet Type Businesses**

Committed by an insured whose

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 42 of 95
AIC V. CRUM & FORSTER

business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content or websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to paragraphs **a.**, **b.** and **c.** of the definition of "personal and advertising injury".

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**e. Knowing Violation Of Rights Of Another**

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**f. Material Published Prior To Policy Period**

Based upon or arising out of oral or written publication of material whose first publication took place before the "policy period".

**g. Material Published With Knowledge Of Falsity**

Based upon or arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**h. Quality Or Performance Of Goods - Failure To Conform To Statements**

Based upon or arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**i. Unauthorized Use Of Another's Name Or Product**

Based upon or arising out of the unauthorized use of another's name, product or designation of origin in your e-mail address, domain name or metatag, or any other similar acts to mislead another's potential customers.

**j. Wrong Description Of Prices**

Based upon or arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

4. The following exclusions apply to Insuring Agreement **C** - Medical Payments in addition to those contained within the Common Provisions:

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**c. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

EN0021-0211

© 2011 United States Fire Insurance Company, all rights reserved

Page 9 of 10

Exhibit 1 Page 43 of 95
AIC V. CRUM & FORSTER

**d. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**e. Insuring Agreement A Exclusions**

Excluded under Insuring Agreement A.

**f. Lead Contamination**

To any person injured in any way by lead in any form.

**g. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**h. War**

However caused, arising out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## SECTION III -ADDITIONAL CONDITIONS

**1. Non-Stacking Of Limits Of Insurance**

If the Limits of Insurance of more than one Commercial General Liability Occurrence Coverage Part issued by us or any of our affiliated companies applies to the same or related

"occurrence" or offense, then the maximum Limit of Insurance under all such Commercial General Liability Occurrence Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Commercial General Liability Occurrence Part and the corresponding deductible for that Coverage Parts.

**2. Continuous or Progressive Damage or Injury**

"Bodily injury" or "property damage" occurring or existing partly before and partly during the "policy period", or "personal and advertising injury" arising out of an offense, or arising out of the first of related offenses, committed partly before and partly during the "policy period", will be deemed to have occurred, existed or been committed before the "policy period".

If the date cannot be determined upon which such "bodily injury" or "property damage" first occurred or existed, or the date cannot be determined upon which such offense, or the first of related offenses was first committed, then, for the purposes of policies issued by us, such "bodily injury" or "property damage" will be deemed to have occurred or existed, and such offense or the first of related offenses will be deemed to have been committed before the "policy period".

EN0021-0211

Page 10 of 10

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 44 of 95
AIC V. CRUM & FORSTER

Exhibit 1 Page 45 of 95
AIC V. CRUM & FORSTER



# CONTRACTORS POLLUTION LIABILITY CLAIMS MADE COVERAGE PART

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

### SECTION I – INSURING AGREEMENT

**1. Contractors Pollution Liability**

  a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay:

    (1) As "damages" because of a bodily injury" or "property damage"; and

    (2) For "cleanup costs"; resulting from a "pollution condition" that was caused by an "occurrence" and to which this insurance applies. We may, at our discretion, investigate any "occurrence" or "pollution condition" and settle any "claim" or "suit" that may result. But the amount we will pay is limited as

described in Section IV – Limits of Insurance And Deductible within the Common Provisions.

  b. This insurance applies to "bodily injury", "property damage" and "cleanup costs" only if all of the following conditions are met:

    (1) Before the "policy period", no insured had knowledge of any "occurrence" or "pollution condition" that could reasonably give rise to a "claim" under this Policy;

    (2) Neither the "claim" against you for that "bodily injury", "property damage" or "pollution condition", nor the "occurrence" resulting in that "bodily injury", "property damage" or that "pollution condition" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

    (3) No fact, incident or circumstance involving an "occurrence" or "pollution condition" that reasonably would have resulted in a "claim" against you for that "bodily injury" or "property damage" or those "cleanup costs" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

EN0024-0611

Page 1 of 3

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 46 of 95
AIC V. CRUM & FORSTER

(4) The "bodily injury", "property damage" or "cleanup costs" resulted from a "pollution condition" caused by an "occurrence" that took place within the "coverage territory";

(5) The "occurrence" arises out of "your work" performed, or "your product" delivered, on or after the Retroactive Date and before the end of the "policy period";

(6) The "bodily injury", "property damage", or "pollution condition" resulting in "cleanup costs" occurs on or after the Retroactive Date and before the end of the "policy period"; and

(7) A "claim" for "damages" for that "bodily injury" or "property damage", or for "cleanup costs" for that "pollution condition" is first made against any insured and reported to us in accordance with the provisions set forth in Section VI -Common Conditions, **5.** Duties In the Event Of A Claim Or Suit within the Common Provisions, during the "policy period" or Extended Reporting Period, if applicable, that we provide under Section VIII – Extended Reporting Periods.

A "claim" by a person or organization seeking "damages" will be deemed to have been made at the earlier of the following times:

(1) When written notice of such "claim" is received and recorded by us; or

(2) When we make settlement in accordance with paragraph 1. a. above.

All "claims" for "damages" for "bodily injury" to the same person, including "damages" claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury", will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

All "claims" for "damages" for "property damage" causing loss to the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

All claims for "cleanup costs" incurred by the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

All "claims" which arise out of the same or a related "pollution condition" will be deemed to have been made at the time at which the earliest "claim" arising out of such "pollution condition" was made, and all such "claims" shall be subject to the same Limit of Liability.

## SECTION II – ADDITIONAL EXCLUSIONS

The following additional exclusions apply to the Contractors Pollution Liability Coverage Part in addition to those contained within the Common Provisions:

This Policy does not apply to "damages", "defense expenses", "cleanup costs" or any other loss, cost or expense, or any "claim" or "suit":

© 2011 United States Fire Insurance Company, all rights reserved

Exhibit 1 Page 47 of 95
AIC V. CRUM & FORSTER

1. **Damage To Impaired Property Or Property Not Physically Injured**

   Based upon or arising out of "property damage" to, or "cleanup costs" for, "impaired property" or property that has not been physically injured, arising out of:

   a. A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

   b. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

   This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

2. **Damage To Property**

   Based upon or arising out of "property damage" to, or "cleanup costs" for, any real or personal property or facility that, in whole or in part, was rented, occupied or in the care, custody and control of any insured at any time. However, this exclusion does not apply to "property damage" associated with real property in which covered contracted operations are or were being performed by any insured.

3. **Damage To Your Product**

   Based upon or arising out of "property damage" to "your product" arising out of it or any part of it.

4. **Damage To Your Work**

   Based upon or arising out of "property damage" to "your work" arising out of it or any part of it and included in the

"products-completed operations hazard".

However, this exclusion does not apply:

a. If the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor; or

b. To the completed operations of "your work" whether performed by you or on your behalf.

5. **Professional Services**

   Based upon or arising out of any insured's rendering or failure to render any "professional services".

   However, this exclusion does not apply when specified "professional services" are endorsed onto this Coverage Part or where such services are incidental to the designated operations stated on a Designated Operations Coverage Endorsement applicable to this Coverage Part.

**SECTION III – ADDITIONAL CONDITIONS**

1. **Non-Stacking Of Limits Of Insurance**

   If the Limits of Insurance of more than one Contractors Pollution Liability Claims Made Coverage Part issued by us or any of our affiliated companies applies to the same or related "occurrence" or "pollution condition", then the maximum Limit of Insurance under all such Contractors Pollution Liability Claims Made Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Contractors Pollution Liability Claims Made Coverage Part and the corresponding deductible for that Coverage Part.

EN0024-0611

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 49 of 95
AIC V. CRUM & FORSTER


part of the FAIRFAX group

THIS COVERAGE PART PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS. PLEASE READ THE ENTIRE FORM CAREFULLY.

# ERRORS AND OMISSIONS LIABILITY COVERAGE PART

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

## SECTION I - INSURING AGREEMENT

### 1. Errors And Omissions Liability

   a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay as "damages" or "cleanup costs" because of a "wrongful act" to which this insurance applies. We may, at our discretion, investigate any incident and settle any "claim" or "suit" that may result. But the amount we will pay is limited as described in Section **IV** - Limits Of Insurance And Deductible within the Common Provisions.

   b. This insurance applies to "claims" for "damages" or "cleanup costs" resulting from a "wrongful act" only if all of the following conditions are met:

   (1) Before the "policy period", no insured had knowledge of any "wrongful act" that could reasonably give rise to a "claim" under this Policy.

   (2) The "claim" against you resulting from that "wrongful act" was not reported under any policy in effect before the "policy period" nor was disclosed in the application for this Policy;

   (3) No fact, incident, circumstance, transaction, advice or decision involved in the rendering or failure to render "professional services" related to a "wrongful act" was reported as a "claim" or potential "claim" against you under any policy in effect before the "policy period" or was disclosed in the application for this Policy;

   (4) The "wrongful act" forming the basis of the "claim" was committed on or after the Retroactive Date shown in the Declarations, and before the end of the "policy period";

   (5) That the rendering or failure to render "professional services" is caused by a "wrongful act" that took place within the "coverage territory"; and

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 50 of 95
AIC V. CRUM & FORSTER

Attachment 1, p. 57

(6) The "claim" for "damages" or "cleanup costs" is first made against any insured and reported to us in accordance with the provisions set forth in Section VI – Common Conditions, **5. Duties In the Event Of A Claim Or Suit** within the Common Provisions, during the "policy period" or Extended Reporting Period, if applicable, that we provide under Section VIII – Extended Reporting Periods.

A "claim" by a person or organization seeking "damages" will be deemed to have been made at the earlier of the following times:

(a) When written notice of such "claim" is received and recorded by us; or

(b) When we have made a settlement in accordance with paragraph **1.a.**, above.

All "claims" arising out of "wrongful acts" to the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

All "claims" which arise out of the same or a related "wrongful act" will be deemed to have been made at the time at which the earliest "claim" arising out of such "wrongful act" was made, and all such "claims" shall be subject to the same Limit of Liability.

## SECTION II - ADDITIONAL EXCLUSIONS

The following additional exclusions apply to the Errors And Omissions Liability Coverage Part in addition to those contained within the Common Provisions:

This Policy does not apply to "damages", "defense expenses", "cleanup costs" or any other loss, cost or expense, or any "claim" or "suit":

1. **Electronic Data**

   Based upon or arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

2. **Express or Implied Warranties**

   Based upon or arising out of any express or implied warranties or guarantees.

3. **Faulty Workmanship**

   Based upon or arising out of the cost to repair or replace any faulty workmanship, construction or work not in accordance with your "professional services".

4. **Insurance/Bonds**

   Based upon or arising out of the advising, requiring, or failure to advise or require, or the failure to obtain or maintain, any form of insurance, surety bond or financial guarantee.

5. **Products**

   Based upon or arising out of "your product".

6. **Recall Of Products, Work or Impaired Property**

   Based upon or arising out of the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

   a. "Your product";

   b. "Your work"; or

   c. "Impaired property";

EN0025-0611

© 2011 United States Fire Insurance Company, all rights reserved.

Page 2 of 3

Exhibit 1 Page 51 of 95
AIC V. CRUM & FORSTER

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition therein.

This Exclusion does not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **IV** - Limits Of Insurance And Deductible within the Common Provisions and indicated in the Declarations.

## SECTION III - ADDITIONAL CONDITIONS

1. **Non-Stacking Of Limits Of Insurance**

   If the Limits of Insurance of more than one Errors and Omissions Liability Coverage Part issued by us or any of our affiliated companies applies to the same or related "wrongful act", then the maximum Limit of Insurance under all such Errors and Omissions Liability Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Errors and Omissions Liability Coverage Part and the corresponding deductible for that Coverage Part.

EN0025-0611

© 2011 United States Fire Insurance Company, all rights reserved.

Exhibit 1 Page 52 of 95
AIC V. CRUM & FORSTER



# CLAIMS REPORTING

Notice of a Claim or circumstances to the Insurer shall be given in writing to:

    Crum & Forster
    Claims Department
    305 Madison Avenue
    Morristown, New Jersey 07960
    305_Liability@cfins.com

Notice given in writing to the Insurer's agent will be considered notice to the Insurer.

Exhibit 1 Page 53 of 95
AIC V. CRUM & FORSTER

## SURPLUS LINES FILING AND POLICY ISSUANCE CRITERIA

### SERVICE OF PROCESS CLAUSE

The Commissioner, Director, or Superintendent of Insurance of the State (or other office specified for the following purpose) in the State of Alaska is hereby designated as the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit, or proceeding arising out of this policy. The Company further designates:

| | |
|---|---|
| Name: | Mary Jane Robertson |
| Name of Company or Firm: | Crum & Forster Specialty Insurance Co. |
| Mailing Address: | 305 Madison Avenue<br>Morristown, NJ 07960 |

As its agent in New Jersey to whom such process shall be forwarded by the Commissioner, Director, or Superintendent of Insurance.

ALL STAMPS PLACED ON POLICY OR OTHER DOCUMENTS MUST BE IN RED INK

EN0005-0211

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

A. The following exclusion is added:

**TERRORISM AND PUNITIVE DAMAGES**

This insurance does not apply to any "claim" arising out of or resulting, directly or indirectly, from:

1. "Certified acts of terrorism" or "other acts of terrorism" including any action taken in hindering or defending against an actual or expected incident of a "certified act of terrorism" or "other acts of terrorism"; or

2. Any act of terrorism:

    a. that involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

    b. that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

    c. in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials;

    regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage to of **1.** or **2.** above, including

3. Damages arising out of or resulting, directly or indirectly, from **1.** or **2.** above that are awarded as punitive damages.

B. In the event of an act of terrorism, a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Policy.

C. The DEFINITIONS section is amended and the following added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

    a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

    b. The act is a violent act or an act that is dangerous to human life, property, or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Other act of terrorism" means a violent act or an act that is dangerous to human life, property, or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of the any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance

Exhibit 1 Page 55 of 95
AIC V. CRUM & FORSTER

Act of 2002. Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Exhibit 1 Page 56 of 95
AIC V. CRUM & FORSTER



**Crum Forster**
part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MINIMUM PREMIUM AND
# MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

A. Under the Common Provisions, **SECTION VI – COMMON CONDITIONS**, item **2.Cancellation And Nonrenewal** is amended by the addition of the following:

This Policy is subject to both a "minimum premium" and a "minimum retained premium".

In the event the audit premium is found by us to be greater than the premium stated in the Declarations, the additional premium is due and payable upon notice by us to the First Named Insured. If the audit premium is found to be less than the premium stated in the Declarations, we will retain the "minimum premium".

In the event of cancellation by the First Named Insured, a "minimum retained premium" will apply.

Cancellation for non-payment of premium after the effective date of this Policy shall be deemed a request by the First Named Insured for cancellation of this Policy, thereby activating the "minimum retained premium" provision.

B. Under the Common Provisions, **SECTION VII – COMMON DEFINITIONS** is amended by the addition of the following:

1. "Minimum premium" means 100% of the premium stated in the Declarations plus any additional premium generated by:

   a. Subsequent endorsement; and

   b. Audit, if applicable.

2. "Minimum retained premium" means the amount of premium retained by us should you cancel this Policy prior to the end of the "policy period". "Minimum retained premium" is calculated as the great of:

   a. 25% of the premium stated in the Declarations:

   b. A short rate or pro-rata of the premium stated in the Declarations; or

   c. The audit premium.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



### Crum & Forster[1] Privacy Principles

Crum & Forster's Privacy Principles guide our conduct in the collection, use, release and security of personal and confidential information we obtain as part of our business of providing and servicing commercial insurance products, including underwriting, policy administration, insurance claims adjusting, appraisal and loss control services. These principles define Crum & Forster's commitment to the privacy and integrity of the information we accumulate, manage and store.

### Who collects and has access to non-public personal information?

Personal information may be collected by and/ or shared with employees of Crum & Forster or by any of Crum & Forster's authorized representatives, attorneys, or others who provide services to Crum & Forster in connection with providing and servicing its commercial insurance products, such as claims administrators, independent appraisers, managed care providers, systems vendors, or similar service providers. Crum & Forster requires service providers to honor the privacy principles in the handling of non-public personal information obtained through its business relationship with Crum & Forster. Additionally, Crum & Forster may disclose information to third parties as allowed by law. For example, in response to a subpoena or other order or inquiry of a court, regulator or governmental agency or to its insurers.

### Why does Crum & Forster need personal information and what do we do with it?

Crum & Forster limits the collection, disclosure, and use of customer information to only what is needed to properly underwrite and service its insurance products, and/ or to fulfill legal or regulatory requirements.

Crum & Forster collects personal information solely for conducting its business of underwriting and servicing and administering its insurance products including, but not limited to:

Underwriting and renewal of its commercial insurance products;
Claims Handling and adjusting, including investigation and payment of claims;
Claims administration and reporting;
Fraud detection and prevention;
Loss Control;
Complying with the law and reporting requirements;
Business activities that Crum & Forster may legally undertake.

Crum & Forster does not sell information to any third parties, and does not use it for marketing any of its insurance products.

---

1 The Crum & Forster family of companies includes:
United States Fire Insurance Company, The North River Insurance Company, Crum & Forster Indemnity Company, Crum & Forster Insurance Company, Crum & Forster Underwriters Co. of Ohio, Crum & Forster Specialty Insurance Company, and Seneca Insurance Company

EN0011-0211

Exhibit 1 Page 58 of 95
AIC V. CRUM & FORSTER

## What types of information are collected?

The type of information that Crum & Forster collects varies according to the insurance product involved, and may include information we receive from you on applications and other forms; information we receive from your employer; information we receive from other sources such as motor vehicle reports.

## Safeguarding Your Privacy

Access to non-public personal information is limited to those employees who specifically need such information to conduct their business responsibilities.

If you conclude your relationship with us, we will continue to safeguard your privacy in accordance with the standards described in this notice.

We maintain physical, electronic and procedural safeguards to protect non-public personal information.

Our employees have been provided with a copy of this policy and receive annual training on safeguarding non-public personal information. Employees who violate these standards are subject to disciplinary measures.

## About Our Website

Our website is used only to disseminate information. Crum & Forster does not place electronic "cookies" in the browser files of any guests. We do not collect any individual information as a result of the public visiting the site. In other words, we may count how many times our site has been visited, but do not gather any personal information about the visitors. If you send us an email, your communication will identify you to us. However, we will only use the information you provide to respond to your inquiry. The privacy of communication over the Internet cannot be guaranteed. Crum & Forster does not assume any responsibility any loss or damage you may experience or incur by the sending of personal information over the Internet by or to Crum & Forster.

## Questions?

If you have any questions concerning our Privacy Principles, please contact our Privacy Compliance Officer at:

Crum & Forster
Attn: Privacy Compliance Officer
305 Madison Avenue
Morristown, New Jersey 07960

EN0011-0211



# EMERGENCY RESPONSE HOTLINE

## 1-800-690-5520
## "Program Name is Crum & Forster Spill"

Crum and Forster has established an emergency response hotline for immediate reporting of pollution events or other events requiring emergency response.

Immediate reporting of such events ensures timely notice to us of pollution claims as well as other claims that may require immediate response.

The number is: 1-800-690-5520
Say- "Program Name is Crum & Forster Spill"

Please use the hotline to notify us immediately of any situation you encounter that may lead to a pollution claim.

Using the hotline may help you to fulfill some of your responsibilities to us. Reimbursement of "emergency response costs" is conditioned on timely reporting by use of the emergency response hotline.

# Crum Forster

Crum & Forster Specialty Insurance Company

## Welcome to *Crum & Forster*!

As a policyholder of the *Crum & Forster* companies, we are pleased to enclose the following:

> ➢ A copy of your insurance policy. Please read your policy thoroughly and call your broker if you should have any questions.
> ➢ A **Loss Reporting Procedures Letter**
> ➢ A **Spill Response Kit** – (Available by Request)

The **Loss Reporting Procedures is attached and** will assist you with reporting a claim. Please review the contents at this time so that you are familiar with the information that will be requested. When completed, immediately report the claim to us by:

- ❖ EMAIL to: **liabilitynol@cfins.com**
- ❖ FAX to: **Liability Claims, 877-622-6204** and your broker
- ❖ PHONE: **800-690-5520**

The **Spill Response Kit (AVAILABLE BY REQUEST)** is designed for job sites and/or glove boxes of vehicles. The kit is ideal for policyholders having Transportation Pollution Liability, and/or job-site coverage such as Contractors Pollution Liability or Professional Liability. Included in this kit are:

- ✓ **Incident Report Cards**, which provide a simple format to record the facts and circumstances of the event.
- ✓ **Witness Cards**, which can be distributed to any individual who may have witnessed the event.
- ✓ **Accident Notification Cards**, which can be used when you might be working alone when an event occurs and you cannot leave the site. This card provides key information for you to solicit assistance from a passer-by.

---

**REPORT ALL SPILLS AND/OR RELEASES TO THE ENVIRONMENT TO:**

1-800-690-5520

SAY *"PROGRAM NAME IS CRUM&FORSTER SPILL"*

---

Stickers are provided in both kits with the 800 number. Please post these stickers in high-visibility locations around your business operation. This number is available to you <u>24-hours, 7-days a week, 365 days a year</u> to respond to a spill or accident. Please call as soon as you are aware of a release.

*Please note that the Loss Reporting Procedures and the Spill Response Kit are tools to aid you in gathering the necessary claim information. By providing these tools, we do not guarantee coverage under the policy or relieve you of any of your duties or obligations under the policy. Please read and understand your policy to better understand the coverage available and your duties and obligations.*

EN0051-1011


part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SELF INSURED RETENTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVER PART
ONSITE CLEANUP COVERAGE PART

## SCHEDULE

| COVERAGE | AMOUNT & BASIS OF RETAINED LIMIT | |
|---|---|---|
| **I. COMMERCIAL GENERAL LIABILITY:** | Each Claim | Each Occurrence |
| A. Bodily Injury | N/A | N/A |
| B. Property Damage | N/A | N/A |
| C. Bodily Injury & Property Damage Combined | N/A | $100,000 |
| D. Bodily Injury & Property Damage Combined: | | |
| Separate commercial General Liability and Products/Completed Operations Liability Deductibles | | |
| 1. General Liability | N/A | N/A |
| 2. Products/Completed Operations Liability | N/A | N/A |
| **II. MONOLINE PRODUCTS/COMPLETED OPERATIONS LIABILITY:** | Each Claim | Each Occurrence |
| | N/A | N/A |
| **III. CONTRACTORS POLLUTION LIABILITY:** | Each Pollution Condition | |
| | $100,000 | |
| **IV ERRORS AND OMISSIONS LIABILITY:** | Each Claim | |
| | $100,000 | |
| **V. THIRD PARTY POLLUTION LIABILITY:** | Each Pollution Condition | |
| | N/A | |
| **VI. ONSITE CLEANUP** | Each Pollution Condition | |
| | N/A | |

I.  If a corresponding dollar amount is indicated in the **SCHEDULE** shown above, then coverage applicable to those coverage parts will apply in excess of the insured's Self Insured Retention. Our total liability for all "claims" will not exceed the limits of liability as stated in this Policy's Declarations. The Self Insured Retention shall hereafter be referred to as the Retained Limit.

The Retained Limit, or any part of it, shall not be insured without our acceptance of your prior written notice to us of your intention to insure the Retained Limit.

A. **Defense Expenses Erode Your Retained Limit**

The Retained Limit applies to payments for "damages", "cleanup costs" and, where applicable, "defense expenses" (excluding salaries of "employees" and office expenses of the insured) incurred by the insured in the investigation, negotiation, settlement and defense of any "claim" or "suit" to which this Policy applies.

In the event that the Aggregate Retained Limit is exhausted by payments for "damages", "cleanup costs" or "defense expenses" to which this insurance applies, the provisions of this endorsement are void and all terms and conditions of the Policy are reinstated to their full force and effect. We will then be obligated to assume charge of the settlement or defense of any "claim" or "suit" against the insured not yet settled, whether or not reported to us.

EN0105-0211

B. Indemnification: Any reference to our agreement to pay those sums that the insured becomes legally obligated to pay as "damages" is deleted. Instead, we agree to indemnify an insured for all sums which an insured becomes legally obligated to pay or has paid as "damages" or "cleanup costs" for which coverage is provided by this Policy.

II. A. We do not have the duty to investigate or defend any "occurrence", offense, "wrongful act", "pollution condition", "claim" or "suit" unless and until the Retained Limit is exhausted with respect to that "occurrence", offense, "wrongful act", "pollution condition", "claim" or "suit". However, we may, at our discretion and expense, participate with you in the investigation of any such "occurrence", offense, "wrongful act", "pollution condition" and the defense of any such "claim" of "suit that may result.

B Should any "occurrence", offense, "wrongful act", "pollution condition" appear likely to exceed the Retained Limit, no expenses may be incurred on our behalf by an insured or third party claims administrator without our prior written consent.

C. Should any "claim or "suit" arising from an "occurrence", offense, "wrongful act" or "pollution condition" during the "policy period" be settled for a total amount not exceeding the Retained Limit, we will not be obligated to pay any expenses to you or to anyone else on your behalf.

D. Payments by others, including but not limited to additional insureds and insurers, cannot be used to settle a "claim" or satisfy a verdict payment owed by you within the Retained Limit.

E. Should the settlement amount including payments for "damages", "cleanup costs" and/or "defense expenses" for any "claim" or "suit" exceed the Retained Limit, we will pay "damages", "cleanup costs" and/or "defense expenses", where applicable, (excluding salaries of "employees" and office expenses of the insured) in excess of the Retained Limit.

III. Under the Common Provisions, **SECTION VI – COMMON CONDITIONS items 5. and 6.** are deleted and replaced with the following single item:

**5. Duties In The Event Of Claim, Potential Claim, Or Suit**

a. We and the insured have mutually agreed upon the use of:

> Company:
> Contact Name:
> Address:
> Phone Number:

for the purpose of providing claims administration within the Retained Limit.

b. You must see to it that the above named third party claims administrator is notified promptly of an "occurrence", offense, "wrongful act" or "pollution condition" which may result in a "claim". Notice should include:

(1) How, when and where the "occurrence", offense, "wrongful act" or "pollution condition" took place;

(2) The name and addresses of any involved persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence", offense, "wrongful act" or "pollution condition".

c. If a "claim" is made or a "suit" is brought against any insured, you must see to it that the above named third party claims administrator receives prompt written notice of the "claim" or "suit".

d. You and any other involved insured must:

(1) Immediately send to the above named third party claims administrator copies of any "claim" or demand;

Exhibit 1 Page 63 of 95
AIC V. CRUM & FORSTER

(2) Authorize the above named third party claims administrator to obtain records and other information; and

(3) Cooperate with the above named third party claims administrator in the investigation, settlement or defense of the "claim" or "suit".

IV. Notice Provisions

A. You shall immediately notify us in writing of any "claim", "occurrence", offense, "wrongful act" or "pollution condition", without regard to liability, involving any one of the following:

(1) Death;

(2) Brain damage;

(3) Serious disfiguring burns, or burns covering more than twenty-five percent (25%) of the body;

(4) Spinal injury, Paraplegia or Quadriplegia;

(5) Amputation or serious functional impairment of any major limb;

(6) Severe internal body organ damage or loss;

(7) Multiple fractures;

(8) Loss of sight;

(9) Sexual abuse or molestation;

(10) Any other "occurrence", offense, "wrongful act" or "pollution condition" involving "bodily injury", "property damage" or "personal and advertising injury" for which the insured and/or the third party claims administrator has created a loss reserve equal to or greater than fifty percent (50%) of the Each Occurrence / Claim Retained Limit; or

(11) You receive a notice of a "suit" in which the damage demand exceeds the Retained Limit and/or a "suit" or "claim" for punitive damages.

B. Loss Settlement made by the insured/third party claims administrator must be within the terms, conditions and limits of this coverage and within the Each Occurrence / Claim Retained Limit.

C. In the event of a midterm cancellation of this Policy, the Retained Limit amounts shown in the **SCHEDULE** above are not subject to any pro rata reduction. In the event of a cancellation of the contract between you and the third party claims administrator, you will notify us within ten (10) days from the date of such cancellation. If you fail to contract with a third party claims administrator that is suitable to us, then we have the right to contract directly with a third party claims administrator that is suitable to us to administer the "claims" within the Retained Limit.

D. We shall have the right but not the duty, at our own expense, to assume charge of the defense and/or settlement of any "claim" or "suit" brought against an insured and, upon our written request, you shall tender such portion of the Retained Limit as we consider necessary to complete the settlement of a "claim" or "suit'.

E. Your bankruptcy, insolvency, inability to pay, failure to pay, or refusal to pay the Retained Limit will not increase our obligations under the Policy. In the event there is insurance, whether or not applicable to an "occurrence", offense, "claim" or "suit" within the Retained limit, you will continue to be responsible for the full amount of the Retained Limit before the limits of insurance under this Policy apply. Bankruptcy or insolvency of the insured will not alter the terms and conditions of this endorsement.

V. Reporting Requirements

A. On a quarterly basis, you must provide us with a written summary (loss run) of all "occurrences", offenses, "wrongful acts" or "pollution conditions", "claims", or "suits" which have or may result in payments with in the Retained Limit.

EN0105-0211

B. Within forty-five (45) days after the end of the "policy period", you must give us a listing of all existing "claims" and "suits". At a minimum the list must include for each "claim" or "suit":

   (1) A description of the "claim", "occurrence", offense, "wrongful act" or "pollution condition";

   (2) The date of the incident or "occurrence", offense, "wrongful act" or "pollution condition";

   (3) The amounts paid and reserved for future payments and loss and "defense expenses"; and

   (4) The current status of the "claim" or "suit".

C. Semi-annually after the expiration of the Policy, you are required to give us an updated listing of the status of all "claims" and "suits", both paid and reserved, until all "claims" and "suits" for the "policy period" are closed or settled.

D. Compliance with the reporting requirements in this endorsement is a condition precedent to coverage under this Policy.

_____

Authorized Signature of Insured

Exhibit 1 Page 65 of 95
AIC V. CRUM & FORSTER



part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PUNITIVE DAMAGES WHERE ALLOWABLE BY LAW

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS
THIRD PARTY POLLUTION LIABILITY COVERAGE PART

**Section V. Common Exclusions**, item 14. Punitive or Multiplied Damages within the Common Provisions, is deleted in its entirety and replaced with the following:

14. Punitive Damages or Multiplied Damages

For punitive, exemplary or the multiplied portion of multiplied damages. However, this exclusion will not apply to punitive damages where allowable by law.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0107-0211                                                           Page 1 of 1

Exhibit 1 Page 66 of 95
AIC V. CRUM & FORSTER


THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

## SCHEDULE

| Name of Person(s) or Organization(s) |
|---|
| Where Required by Written Contract |
| |
| |
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**SECTION VI -- COMMON CONDITIONS, item 17. Transfer Of Rights of Recovery Against Others To Us** within the Common Provisions is amended by the addition of the following:

Solely as respects the person(s) or organization(s) indicated in the Schedule shown above, we waive any right of recovery we may have against the person(s) or organization(s) indicated in the Schedule shown above because of payments we make for "damages" arising out of your ongoing operations or "your work" performed under a written contract with that person(s) or organization(s) and included in the "products-completed operations hazard".

However, this waiver shall not apply to "damages" resulting from the sole negligence of the person(s) or organization(s) indicated in the Schedule shown above.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0109-0211　　　　　　　　　　　　　　　　　　　　Page 1 of 1

Exhibit 1 Page 67 of 95
AIC V. CRUM & FORSTER



**Crum Forster**
part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) or Organization(s) |
|---|
| Where Required By Written Contract |
| |

**SECTION III – WHO IS AN INSURED** within the Common Provisions is amended to include as an additional insured the person(s) or organization(s) indicated in the Schedule shown above, but only with respect to liability caused, in whole or in part, by "your work" for that insured which is performed by you or by those acting on your behalf.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0111-0211

Page 1 of 1

Exhibit 1 Page 68 of 95
AIC V. CRUM & FORSTER



part of the FAIRFAX group

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIMARY AND NON-CONTRIBUTORY ADDITIONAL INSURED WITH WAIVER OF SUBROGATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART

## SCHEDULE

| Name of Additional Insured Person(s) or Organization(s) |
|---|
| Where Required by Written Contract |
| |
| |
| |

A. **SECTION III – WHO IS AN INSURED** within the Common Provisions is amended to include as an additional insured the person(s) or organization(s) indicated in the Schedule shown above, but solely with respect to "claims" caused in whole or in part, by "your work" for that person or organization performed by you, or by those acting on your behalf.

This insurance shall be primary and non-contributory, but only in the event of a named insured's sole negligence.

B. We waive any right of recovery we may have against the person(s) or organization(s) indicated in the Schedule shown above because of payments we make for "damages" arising out of "your work" performed under a designated project or contract with that person(s) or organization(s).

C. This Endorsement does not reinstate or increase the Limits of Insurance applicable to any "claim" to which the coverage afforded by this Endorsement applies.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0118-0211                                                                                          Page 1 of 1

Exhibit 1 Page 69 of 95
AIC V. CRUM & FORSTER



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CANCELLATION BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

Under the Common Provisions, **SECTION VI – COMMON CONDITIONS**, the first paragraph of item **2. Cancellation And Nonrenewal** is deleted in its entirety and replaced by the following:

This Policy may be cancelled by the First Named Insured by surrender thereof to us or by mailing to us written notice stating when thereafter the cancellation shall be effective. We may cancel or nonrenew this Policy by mailing a written notice to the First Named Insured at the address shown in the Declarations of this Policy. The mailing of notice of cancellation shall be sufficient notice and the effective date of cancellation stated in such notice shall become the end of the "policy period".

The effective dates of such cancellation shall not be less than 90 days (ten (10) days for non-payment of premium) following mailing of the notice of cancellation to the First Named Insured. The time of surrender or the effective date of cancellation stated in the notice shall become the end of the "policy period".

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0134-0211

Page 1 of 1

Exhibit 1 Page 70 of 95
AIC V. CRUM & FORSTER



**Crum Forster**
part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NOTICE OF CANCELLATION –
# CERTIFICATE HOLDER(S)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

## SCHEDULE

| Certificate Holder(s) |
| --- |
| All Certificate Holders Required by Written Contract |

Under the Common Provisions, **SECTION VI – COMMON CONDITIONS, item 2. Cancellation And Nonrenewal** is amended by the addition of the following:

If we cancel this Policy before the expiration date thereof, we will mail a 30 days written notice (ten (10) days for non-payment of premium) to the Certificate Holder(s) indicated in the Schedule shown above.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0136-0211

Page 1 of 1

Exhibit 1 Page 71 of 95
AIC V. CRUM & FORSTER



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# GENERAL CHANGE ENDORSEMENT

Policy Change Number

| POLICY NUMBER EPK-101290 | POLICY CHANGES EFFECTIVE 05/01/13 | COMPANY **Crum and Forster Specialty Insurance Company** |
|---|---|---|
| NAMED INSURED Alaska Interstate Construction, LLC | | |
| COVERAGE PARTS AFFECTED COMMERCIAL GENERAL LIABILITY COVERAGE PART CONTRACTORS POLLUTION LIABILITY COVERAGE PART | | |

CHANGES

**NAMED INSURED SCHEDULE**

Alaska Interstate Construction, LLC

Alaska Aggregate Products, LLC

Kobuk River/AIC LLC

Deadhorse Maintenance and Operations, LLC

**FOR THEIR OWNERSHIP INTERESTS ONLY:**

Peak Alaska Ventures, Inc.

Nabors Alaska Services Corp.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

_____
Authorized Representative Signature

EN0137-0211

Page 1 of 1

Exhibit 1 Page 72 of 95
AIC V. CRUM & FORSTER



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AUDIT RATE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

This Policy is auditable at a rate of $1.67 per thousand dollars of gross receipts over $55,000,000.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0138-0211

Exhibit 1 Page 73 of 95
AIC V. CRUM & FORSTER


part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AGGREGATE LIMITS OF INSURANCE PER PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Under the Common Provisions, **Section IV – LIMITS OF INSURANCE AND DEDUCTIBLE**, item **3.** is amended by the addition of the following:

The General Aggregate Limit applies separately to each of your projects away from premises owned by or rented to you.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Exhibit 1 Page 74 of 95
AIC V. CRUM & FORSTER



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYEE BENEFITS LIABILITY COVERAGE
### THIS ENDORSEMENT PROVIDES CLAIMS-MADE AND REPORTED COVERAGE. PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limit of Insurance | | Deductible Each Occurrence |
|---|---|---|---|
| Employee Benefits Programs | $2,000,000 | Employee Benefits Liability Each occurrence Limit | $5,000 |
| | $2,000,000 | Employee Benefits Liability Aggregate Limit | |

Retroactive Date: 12/01/04

A. The following is added to **SECTION 1 – INSURING AGREEMENTS** within the Commercial General Liability Part:

**INSURING AGREEMENT – EMPLOYEE BENEFITS LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages". However, we will have no duty to defend the insured against any "suit" seeking "damages" to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

      (1) The amount we will pay for "damages" is limited as described in Section E. of this Endorsement; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements and supplementary payments.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SECTION II – SUPPLEMENTARY PAYMENTS** within Section C of this Endorsement. This insurance applies to "damages" only if:

      (3) The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

      (4) The act, error or omission, did not take place before the Retroactive Date shown in the Schedule nor after the end of the "policy period"; and

      (5) A "claim" for "damages", because of an act, error or omission, is first made against any insured, in accordance with Paragraph **C.** below, and reported to us during the "policy period" or an Extended Reporting Period we provide under Paragraph **G.** of this Endorsement.

   b. A "claim" seeking "damages" will be deemed to have been made at the earlier of the following times:

EN0302-0211

Exhibit 1 Page 75 of 95
AIC V. CRUM & FORSTER

**(1)** When notice of such "claim" is received and recorded by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **1.a.** above.

A "claim" received and recorded by us within thirty (30) days after the end of the "policy period" will be considered to have been received within the "policy period", if no subsequent policy is available to cover the "claim".

**c.** All "claims" for "damages" made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including "damages" claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

2. **Exclusions**

The coverage afforded by this Endorsement does not apply to any "claim":

**a. Dishonest, Fraudulent, Criminal Or Malicious Act**

Based upon or arising out of "damages" arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, Personal Injury or Advertising Injury**

Based upon or arising out of "bodily injury", "property damage" or "personal and advertising injury".

**c. Failure to Perform A Contract**

Based upon or arising out of "damages" arising out of failure of performance of contract by any insurer.

**d. Insufficiency Of Funds**

Based upon or arising out of "damages" arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advice Given with Respect To Participation**

Based upon or arising out of:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation And Similar Laws**

Based upon or arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

Based upon or arising out of "damages" for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Based upon or arising out of any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines Or Penalties**

EN0302-0211

Based upon or arising out of taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-Related Practices**

Based upon or arising out of "damages" arising out of wrongful termination of employment, discrimination, or other employment-related practices.

B. Solely, for the purposes of coverage afforded by this Endorsement, **SECTION II – SUPPLEMENTARY PAYMENTS** within the Common Provisions is deleted in its entirety and replaced by the following:

**SECTION II – SUPPLEMENTARY PAYMENTS**

We will pay, with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend":

1. All expenses we incur.

2. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

3. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

4. All costs taxed against the insured in the "suit".

5. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

6. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will reduce the limits of insurance.

C. Solely, for the purposes of coverage afforded by this Endorsement, item **2.** of **SECTION III – WHO IS AN INSURED** within the Common Provisions-is deleted in its entirety and replaced by the following:

2. Each of the following is also an insured:

   a. Each of your "employees" who is or was authorized to administer your "employee benefit program".

   b. Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

   c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

D. Solely, for the purposes of coverage afforded by this Endorsement, item **3.** of **SECTION III – WHO IS AN INSURED** within the Common Provisions does not apply.

E. Solely, for the purposes of coverage afforded by this Endorsement, **SECTION IV – LIMITS OF INSURANCE AND DEDUCTIBLE** within the Common Provisions is deleted in its entirety and is replaced by the following:

**1. Limits Of Insurance**

   a. The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

      (1) Insureds;

      (2) "Claims" made or "suits" brought";

(3) Persons or organizations making "claims" or brining "suits";

(4) Acts, errors or omissions; or

(5) Benefits included in your "employee benefit program".

**b.** The Employee Benefits Liability Aggregate Limit is the most we will pay for all "damages", including supplementary payments, because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program". This Aggregate Limit of Insurance is part of and not in addition to the Policy Aggregate limit of Insurance shown in the Declarations of the policy.

**c.** Subject to the Employee Benefits Liability Aggregate Limit, the Employee Benefits Liability Each Occurrence Limit is the most we will pay for any one "claim" for all "damages" sustained by any one or more "employees", including "damages" sustained by such "employee's" dependents and beneficiaries, as a result of:

**(1)** Any act, error or omission; or

**(2)** A series of related acts, errors or omissions

negligently committed in the "administration" of your "employee benefit program".

All "claims" for "damages" made by one or more "employees" because of any one act, error or omission, or a series of related acts, errors or omissions, including "damages" claimed by such "employee's" dependents and beneficiaries, will be deemed to be one "claim".

However, the amount paid under this Endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this Endorsement apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the "policy period" shown in the Declarations of the policy to which this Endorsement is attached, unless the "policy period" is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Payments under these Limits of Insurance are part of and erode the Policy Aggregate Limit of Insurance shown in the Declarations.

**2. Deductible**

Our obligation to pay "damages" on behalf of the insured applies only to the amount of "damages" in excess of the deductible amount stated in the Schedule shown above as applicable to Employee Benefits Liability Each Occurrence. The limits of insurance shall not be reduced by the amount of this deductible.

**a.** The deductible amount stated in the Schedule shown above applies to all "damages" sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

**b.** The terms of this insurance, including those with respect to:

**(1)** Our right and duty to defend any "suits" seeking those "damages"; and

**(2)** Your duties, and the duties of ay other involved insured, in the event of an act, error or omission, or "claim";

apply irrespective of the application of the deductible amount.

EN0302-0211

Page 4 of 7

Exhibit 1 Page 78 of 95
AIC V. CRUM & FORSTER

c. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

F. Solely, for the purposes of coverage afforded by this Endorsement, Conditions **5., 6. and 11.** of **SECTION VI – COMMON CONDITIONS** within the Common Provisions are deleted in their entirety and replaced by the following:

**Duties In The Event Of An Act, Error Or Omission, Or Claim Or Suit**

    **a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

        **(1)** What the act, error or omission was and when it occurred; and

        **(2)** The names and addresses of anyone who may suffer "damages" as a result of the act, error or omission.

    **b.** If a "claim" is made or "suit" is brought against any insured, you must:

        **(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

        **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

    **c.** You and any other involved insured must:

        **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

        **(2)** Authorize us to obtain records and other information;

        **(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

        **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

    **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without or consent.

**Other Insurance**

This insurance is excess over any other valid and collectible insurance that is available to the insured for a loss we cover under this Endorsement.

G. Solely, for the purposes of coverage afforded by this Endorsement, **Section VIII - EXTENDED REPORTING PERIODS** within the Common Provisions is deleted in its entirety and is replaced by the following:

**EXTENDED REPORTING PERIOD**

The following provision applies only to Employee Benefits Liability Coverage:

**1.** You will have the right to purchase an Extended Reporting Period, as described below, if this endorsement is canceled or not renewed by you or by us.

**2.** The Extended Reporting Period does not extend the "policy period" or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the "policy period" but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

EN0302-0211

3. An Extended Reporting Period of one (1) year is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within thirty (30) days after the end of the "policy period". The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

   a. The "employee benefit programs" insured;

   b. Previous types and amounts of insurance;

   c. Limits of insurance available under this Endorsement for future payment of "damages"; and

   d. Other related factors.

The Extended Reporting Period Endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extending Reporting Period provided hereunder, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

4. If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for "claims" first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be the dollar amount of the Limits of Insurance not exhausted by payments of judgments, settlements and supplementary payments under this coverage, and shown in the Schedule of this endorsement under Limits of Insurance, subject to the available Policy Aggregate Limit of Insurance not exhausted by the payment of judgments, settlements and supplementary payments under the policy.

Paragraph E. **1.b.** of this endorsement will be amended accordingly.

H. Solely, for the purposes of coverage afforded by this Endorsement, the following definitions are added to **SECTION VII – COMMON DEFINITIONS** within the Common Provisions:

"Administration" means:

   a. Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

   b. Handling records in connection with the "employee benefit program"; or

   c. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

"Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

"Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   d. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who satisfy the plan's eligibility requirements;

   e. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such

EN0302-0211

Exhibit 1 Page 80 of 95
AIC V. CRUM & FORSTER

benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

f. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

g. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

h. Any other similar benefits designated in the Schedule or added thereto by endorsement.

I. Solely, for the purposes of coverage afforded by this Endorsement, Definitions **6. 12. and 36.** in **SECTION VII – COMMON DEFINITIONS** within the Common Provisions are deleted in their entirety and replaced by the following:

**6.** "Claim" means any written demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for "damages" as the result of an act, error or omission.

**12.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**36.** "Suit" means a civil proceeding in which "damages" because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such "damages" are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BOATS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description of Watercraft:**
2003 Sea Arc River S0M2568L203
2009 Homemade 14x40 1440
2008 Stabi-Craft 589 Frontier XKLU6151E808
1982 Umpqua Marine 7062-70001227551

**Additional Premium:** Included

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**1.** Under the Common Provisions, **SECTION V – COMMON EXCLUSIONS, Item 1. Aircraft, Auto Or Watercraft** does not apply to any watercraft owned or used by or rented to the insured shown in the Schedule.

**2.** Under the Common Provisions, **SECTION III – WHO IS AN INSURED** is amended to include as an insured any person or organization legally responsible for the use of any such watercraft you own, provided the actual use is with your permission.

EN0312-0211

Page 1 of 1

Exhibit 1 Page 82 of 95
AIC V. CRUM & FORSTER


Crum Forster
part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name of Additional Person(s) or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| Where Required by Written Contract | Where Required by Written Contract |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section III – Who Is An Insured** within the Common Provisions is amended to include as an insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

EN0320-0211

Page 1 of 1

Exhibit 1 Page 83 of 95
AIC V. CRUM & FORSTER



**Crum Forster**

part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT TO DAMAGE TO YOUR WORK EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Under the Commercial General Liability Coverage Form, **Section II – ADDITIONAL EXCLUSIONS**, Paragraph **2**, Item **e. Damage to Your Work** is deleted in its entirety and is replaced with the following:

**e. Damage to Your Work**

"Property damage" to "your work" or any part of it and included in the "products-completed operations hazard".

However, this exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0346-0313                                                                 Page 1 of 1

Exhibit 1 Page 84 of 95
AIC V. CRUM & FORSTER



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRANSPORTATION POLLUTION LIABILITY BLANKET ENDORSEMENT

This endorsement modifies insurance provided under the following:

CONTRACTORS POLLUTION LIABILITY COVERAGE PART

**SCHEDULE**

| | |
|---|---|
| Transportation Pollution – Each Pollution Condition Limit: | $ |
| Transportation Pollution Aggregate Limit: | $ |
| Transportation Pollution Deductible Amount: | $ |

(If no entry appears above, the Limits of Insurance shown in the Declarations will apply.)

A. As respects the coverage afforded by this Endorsement, the maximum amounts for which we are liable for "claims" relating to transportation pollution is indicated in the Schedule shown above.

The Transportation Pollution – Each Pollution Condition Limit and the Transportation Pollution Aggregate Limit stated in the Schedule above are subject to and not in addition to the Contractors Pollution Liability Each Pollution condition Limit and the General Aggregate Limit stated in the Declarations.

Payments under the Transportation Pollution – Each Pollution Condition Limit and Transportation Pollution Aggregate Limit indicated in the Schedule shown above are part of and erode the Contractors Pollution Liability Each Pollution Condition Limit and the General Aggregate Limit stated in the Declarations.

If no limit is indicated in the Schedule shown above, then the limits of the liability stated in the Declarations applicable to this Coverage Part will apply.

B. Solely as respects the coverage afforded by this Endorsement, the Transportation Pollution Deductible Amount indicated in the Schedule shown above applies once to each "pollution condition" and can be applied either for "defense expenses", where applicable, settlement, payment of judgment(s) or any combination thereof.

C. Solely as respects the coverage afforded by this Endorsement, under the Common Provisions, **SECTION V – COMMON EXCLUSIONS, item 1. Aircraft, Auto Or Watercraft** is deleted in its entirety and replaced by the following:

**1. Aircraft, Auto Or Watercraft**

Based upon "bodily injury" or "property damage" arising out of the ownership, operation, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes "loading and unloading".

Notwithstanding the above, coverage is provided only for "autos" which have statutory auto liability coverage in place with a carrier rated "A- (VII) or higher by A.M. Best.

This exclusion applies even if the "claim" against any insured alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of another by that insured, or if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.
This exclusion does not apply to:

a. A watercraft while ashore on premises you own or rent;

EN0405-0611

Page 1 of 2

Exhibit 1 Page 85 of 95
AIC V. CRUM & FORSTER

b. A watercraft you do not own that is:
    (1) Less than twenty-six (26) feet long; and
    (2) Not being used to carry persons or property for a charge;
c. Parking an "auto" on, or on the roadway near premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;
d. Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or
e. "Bodily injury" or "property damage" arising out of:
    (1) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or
    (2) The operation of any of the machinery or equipment listed In Paragraph f.(2) or f.(3) of the definition of "mobile equipment"; or
f. "Claims" arising from "pollution conditions" caused by, arising out of or in any way related to the operation, maintenance, use or "loading or unloading" of "autos" by or on behalf of the Named Insured.


ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MOLD DEFINITION GIVEBACK

This endorsement modifies insurance provided under the following:

CONTRACTORS POLLUTION LIABILITY COVERAGE PART

### SCHEDULE

| | |
|---|---|
| Mold – Each Pollution Condition Limit: | $ |
| Mold – Aggregate Limit: | $ |
| Mold Deductible Amount: | $ |

(If no entry appears above, the Limits of Insurance shown in the Declarations will apply.)

A. As respects the coverage afforded by this Endorsement, the maximum amounts for which we are liable for "claims" relating to "mold" are the limits of insurance indicated in the Schedule shown above.

B. The Mold – Each Pollution Condition Limit and the Mold – Aggregate Limit indicated in the Schedule shown above are subject to and not in addition to the Contractors Pollution Liability Each Pollution Condition Limit and the General Aggregate Limit stated in the Declarations.

Payments under the Mold – Each Pollution Condition Limit and Mold – Aggregate Limit indicated in the Schedule shown above are part of and erode the Contractors Pollution Liability Each Pollution Condition Limit and the General Aggregate Limit stated in the Declarations.

C. The Mold Deductible Amount indicated in the Schedule shown above applies once to each "pollution condition" resulting in "mold" and can be applied either for "defense expenses", where applicable, settlement, payment of judgment(s), or any combination thereof.

D. Under the Common Provisions, SECTION VII -- COMMON DEFINITIONS, item 29. "Pollutants" is deleted in its entirety and replaced with the following:

29. "Pollutants" means, any solid, liquid, gaseous, thermal or biological irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and any matter that by its presence corrupts, defiles, contaminates or is harmful to the soil, air or water, living things or the environment. Waste includes materials to be recycled, reconditioned or reclaimed. It is understood that any substance or matter that is a "pollutant" does not lose its status as a "pollutant" because it has, or may have, a useful function or purpose. "Pollutants" also includes "mold".

As stated under the Common Provisions, SECTION VII – COMMON DEFINITIONS, item 22."Mold" is defined as follows:

"Mold" means any permanent or transient fungus, mold, mildew, or mycotoxin, or any of the spores, scents, or byproducts resulting therefrom regardless of whether they are proved to cause disease, injury or damage.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ALASKA POLICYHOLDER NOTICE
# 3 AAC 25.050

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

This policy is issued by a nonadmitted or surplus lines insurer. Insurance may only be purchased from nonadmitted insurers if the full amount, kind, or class of insurance cannot be obtained from insurers who are admitted to do business in the State of Alaska. Your broker or the surplus lines broker has determined that this was true on the date the policy was placed. Before issuing a renewal policy or extending this policy, remarketing is required. To avoid intentional or unintentional extension of coverage in the surplus lines market when an admitted market for that coverage exists, a nonadmitted insurer is prohibited from the automatic renewal or extension of a policy without remarketing by your broker or the surplus lines broker.

In order to comply with the Alaska Administrative Code, the following notice is given:

**You are hereby notified that, under 3 AAC 25.050, your policy will terminate effective no later than the date and time of its expiration. We reserve the right to cancel this policy sooner than the expiration date by giving you notice of cancellation as required in AS 21.36.220. You may request through your broker that a new policy from the surplus lines broker be concurrent with the effective date of the termination of this policy.**

**You are also notified that a new policy, if issued by us, is subject to rerating, which may result in a premium increase of more than ten percent (10%). As required by 3 AAC 25.050, you are hereby notified that any subsequent policy issued by us may be subject to a ten percent (10%) or more increase in premium. The actual premium will be based upon rates that apply at the time a subsequent policy, if any, is issued and will be made available to you before the effective date of the new policy, or the date subsequent coverage is bound, whichever occurs first.**

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

EN0701-0511

Page 1 of 1

Exhibit 1 Page 88 of 95
AIC V. CRUM & FORSTER

**Crum Forster**
part of the FAIRFAX group

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALASKA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART

**A.** Under the Common Provisions, **SECTION VI – COMMON CONDITIONS**, Item 2, Cancellation and Nonrenewal is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. We may cancel this policy by mailing to you and the agent or broker of record written notice of cancellation. Such notice, stating the reason for cancellation, must be sent by first class mail at least:

   **a.** 10 days before the effective date of cancellation if we cancel for:

   (1) Conviction of the insured of a crime having as one of its necessary elements an act increasing a hazard insured against; or

   (2) Fraud or material misrepresentation by the insured or a representative of the insured in obtaining the insurance or by the insured in pursuing a claim under this policy; or

   **b.** 20 days before the effective date of cancellation if we cancel for:

   (1) Nonpayment of premium; or

   (2) Failure or refusal of the insured to provide the information necessary to confirm exposure or determine the policy premium; or

   **c.** 60 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail our notice to your last known address and the last known address of the agent or broker of record.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. A post office certificate of mailing or certified mail receipt will be sufficient proof of mailing of notice.

6. If this policy is cancelled, we will return any premium refund due to the agent or broker of record, or directly to the first Named Insured, or, if applicable, to the premium finance company. If:

   **a.** We cancel, the refund will be the pro rata unearned premium. The refund will be returned or credited before the effective date of cancellation. However, if cancellation is for:

   (1) Nonpayment of premium;

   (2) Conviction of the insured of a crime having as one of its necessary elements an act increasing a hazard insured against;

   (3) Discovery of fraud or material misrepresentation made by the insured or a representative of the insured in obtaining the insurance or by the insured in pursuing a claim under the policy; or

   (4) Failure or refusal of the insured to provide the information necessary to confirm exposure or necessary to determine the policy premium;

   any unearned premium shall be returned or credited within 45 days after the cancellation notice is given; or

   **b.** The first Named Insured cancels, the refund:

Includes copyrighted material of Insurance Service Office, Inc. with its permission.

Exhibit 1 Page 89 of 95
AIC V. CRUM & FORSTER

**(1)** Will be the pro rata unearned premium minus a cancellation fee of 7.5% of the pro rata unearned premium. However, we will not retain this cancellation fee if this policy is cancelled:

    **(a)** And rewritten with us or in our company group;

    **(b)** At our request;

    **(c)** Because you no longer have a financial or insurable interest in the property or business operation that is the subject of this insurance; or

    **(d)** After the first year for a prepaid policy written for a term of more than one year; or

**(2)** Will be returned or credited:

    **(a)** By the effective date of cancellation; or

    **(b)** Within 45 days of your request to cancel;

    whichever is later.

    If the policy is selected for audit, we will complete the audit within 45 days of receipt of the request for cancellation. The refund will be returned within 45 days of completion of an audit, or the effective date of cancellation, whichever is later.

**B.** The following is added and supersedes any provision to the contrary:

**Nonrenewal**

**1.** If we decide not to renew this policy, we will mail written notice of nonrenewal, by first class mail, to you and the agent or broker of record at least 45 days before:

    **a.** The expiration date; or

    **b.** The anniversary date if this policy has been written for more than one year or with no fixed expiration date.

**2.** We need not mail notice of nonrenewal if:

    **a.** We have manifested in good faith our willingness to renew; or

    **b.** The first Named Insured has failed to pay any premium required for this policy; or

    **c.** The first Named Insured fails to pay the premium required for renewal of this policy.

**3.** Any notice of nonrenewal will be mailed to your last known address and the last known address of the agent or broker of record. A post office certificate of mailing or certified mail receipt will be sufficient proof of mailing of notice.

**C.** The following Condition is added:

**Notice Of Premium Or Coverage Changes On Renewal**

If the premium to renew this policy increases more than 10% for a reason other than an increase in coverage or exposure basis, or if after the renewal there will be a material restriction or reduction in coverage not specifically requested by the insured, we will mail written notice to your last known address and the last known address of the agent or broker of record at least 45 days before:

**1.** The expiration date; or

**2.** The anniversary date if this policy has been written for more than one year or with no fixed expiration date.

---

EN0711-0511

Includes copyrighted material of Insurance Service Office, Inc. with its permission.

Page 2 of 2

Exhibit 1 Page 90 of 95
AIC V. CRUM & FORSTER

# WORLDWIDE FACILITIES, INC.

725 SOUTH FIGUEROA STREET / SUITE 1900 / LOS ANGELES, CA 90017

TEL (213) 236-4500
FAX (213) 244-9655
CA LIC. # 0414108

4/29/13        *B I N D E R  #  146321.01*        Page 1 of 3

**INSURED:** Alaska Interstate Construction, LLC
PO Box 23709
Anchorage, AK 99523

**AGENT:** Marsh & McLennan Agency LLC
1031 West Fourth Avenue, Suite 400
Anchorage, AK 99501

Binder is effective from 12:01 AM **05/01/13** to 12:01 AM **08/01/13** unless cancelled or replaced by the Policy.
Policy is effective from 12:01 AM 05/01/13 to 12:01 AM 05/01/14.

This is to certify that, in accordance with your instructions, we have procured insurance as hereinafter specified:

**COMPANY:**     **Navigators Specialty Insurance Company**

POLICY NO:     CH13EXC741560IC
RENEWAL OF:     CH11EXC741560IC

**COVERAGE:**     Navigators Excess

**LIMITS:**     $10,000,000 Each Occurrence or Event
$10,000,000 General Aggregate
$10,000,000 Products-Completed Operations Aggregate

Underlying:
**Auto Liability**
Carrier: Greenwich Insurance Co.
Policy No: RAD500023402
Term: 05/01/2013 to 05/01/2014
Limits: $1,000,000 Combined Single Limit

**General Liability**
Carrier: Crum & Forster Specialty Company
Policy No: EPK-101290
Term: 05/01/2013 to 05/01/2014
Limits:
$2,000,000 Each Occurrence
$2,000,000 Personal and Advertising Injury - Any One Person or Organization
$2,000,000 General Aggregate - Per Project
$2,000,000 Products Completed Operations Aggregate
Occurrence

**Employers Liability**
Carrier: XL Insurance
Policy No: RWE500023302
Term: 05/01/2013 to 05/01/2014
Limits:
$1,000,000 BI by Each Accident - Each Accident
$1,000,000 BI by Each Disease - Each Employee
$1,000,000 BI by Disease - Policy Limit

**Contractor's Pollution Liability**
Carrier: Crum & Forster Specialty Company
Policy No: EPK-101290
Term: 05/01/2013 to 05/01/2014
Limits:
$2,000,000 Each Occurrence
$2,000,000 Aggregate

Exhibit 1 Page 91 of 95
AIC V. CRUM & FORSTER

# WORLDWIDE FACILITIES, INC.

725 SOUTH FIGUEROA STREET / SUITE 1900 / LOS ANGELES, CA 90017

TEL (213) 236-4500
FAX (213) 244-9655
CA LIC. # 0414108

**Limits cont..**

Claims Made

**Professional Liability**
Carrier: Crum & Forster Specialty Company
Policy No.: EPK-101290
Term: 05/01/2013 to 05/01/2014
Limits:
$2,000,000 Each Occurrence
$2,000,000 Aggregate
Claims Made

**TERMS:** Policy Period: 05/01/2013 to 05/01/2014

Forms and Endorsements:
1. Commercial Excess Liability Declarations NAV-EXC-DEC (04/10)
2. Commercial Excess Liability Coverage Part NAV-EXC-001(04/10)
3. Claim Reporting Procedures NAV-PHN-200 (06/08)
4. Alaska Changes NAV-EXC-200-AK (03/05)
5. ALASKA POLICYHOLDER NOTICE NSIC AK NOTICE (08/12)
6. OFAC ENDORSEMENT NAV-ML-002 (11/12)
7. Claims Made Underlying - Alaska NAV-EXC-304-AK (03/10)
8. Nuclear Energy Liability Exclusion NAV-EXC-302 (07/09)
9. Exclusion - Rejected Coverage NAV-EXC-321 (07/09)
10. Service of Suit Endorsement NAV-ECD-300 (04/05)
11. Exclusion of Certified Acts of Terrorism NAV-EXC-401 (01/08)
12. Amendment of Conditions Other Insurance Primary and Non- NAV-EXC-348A (01/11)
13. Amendment - Policy Term NAV-ECD-106 (02/11)
14. Amendment - Schedule of Underlying NAV-ECD-104 (02/11 )

Terrorism Premium: Excluded

Subject to:
1. Copy of underlying Policy/Endorsements within 60 days of binding.
2. All Underlying Policy numbers required to bind. (rec'd)
3. Signed Terrorism Policy Holder Notice - (rec'd)
4. Signed Application within 30 days of binding (rec'd)
5. Receipt of sub-contractor agreement.
6. Loss runs for the past 5 years for all named insureds.
7. Alaska Due Diligence required prior to binding or coverage cannot be bound. (ECP rec'd)

Navigators policy will be issued within 30 days of the acceptable review of the underlying.

The terms of this policy may differ from those requested in your submission. Sample policy forms are available upon request. Please let me know if you need copies of any of the forms.

You may issue ACORD certificates of insurance which accurately reflect the coverage provided by this policy. Should you need to issue a non-ACORD certificate, please seek prior approval.

Exhibit 1 Page 92 of 95
AIC V. CRUM & FORSTER

4/29/13                    *B I N D E R  #  146321.01*                    Page 3 of 3

**EXCLUSIONS:** Per The Policy Form In Addition To The Exclusions Referenced Under The Conditions (if applicable).

**RATE:**          Flat

**PREMIUM:**   $ 105,000.00  Minimum and Deposit
           250.00  Processing Fee - Fully retained at inception
       2,835.00  State Tax
       1,050.00  AK Filing Fee
  $ 109,135.00  **Total**

No flat cancellations. 25% minimum retained premium in the event of cancellation. Fees are 100% Fully Earned.

**REMARKS:**   In order to comply with Surplus Line Regulations for policies with multi-state exposures, the retailer
must provide WWFI with the percentage of the insured's business operations and/or employees that
are located in each state outside the home state, (as defined by NRRA), prior to binding the policy.
The surplus line taxes and fees are subject to change if it is determined that the premium
allocations between or among states differ from any allocations that may or may not be
contemplated in this quotation and/or binder.

AK - SURPLUS LINES WORDING:
"This is evidence of insurance procured and developed under the
Alaska Surplus Lines Law AS21.34. It is not covered by the Alaska
Insurance Guarantee Association Act, AS21.80. This insurer does
not hold a certificate of authority with Alaska, and is not subject to
supervision by the Alaska Department of Insurance. "
Worldwide Facilities, Inc. - License #9718

AK DUE DILIGENCE:
By Alaska State regulation, in order to allow us to request coverage bound, a completed AK Diligent
Search form, or written confirmation that Diligent Search has been conducted (with the completed
form to follow), must be received prior to or with your bind request.

Please review the above carefully; terms and/or conditions may differ from those requested in your submission. In addition to the
above mentioned exclusions, the policy contains other standard exclusions; specimen policies are available upon request. Terms
herein are summarized for use by a licensed broker and should not be submitted in this format to the applicant. Please call with any
questions.
This Binder is subject to all terms and conditions of the policy to be issued. The Binder shall be terminated and voided by delivery of a
policy to either the insured, his agent or representative. The coverage will remain in effect for the term indicated unless cancelled by the
insured, WORLDWIDE FACILITIES, INC. or the Company, via written notice.

This Binder is a privileged document and shall not be released or assigned in whole or in part to any other person or entity without
the written consent of WORLDWIDE FACILITIES, INC., endorsed here on.

Davis D. Moore

Exhibit 1 Page 93 of 95
AIC V. CRUM & FORSTER

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT - POLICY TERM

Item 2. of the Declarations is amended as follows:

2.  Policy Period:        From  12/01/2011  To  05/01/2013
                          (At 12:01 A.M. Standard Time at your mailing address shown above.)

All other terms of the policy remain unchanged.

Contains copyrighted material of the
Insurance Services Office, Inc. with its permission.
Exhibit 1 Page 94 of 95
AIC V. CRUM & FORSTER

POLICY NUMBER: CH11EXC741560IC
ENDORSEMENT NUMBER: 02

COMMERCIAL EXCESS/UMBRELLA LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT - FORMS AND ENDORSEMENTS

Effective 12/01/2012, and in consideration of an additional premium of $18,000.00, the following is  added:

Amendment - Policy Term   NAV-ECD-106 (02/11)

All other terms of the policy remain unchanged.

"This is evidence of insurance procured and developed under
the Alaska Surplus Lines Law AS21.34.  It is not covered by
the Alaska Insurance Guarantee Association Act, AS21.80.
This insurer does not hold a certificate of authority with
Alaska, and is not subject to supervision by the Alaska
Department of Insurance."
Worldwide Facilities, Inc. – License #9718

Alaska Surplus Lines Tax & Fee Breakdown

| | | |
|---|---|---|
| Premium: | $ | 18,000.00 |
| Processing Fee: | $ | |
| Company Fee: | $ | |
| Inspection Fee: | $ | |
| 2.7% State Tax: | $ | 486.00 |
| 1.0% AK Filing Fee: | $ | 180.00 |

NAV-ECD-101 (05/10)

Navigators Specialty Insurance Company

Page 1 of 1

Contains copyrighted material of the
Insurance Services Office, Inc. with its permission

Exhibit 1 Page 95 of 95
AIC V. CRUM & FORSTER

RECEIVED
JUL 03 2013
Burch Horton Bittner & Cherot

COPY
Original Received
JUN 2 8 2013
Clerk of the Trial Courts

Cabot Christianson, Esq.
Alaska Bar No. 7811089
LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 W. 8th Avenue, Suite 201
Anchorage, Alaska 99501
(907) 258-6016
Attorney for Plaintiff VC Sellers Reserve, LLC

Paul D. Stockler, Esq.
Alaska Bar No. 8606032
LAW OFFICES OF PAUL D. STOCKLER
737 West 5th Ave., Suite 205
Anchorage, Alaska 99501
(907) 277-8564
Attorney for Plaintiff VC Sellers Reserve, LLC

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

# IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

## THIRD JUDICIAL DISTRICT AT ANCHORAGE

VC SELLERS RESERVE, LLC, )
)
                 Plaintiff, )
    v. )
)
ALASKA INTERSTATE )
CONSTRUCTION, LLC, )
) **Case No.: 3AN-13-07667 CI**
              Defendant. )
)

## AMENDED COMPLAINT

PAGE 1:      AMENDED COMPLAINT
                VCS V AIC, CASE NO. 3AN-13-07667 CI
                H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

Exhibit 2 Page 1 of 32
AIC V. CRUM & FORSTER



**Allegations common to all counts**

1.     Plaintiff VC Sellers Reserve, LLC ("VC Sellers") is a Washington limited liability company qualified in all ways to bring this action.

2.     Defendant Alaska Interstate Construction, LLC ("AIC") is an Alaska limited liability company doing business in Anchorage, Alaska, and elsewhere in Alaska.

3.     This Court has subject matter jurisdiction over this case and personal jurisdiction over the parties.  Venue is properly laid in this Court.

4.     VC Sellers was created in connection with the sale of the stock of Veco Corporation ("Veco") to CH2M HILL Companies, Ltd. ("CH2M") in 2007.  As part of that sale, VC Sellers indemnified CH2M from certain environmental liabilities associated with the Veco facility in Deadhorse, Alaska known as Tracts 2, 22 and 23 ("the Property").

5.     Restoration Science and Engineering, LLC ("RSE") is an environmental consulting firm based in Anchorage.  VC Sellers retained RSE for professional assistance and advice in connection the managing the environmental liability at the Property.

6.     AIC owns and operates a soil remediation facility in Deadhorse, Alaska.  The facility remediates soil by heating the soil to temperature levels that burn off contaminants.

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

Exhibit 2 Page 2 of 32
AIC V. CRUM & FORSTER



7.    In 2008, RSE and AIC entered into a contract under which AIC agreed to excavate contaminated soil from the Property, haul that soil to the AIC facility in Deadhorse, store that soil at the AIC facility until it could be remediated (burned), and returned to the Property. The work also called for AIC to install a protective geo-tech liner on AIC property upon which the contaminated soil would be stored until it could be burned. The contract is in the form of an offer letter dated July 7, 2008, from AIC to RSE proposing a scope of work and payment terms, combined with a letter dated August 27, 2008, from RSE to AIC accepting that proposal. The two letters, combined, constitute the contract ("the Contract") between the parties and are attached hereto as Exhibit A.

8.    RSE entered into the Contract as agent for VC Sellers. All parties clearly understood this at the time. Functionally, the Contract was entered into between VC Sellers and AIC.

9.    The scope of the contamination was unknown when the Contract was entered into. Accordingly, the Contract called for a per-cubic-yard or per-ton rates: $7.76 per cubic yard for site excavation, $2.25 per cubic yard for hauling contaminated soil to the AIC facility, $99.00 per ton for remediation, and $13.78 per cubic yard to back haul the remediated soil.

10.    AIC performed under the Contract during the summer seasons of 2008, 2009 and 2010. By the end of the 2009 season, most but not all of the contaminated soil from the Property had been excavated and remediated.

PAGE 3:    AMENDED COMPLAINT
VCS V AIC, CASE NO. 3AN-13-07667 CI
H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

Exhibit 2 Page 3 of 32
AIC V. CRUM & FORSTER

11.     Starting approximately May 11, 2010, AIC started burning the contaminated soil. The month prior, specifically in an April 14, 2010 email from RSE, representative Lucas Gamble to AIC, RSE informed AIC that the remediation work needed to be completed prior to August 31, 2010.

12.     By approximately June 11, 2010, AIC had completed excavation of all the contaminated soil from the Property. Because soil could be excavated and transported from the Property at a faster rate than it could be remediated at the AIC facility, there existed on that date a large pile, or piles, of contaminated soil at the AIC facility which was burned thereafter.

13.     Throughout the summer of 2010, RSE from time to time reminded AIC that all remediation needed to be completed by August 31, 2010.

14.     In mid-August, 2010, RSE and AIC conferred in order to confirm that all remediation work would be completed by August 31, 2010. AIC confirmed to RSE that AIC would be able to meet that deadline.

15.     On approximately August 18, 2010, Stephen Heintz, Superintendent of the AIC facility in Deadhorse, created what he called a "watch dog" file which was designed to satisfy AIC, and RSE, that the August 31, 2010 deadline could be met. AIC measured the size of the pile remaining on that date to be burned, and determined the pile to be 130 feet by 74 feet by 10 feet high. For purposes of estimation, AIC assumed a purely rectangular pile, assumed that each cubic yard would weigh 1.5

PAGE 4:     AMENDED COMPLAINT
            VCS V AIC, CASE NO. 3AN-13-07667 CI
            H:\2884\VC v AIC\AMENDED COMPLAINT.WPD

Exhibit 2 Page 4 of 32
AIC V. CRUM & FORSTER

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

tons, and arrived at an estimate of 5,344 tons of soil. At a burn rate of 440 tons per day, this resulted in an estimate of 12.15 days of burning. AIC therefore estimated that all remediation would be completed by August 30, 2012. AIC created a Word document that contained a table showing the estimated 5, 344 tons to be burned. The table was designed so that each day, the amount of soil burned that day would be subtracted, and the balance would show the amount of soil yet to be remediated.

16.     On August 18, 2010, Stephen Heintz forwarded the watch dog file to other AIC employees, including C. J. Ringlieb, who worked at the AIC facility in Deadhorse.

17.     On August 19, 2010, Ringlieb sent an email to Lucas Gamble, of RSE, stating, "Lucas, Just a heads up for the client and RSE on the estimated tonnage and date," and attached the watch dog file described above. The watch dog file as of that date showed the starting 5, 344 tons, minus 442 tons burned on August 18, 2010, for a remaining balance of 4,902 tons. Exhibit B hereto.

18.     On August 19, 2010, Gamble responded to Ringlieb by email stating, "Great news! Thanks for the heads up!" See Exhibit B hereto.

19.     The watch dog file grew each day, as each day's burning was logged in. The last version of the watch dog file that was transmitted to RSE was the watchdog file for August 24, 2010, which was transmitted to RSE on August 25. At that time, the watchdog file was as follows:

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

Exhibit 2 Page 5 of 32
AIC V. CRUM & FORSTER

# Remediation RSE Project

| Date | Remaining Soil To Remediate | Estimate |
|------|----------------------------|----------|
| 8-18-10 | Estimated contaminated pile size ( 130'L X 74'W X 10'T ) | 5344 Tons |
| | With an average of 440 Tons daily, projected completion<br>Will take approximately 12.15 days ( August 30, 2010 ) | |
| 8-18-10 | Day shift 226 Tons / Night shift 216 Tons      -442 Tons | 4902 |
| 8-19-10 | Day Shift 230 Tons / Night shift 228 Tons      -458 Tons | 4444 |
| 8-20-10 | Day Shift 238 Tons / Night shift 227 Tons      -465 Tons | 3979 |
| 8-21-10 | Day Shift 215 Tons / Night Shift 199 Tons      -414 Tons | 3565 |
| 8-22-10 | Maintenance Day Repairs to the plant Day Shift ran 105 Tons in 5.5 hours / Night Shift 221 Tons      -326 Tons | 3239 |
| 8-23-10 | Day Shift 221 Tons / Night Shift 233 Tons      -454 Tons | 2785 |
| 8-24-10 | Day Shift 159 Tons / The discharge Conveyor drive motor burnt out at 2:30 PM Foot print of new motor did not match up with base plate. Caused 7 hours Down Time. Night shift ran 167 Tons      -326 | 2459 |

20.     Neither RSE or VC Sellers was supplied with the watch dog file for August 25, 2010 or thereafter, until after AIC instituted the litigation described below.

21.     AIC ceased maintaining the watch dog file after August 30, 2010.

PAGE 6:     AMENDED COMPLAINT<br>VCS V AIC, CASE NO. 3AN-13-07667 CI<br>H:\2884\VC v AIC\AMENDED COMPLAINT.WPD



22.     In October, 2010, AIC sent RSE a final billing which showed charges for burning through September 26.  Part of that billing showed charges for remediating the soil underneath the liner.  Because it was impossible for soil located underneath the geo-tech liner to have come from the Property, RSE objected to the billing on that basis.  RSE also objected to charges for soil burned after August 31, 2010, on the ground that all burning was supposed to have been completed by that date.

23.     AIC's records showed that the geo-tech liner was cut up and sent to the land fill on September 20, 2010.  Accordingly, on September 24, 2010, AIC issued a revised invoice deleting any charges on or after that date, but maintained that all charges through September 19, 2010 were proper.   From September 1, 2010 through September 19, 2010, AIC claimed to have burned about 6,025 tons of soil, which at $99 per ton was a charge of about $600,000.

24.     On or about October 11, 2010, VC Sellers tendered a check to AIC for $340,448.78, the amount due for burning through August 31, 2010, and therefore the amount that RSE and VC Sellers estimated, at the time, was properly owed.  VC Sellers advised AIC that cashing the check would be full and final satisfaction for all claims of AIC against VC Sellers with respect to the project.

25.     AIC refused to cash the check, and eventually returned the check to VC Sellers.

Exhibit 2 Page 7 of 32
AIC V. CRUM & FORSTER

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

26.     On or about November 1, 2011, Jack Miller, an attorney for VC Sellers with respect to this matter, spoke with Dan Kent, an attorney for AIC with respect to AIC's claim for the unpaid invoice. That conversation was commemorated in a letter dated November 3, 2011 from Kent to Miller. A copy of that letter, not including its enclosures, is attached hereto as Exhibit C.

27.     In the November 3, 2011 letter, Kent demanded payment of $940,532.00. The letter states in part:

> AIC began burning contaminated soil for RSE on May 11, 2010 and finished September 19, 2010. During the remediation process AIC encountered issues with the soil that increased the time for remediation and the total tons burned. For instance, during storage the liquid contaminate seeped to the center and/or bottom of the pile. The soil at the bottom and center of the pile had a higher concentration level than the rest. The soil would also freeze during the winter months. **Consequently, in order to remediate the high-contaminate and frozen soil, it had to be burned at a slower rate and/or blended with uncontaminated soil.**

> ...

> RSE currently complains that the final number provided by AIC was 5,000 tons higher than the estimate provided in August. In the August 26 conference call AIC provided its rough estimate of the total amount of soil remaining for remediation - about 2,000 tons. AIC was emphatic that was only a rough estimate. AIC did not and could not promise to complete remediation of all soil by the end of August and was clear about that as well. AIC had no control over either number, but it depended on the actual amount and conditions of the soil to determine how long remediation would take. As noted above, during remediation AIC found that some of the soil was frozen and some of it was too contaminated to burn just once. **In order to remediate the soil it had to be blended with other soil or burned multiple times. Sometimes the blending rate was as high as 60/40. RSE knew these factors from the history of the process.**

PAGE 8:     AMENDED COMPLAINT
VCS V AIC, CASE NO. 3AN-13-07667 CI
H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

Exhibit 2 Page 8 of 32
AIC V. CRUM & FORSTER

(emphasis added).

28.    The November 1, 2011, conversation and follow-up letter of November 3, 2011, was the first time that VC Sellers or RSE were aware that AIC was charging VC Sellers for multiple burns of the same soil, or blending contaminated with uncontaminated soil.

29.    On May 29, 2012, AIC filed suit against RSE for alleged breach of contract and unjust enrichment, Anchorage Superior Court Case No. 3AN-12-07510 CI. RSE entered an appearance but did not file an answer.  On January 11, 2013, AIC dismissed the suit by filing a Notice of Dismissal Without Prejudice Prior to Answer.

30.    On information and belief VC Sellers estimates that AIC's multiple charges and overbillings amount to approximately 42,000 tons of soil, or an overcharge of approximately $4,200,000.

## FIRST CAUSE OF ACTION

### Breach of Contract

31.    VC Sellers realleges the foregoing allegations.

32.    The Contract between RSE and AIC calls for soil remediation at the rate $99.00 per ton.  There is no mention of multiple charges for multiple burnings of the same soil, or charging for clean uncontaminated soil that is blended with contaminated soil.

PAGE 9:    AMENDED COMPLAINT
           VCS V AIC, CASE NO. 3AN-13-07667 CI
           H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

33. AIC's charges for multiple burnings of the same soil, or charging for clean uncontaminated soil that is blended with contaminated soil are a breach of the Contract, for which VC Sellers is entitled to damages in the amount $4,200,000 or such other amount as may be proved at trial.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

34. VC Sellers realleges the foregoing allegations.

35. Every contract in Alaska contains an implied covenant of good faith and fair dealing.

36. AIC's charges for multiple burnings of the same soil, or charging for clean uncontaminated soil that is blended with contaminated soil are a breach of the implied covenant of good faith and fair dealing, for which VC Sellers is entitled to damages in the amount $4,200,000 or such other amount as may be proved at trial.

## THIRD CAUSE OF ACTION

### Fraud

37. VC Sellers realleges the foregoing allegations.

38. AIC's charges for multiple burnings of the same soil, or charging for clean uncontaminated soil that is blended with contaminated soil, constitute fraud for which VC Sellers is entitled to damages in the amount $4,200,000 or such other amount as may be proved at trial.

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

Exhibit 2 Page 10 of 32
AIC V. CRUM & FORSTER



## FOURTH CAUSE OF ACTION

### Misrepresentation

39.     VC Sellers realleges the foregoing allegations.

40.     AIC's charges for multiple burnings of the same soil, or charging for clean uncontaminated soil that is blended with contaminated soil, constitute misrepresentation for which VC Sellers is entitled to damages in the amount $4,200,000 or such other amount as may be proved at trial.

## FIFTH CAUSE OF ACTION

### Unfair Trade Practices Act (charges for multiple burnings and for clean soil)

41.     VC Sellers realleges the foregoing allegations.

42.      AIC's practices of charging for multiple burnings of the same soil, and charging for clean uncontaminated soil that is blended with contaminated soil, are "unfair or deceptive acts in the conduct of trade" within the meaning of the Uniform Trade Practices Act, AS 45.50.471 *et. seq.* ("UTPA").

43.     UTPA applies to the Contract, because UTPA covers both consumer and business-to-business transactions. *Alaska Interstate Construction, Inc. v. Pacific Diversified Investments, Inc.,* 279 P.3d 1156 (Alaska 2012).

44.     Pursuant to the treble damages provisions of UTPA, AS 45.50.531, VC Sellers is entitled to $12,600,000 or treble the amount of actual damages to be determined at trial, plus actual attorneys fees.

Exhibit 2 Page 11 of 32
AIC V. CRUM & FORSTER

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026



## SIXTH CAUSE OF ACTION

### Unfair Trade Practices Act (failure to test, certify or calibrate scales )

45. VC Sellers realleges the foregoing allegations.

46. AS 45.75.080 and its underlying regulations, 17 AAC 90.920 *et seq*, require that any person who uses a scale in commerce must, before using that scale in commerce, register the scale with the State of Alaska. The scale must be tested and certified at least annually.

47. AIC charges for soil remediation by tonnage, and uses a scale in commerce to do so.

48. AIC does not test or certify its scales as required by Alaska law.

49. The Contract with AIC states that "actual tonnage will be determined via the **calibrated** belt scale located on the thermal remediation unit" (emphasis added).

50. Despite the use of the term "calibrated," which suggests regular checking for accuracy, AIC did not ever, either before or during the three-year life of the Contract, ever have an in-house or third-party check its scale for accuracy.

51. AIC's practice of charging for remediated soil on a per-ton basis, by using a scale that is not tested or certified as required by Alaska law, or calibrated as called for by the Contract, are "unfair or deceptive acts in the conduct of trade" within the meaning of UTPA.

PAGE 12: AMENDED COMPLAINT
    VCS V AIC, CASE NO. 3AN-13-07667 CI
    H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

 

52.     VC Sellers is entitled to damages for AIC's failure to test, certify, or calibrate its scales, in an amount to be determined at trial, plus actual attorneys fees.

WHEREFORE, VC Sellers prays for relief as follows:

1.     Judgment against AIC for $4,200,000 for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and misrepresentation.

2.     Judgment against AIC for $12,600,000 for committing unfair trade practices.

3.     Costs, interest and reasonable attorney fees under Counts 1 through 4, and actual attorneys fees under Counts 5 and 6.

4.     Such other relief as this Court deems proper.

Dated June 28, 2013.


LAW OFFICES OF CABOT CHRISTIANSON, P.C.
Attorney for VC Sellers, LLC


By: _____
        Cabot Christianson
        Alaska Bar # 7811089

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

PAGE 13:     AMENDED COMPLAINT
            VCS V AIC, CASE NO. 3AN-13-07667 CI
            H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

LAW OFFICES OF PAUL D. STOCKLER
Attorney for VC Sellers, LLC

By: _____
Paul D. Stockler
Alaska Bar # 8606032

Exhibits:

A     Contract
B     Emails, Ringlieb to Gamble, and Gamble to Ringlieb, August 18/19, 2010.
C     Letter dated November 3, 2011 from Dan Kent to Jack Miller (enclosures to letter not included in this exhibit)

LAW OFFICE OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

PAGE 14:     AMENDED COMPLAINT
VCS V AIC, CASE NO. 3AN-13-07667 CI
H:\2884\VC V AIC\AMENDED COMPLAINT.WPD

Exhibit 2 Page 14 of 32
AIC V. CRUM & FORSTER



August 27, 2008

**RESTORATION**
SCIENCE & ENGINEERING
911 W. 8ᵀᴴ Avenue, Suite 100
Anchorage, AK 99501
Voice: 907-278-1023
FAX: 907-277-5713
Email: NYMAN@ALASKA.NET
URL: www.RestorSci.com

Mr. Kelly Thompson
Mr. Ed Schmidt
601 West 8ᵗʰ Avenue
Anchorage, Alaska 99501

Re:  AIC Proposal for Clean-up and Remediation at Tracts 2, 22, and 23 Deadhorse

Dear Ed and Kelly:

Restoration Science and Engineering (RSE) is pleased to accept the attached proposal from AIC for construction services on the cleanup of former VECO properties in Deadhorse, Alaska. We will attempt to work closely with your staff to schedule resources to maximize the effectiveness of the cleanup efforts.

We understand that billing will generally be on a time and materials and shift rate basis and that the rate for thermal processing are at the $99/ton rate listed in the proposal.

As the work progresses hope that AIC feels free to offer suggestions to our crew to anticipate logistical challenges in a manner that provides our client with most cost-effective project possible.

Sincerely,



David Nyman, P.E.

Attachments      AIC Proposal for Construction Services

Exhibit A
Page 1 of 10

Exhibit 2 Page 15 of 32
AIC V. CRUM & FORSTER

July 7, 2008

Letter No. AIC08-535

**Restoration Science and Engineering**
911 W. 8th Avenue, Suite 100
Anchorage, AK 99501

Attention:    Mr. Dave Nyman

Reference:    Tracts 2, 22 and 23 Deadhorse, Alaska

Subject:      Clean-up and Remediation Proposal

Gentlemen:

In response to your Request for Quotation we are pleased to provide the attached proposal for environmental clean-up at Deadhorse, Alaska. Depending on the timing and rate of excavation, it may be necessary to store the material after excavation in accordance with Alaska Department of Environmental Conservation (ADEC) approved containment liner for Non-UST material. This lined area will be constructed adjacent to our thermal remediation unit. We have provided pricing should you require a liner to store the contaminated material.

We are aware that at this time, due to unknowns in the quantity and type of contamination, if any, you are unable to give an exact date when the actual thermal remediation will take place. However, we have predicated our proposal on excavation and storing the material during the summer months in Prudhoe Bay when the material is in a thawed state.

If you have any questions or require further information, please do not hesitate to contact me at 868-2473.

Sincerely,

ALASKA INTERSTATE CONSTRUCTION, LLC.

Ed Schmidt
Operations Manager

enclosures

## ALASKA INTERSTATE CONSTRUCTION, LLC.

Proposal To
## Restoration Science and Engineering

### Cost Estimate

The Time and materials portion of our proposal is based on shift rates with an approximate production rate of approximately 1,000 cubic yards per shift, depending upon monitoring and sampling frequency. The Unit Price for thermal remediation is based on a minimum quantity of contamination of 100-tons. Actual tonnage will be determined via the calibrated belt scale located on the thermal remediation unit.



We anticipate excavation to be free of any obstructions and buried utilities. We have predicated our proposal on bulk excavation with RSE personnel directing the work and testing for excavation limits on "real time" basis.

It is our intent to time this project so that we excavate, remediate and restore the pad with remediated gravel with one mobilization of personnel and equipment. Our scope of work will include the following items:

1. **Mobilization:**
   Provide RT Airfare transportation, Site Specific HSE training, HSE Plan, and equipment mobilization in order to begin the project.

| Description | Quantity | Unit | T&M Rate | Amount |
|---|---|---|---|---|
| Mobilization | 1 | Lot | $22,000 | $22,000 |

2. **Site Excavation:**

   Provide Supervision, labor, equipment and materials required to excavate hydrocarbon contaminated soil at the subject property.

| Description | Quantity | Unit | T&M Rate | Amount |
|---|---|---|---|---|
| Excavate Soils | 1,000 | CY | $7.76 | $7,760.00 |

3. **Hauling to Remediation Unit:**

   Provide Supervision, labor, equipment and materials required to haul hydrocarbon contaminated soil from the subject property to the AIC thermal Remediation Unit.

| Description | Quantity | Unit | T&M Rate | Amount |
|---|---|---|---|---|
| Haul Soils | 1,000 | CY | $2.26 | $2,260.00 |

2

4. **Thermal Remediation of Hydrocarbon Contaminated Gravel:**

Provide Supervision, labor, equipment and materials required to thermally remediate previously excavated soil.

| Description | Quantity | Unit | Unit Rate | Amount |
|---|---|---|---|---|
| Remediate Soil | 100 | tons | $99.00 | $9,800.00 |



5. **Erect Containment Dike and Install 60-mil HDPE LINER:**

Provide Supervision, labor, equipment and materials required to Erect Containment Dike and Install 60-mil HDPE liner at the AIC Pad.

| Description | Quantity | Unit | T&M Rate | Amount |
|---|---|---|---|---|
| Lined Storage Area | 5,200 | Sq. Ft. | $3.37 | $17,524.00 |

6. **Haul Backfill Materials Oxbow Mine Site to Subject Property:**

Provide Supervision, labor, equipment and materials required to Mine, Haul, Place and Compact material from the Oxbow Mine Site to the Subject Property. Pricing below includes $3.69 per cubic yard Royalty and stripping fees.

| Description | Quantity | Unit | T&M Rate | Amount |
|---|---|---|---|---|
| Backfill Materials | 1,000 | CY | $13.75 | $17,524.00 |

3

# ALASKA INTERSTATE CONSTRUCTION, LLC.

Proposal To

### Restoration Science and Engineering

## OVERVIEW OF PROCESS

**1. PROCESS DESCRIPTION**

**A. Overview**



The AIC soil remediation unit is designed to remediate soil contaminated with non-recycled light distillate petroleum hydrocarbons, including gasoline, jet fuel, diesel oil or No. 2 fuel and heavy crude, by rapidly volatilizing these products from the soil, then thermally destroying them in the discharge air stream. The unit consists of a rotary drum desorber with feed, discharge and combustion control systems, a dust collector, a modular thermal oxidizer, and associated fuel and air delivery systems.

The soil remediator operates as follows. Soil in need of treatment is loaded into a feed hopper. The hopper discharges soil onto a variable speed feeder belt. The feeder belt conveys the soil to a screening device and onto a belt weigh scale. The belt scale provides soil feed rate and totalized weights to the unit's control house. The belt feeds the contaminated soil into a counterflow rotary drum desorber. Volatile compounds and moisture in the soil are evaporated by the heat supplied by a direct-firing burner. Heat transfer to the soil in the rotary desorber is maximized by the falling action of specially-designed lifting flights and patented combustion volume flights.

The heated, dry soil is discharged into an auger system connecting an integrated knock-out box and baghouse. The evaporated volatiles and water, along with dust released by the desorption process, are carried over by the rotary drum exhaust gases into the knockout box, where larger particles drop out of the gas stream. These pre-cleaned gases then flow to the baghouse. Dust collected from the knockout box and baghouse are dropped into the auger system. The collected dust is remediated is mixed with the hot soil. The remediated dust and soil mix are then augered to the mixer cooler where the product is cooled for discharge from the system.

Output from the baghouse is routed through an exhaust fan into a modular thermal oxidizer/stack unit, which reduces the hydrocarbon content of the gas stream with a destructive removal efficiency (DRE) of 97%.

4



B. **Process and Mechanical Features**

**(1) COUNTERCURRENT ROTARY DRUM REMEDIATION**

Soil is remediated in the rotary drum desorber in a countercurrent flow design, where the soil flows countercurrently to the air flow. This scheme allows the soil to reach the desired temperature for vaporization of the hydrocarbon contaminants and, also, to control the dust and vapor temperatures of the gas stream to the baghouse. Exhaust gas temperatures are, thereby, maintained at a level sufficient to prevent the hydrocarbons from condensing while permitting more practical baghouse operation early in the process.

**(2) BAGHOUSE OPERATION STEP**

The lower temperatures from the countercurrent rotary drum operation versus higher temperature gases from parallel flow drum designs, permit the practical use of a baghouse for dust removal in the next operation. This early removal of dust greatly reduces the size of the incinerator required. The remediation of low temperature dust in the gas stream is accomplished in a more practical manner and described below.

**(3) DUST REMEDIATION**

Dust carried over from the rotary drum exhaust is handled in a unique auguring system. This auguring system assures the elevation of the dust to remediation temperatures by direct contact with hot remediated soil. Dust collected from the knock-out box and baghouse falls into the auger. Dust removal from the baghouse filters is assisted by compressed air pulsation. The closed auger system conveys the hot remediated soil through the bottom of the knock-out box and baghouse, before it is introduced into a mixer cooler and discharged from the unit.

**(4) BAGHOUSE SAFETY SYSTEM**

The baghouse is instrument monitored for high temperatures. A high temperature alarm alerts the operator for corrective action and automatic shutdown of the unit is set as a backup.

**(5) PRODUCT COOLING AND FUGITIVE DUST CONTROL**

Hot remediated soil discharged from the baghouse auger is cooled in the mixer cooler with water spray. A multiple nozzle water spray system also functions to hold down fugitive dust released with the steam from the cooled soil. The water spray system is enclosed in a chamber above the screws in the mixer cooler. A filter screen in the top of this chamber also assures fugitive dust control.

5





Exhibit A
Page 6 of 10

Exhibit 2 Page 20 of 32
AIC V. CRUM & FORSTER



C.    Process Instrumentation and Control

The Remediation process is monitored and controlled with the following major instrumentation systems.

(1) ROTARY DRUM PRESSURE CONTROL

A negative pressure is maintained on the drum and desorption process. The negative pressure assures that dust is kept in the system and flows to the baghouse. A pressure indicator, sensing a higher than set point pressure, actuates the damper of the baghouse exhaust fan to maintain the negative pressure.



(2) PRODUCT SOIL TEMPERATURE CONTROL

Soil remediation temperature is maintained by a temperature controller, which senses the temperature in the soil being discharged from the rotary drum. If the soil temperature drops below the set point, the drum burner is adjusted to raise the thermal duty. A burner damper is automatically actuated by a pressure control actuator to maintain air to the burner. A burner level gauge in the control house monitors the burner operation capacity.

(3) DISCHARGE BELT OVER TEMPERATURE PROTECTION

Should the water spray to the mixer cooler be insufficient or depleted, the hot remediated soil cannot be cooled and would damage or destroy the discharge belt. In this event, a high temperature sensing device is provided with control to shut the unit down.

(4) BAGHOUSE PRESSURE DIFFERENTIAL

Baghouse pressure drop is monitored by a differential pressure indicator. A sudden decline in pressure drop indicates a possible bag rupture. An increased in pressure drop indicates possible plugging.

6

Case 3:14-cv-00126-RRB   Document 1-1   Filed 06/30/14   Page 125 of 159   Attachment 59 p. 124

(5)

A thermocouple in the oxidizer stack senses the stack gas temperature. If the stack gas temperature drops below its set point, a signal will actuate the thermal oxidizer burner to increase the thermal duty. Similar to the drum burner, a blower damper is automatically actuated to feed air flow to the burner. A separate over temperature control system is provided for the thermal oxidizer. In the event that excess hydrocarbons are sent to the thermal oxidizer, combustion levels could be elevated beyond the point where burner turndown is sufficient. Should this occur, a signal from a thermocouple set at a maximum limit for the stack gas temperature shuts the unit down.



## (6) PRIMARY MOTOR MONITORS

Amp meters are provided in the control house for each primary motor in order to monitor any possible overload.



7

## ALASKA INTERSTATE CONSTRUCTION, LLC.

Proposal To

### Restoration Science and Engineering

<u>PROCESS SPECIFICATIONS AND PERFORMANCE</u>



The 25 TPH SRU will remediate soil contaminated with non-recycled light distillate petroleum hydrocarbons, including gasoline, jet fuel and diesel, No. 2 oil or heavy crude oil when operated in accordance with the specified conditions below and operating instructions. Proper operating conditions also include moisture to contaminant ratios, in order to remain below the lower explosive limit (LEL) of the remediated gases, amount, and type of fines to achieve safe and capacity operation. The design basis for the unit is shown below. Other feed characteristics as described above would result in variation in capacity, product, effluents and utility consumption rates. In order to achieve these operating conditions during freezing conditions, AIC will require the SRU and soil be contained in a building. This will allow the material to enter the kiln at approximately 60°F.

**A.    Feed Design Specifications**

| | |
|---|---|
| Type contaminants | No. 2 Oil or Crude |
| Percent by weight contaminant | <7.0% |
| Percent fines (-200) | <10% |
| Percent moisture | 12% |
| Percent coarse particles (3/4 - 2") | 16% |
| Rate, tons per hour | 25 |



*Contaminant shall be in a homogenous state such that any given kilogram quantity will have no more than the specified percent contamination for the soil type.

**B.    Design Operating Conditions**

| | |
|---|---|
| Dryer, Soil Inlet Temperature | 60°F |
| Dryer, Soil Outlet Temperature | 600°F |
| Dryer, Air Inlet Temperature | 900°F |
| Gases, Kiln Outlet Temperature | 350°F |
| Thermal Oxidizer Outlet Air | 1500°F |
| Thermal Oxidizer Inlet Temperature | 1400°F |

**C.    Product and Effluents**

| | |
|---|---|
| Product Soil, Total Residual Hydrocarbons | <50 PPM |
| Product Soil, BTEX | <1 PPM ea. |
| Stack Gases | |
|     Particulate | 1.5 lbs./hr. |
|     NOx | 3.3 lbs./hr. |
|     CO | 0.3 lbs./hr. |
|     VOC | 4.50 lbs./hr. |

8

Exhibit A
Page 9 of 10

Exhibit 2 Page 23 of 32
AIC V. CRUM & FORSTER

# ALASKA INTERSTATE CONSTRUCTION, LLC.

### Proposal to

### Restoration Science and Engineering

#### THERMAL SOIL REMEDIATION

##### Labor and Equipment Rates



**Shift Unlimited Rates for Personnel (Staff and Craft):**

| | |
|---|---|
| Project Manager | $ 1,100 |
| Project Engineer | $980 |
| HSE Engineer | $980 |
| Office Manager | $590 |
| Foreman | $1,030 |
| Operator | $960 |
| Teamster | $960 |
| Laborer | $820 |
| Mechanic / Oiler / Fueler | $1,030 |



**Shift Unlimited Rates for Equipment (Wet):**

| | |
|---|---|
| Pickup Truck (F-350) | $160.00 |
| Cat 330 Excavator | $1,300.00 |
| Cat 966 Loader | $950.00 |
| Cat 683 Compactor | $950.00 |
| Cat D8 Dozer | $2,400.00 |
| KW T-800 Tractor | $670.00 |
| Maxhaul Trailer (30 CY) | $550.00 |
| KW T-800 Tractor | $670.00 |
| 128 Ton Lowboy Trailer | $200.00 |
| Service Truck | $450.00 |



9

y

Exhibit A
Page 10 of 10

Exhibit 2 Page 24 of 32
AIC V. CRUM & FORSTER





| From: | lgamble@gci.net on behalf of Lucus Gamble |
|---|---|
| To: | Conrad Ringlieb |
| Subject: | [released by Allow] RE: RSE Project Estimated Completion 95006-0141 |
| Date: | Thursday, August 19, 2010 7:37:58 AM |

Great News! Thanks for the heads up!

Lucus

**From:** Conrad Ringlieb [mailto:conrad.ringlieb@aicllc.com]
**Sent:** Thursday, August 19, 2010 6:36 AM
**To:** lgamble@gci.net
**Cc:** David Nyman
**Subject:** FW: RSE Project Estimated Completion 95006-0141

Lucus,
Just a heads up for the client and RSE on the estimated completion tonnage and date.

C.J.Ringlieb
AIC North Slope

**From:** Stephen Heintz
**Sent:** Thursday, August 19, 2010 6:32 AM
**To:** Conrad Ringlieb; Kelly Thompson
**Subject:** RSE Project Estimated Completion 95006-0141

Stephen Heintz
SRU Superintendent
Office: 907-670-2540
Stephen.Heintz@aicllc.com

Exhibit B
Page 1 of 3

Exhibit 2 Page 25 of 32
AIC V. CRUM & FORSTER



# David Nyman

| | |
|---|---|
| **From:** | Conrad Ringlieb [conrad.ringlieb@aicllc.com] |
| **Sent:** | Thursday, August 19, 2010 6:36 AM |
| **To:** | lgamble@gci.net |
| **Cc:** | David Nyman |
| **Subject:** | FW: RSE Project Estimated Completion 95006-0141 |
| **Attachments:** | Daily Remediation Update 8-18-10.doc |

Lucus,
Just a heads up for the client and RSE on the estimated completion tonnage and date

C.J.Ringlieb
AIC North Slope

**From:** Stephen Heintz
**Sent:** Thursday, August 19, 2010 6:32 AM
**To:** Conrad Ringlieb; Kelly Thompson
**Subject:** RSE Project Estimated Completion 95006-0141

Stephen Heintz
SRU Superintendent
Office: 907-670-2540
Stephen.Heintz@aicllc.com

Exhibit B
Page 2 of 3

Exhibit 2 Page 26 of 32
AIC V. CRUM & FORSTER

# Remediation RSE Project

 

| Date | Remaining Soil To Remediate | Estimate |
|------|------------------------------|----------|
| 8-18-10 | Estimated contaminated pile size ( 130'L X 74'W X 10'T ) | 5344 Tons |
| | With an average of 440 Tons daily, projected completion Will take approximately 12.15 days ( August 30, 2010 ) | |
| 8-18-10 | Day shift 226 Tons / Night shift 216 Tons        -442 Tons | 4902 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |



LAW OFFICES

# BIRCH HORTON BITTNER & CHEROT
1127 WEST SEVENTH AVENUE • ANCHORAGE, ALASKA 99501-3301 • TELEPHONE 907.276.1550 • FACSIMILE 907.276.3680    A PROFESSIONAL CORPORATION

HAL R. HORTON (1944 - 1998)

| | | | |
|---|---|---|---|
| RONALD G. BIRCH** | TINA M. GROVER | AMY W. LIMERES | OF COUNSEL: |
| WILLIAM H. BITTNER | JAMES H. HORN* | JAMES N. LISTER*0 | JENNIFER C. ALEXANDER |
| KATHRYN A. BLACK | STEPHEN H. HUTCHINGS | TIMOTHY J. PETUMENOS | |
| SUZANNE CHEROT | DANIEL C. KENT | ELISABETH H. ROSS* | |
| ADAM W. COOK | CORTNEY N. KITCHEN | GARUBBA D. SIEBENECK0 | |
| JON M. DEVORE** | THOMAS F. KLINKNER | AARON D. SPERBECK | |
| DOUGLAS E. FULLER* | DAVID E. LAMPP*0 | KENNETH E. VASSAR | |
| MAX D. GARNER | STANLEY T. LEWIS | HOLLY C. WELLS | |
| DAVID KARL GROSS | | | |

1155 CONNECTICUT AVE, N.W.
SUITE 1200
WASHINGTON, D.C. 20036
TELEPHONE 202.659.5800
FACSIMILE 202.659.1027

** D.C. AND ALASKA BAR
† MARYLAND BAR
0 VIRGINIA BAR
* D.C. BAR
ALL OTHERS ALASKA BAR

WRITER'S DIRECT DIAL 907.263.7251 • WRITER'S DIRECT FAX 907.276.3680 • dkent@bhb.com

November 3, 2011

**HAND DELIVERED**
**VIA ELECTRONIC DELIVERY**

Mr. John M. ("Jack") Miller
Law Office of John M. Miller, LLC
2448 Brooke Drive
Anchorage, AK 99517

RE:   Alaska Interstate Construction, LLC
      RSE/VC Seller(s) Reserve LLC payment
      Our File No.: 506541.8

Dear Jack:

Alaska Interstate Construction, LLC ("AIC") has asked me to represent them with respect to payments due from Restoration Science and Engineering ("RSE"). To start, I want to thank you for taking the time to discuss this matter with me over the phone on Tuesday. Pursuant to our discussion, this letter serves as demand for payment to AIC of $940,532.00. (This amount includes the $340,448.78 issued to AIC October 11, 2010. AIC did not negotiate the check on the representation that doing so would "constitute full accord and satisfaction, and VC Seller(s) is not responsible for any further or additional payments for services provided by AIC." AIC considers $340,448.78 to be an undisputed amount and requests prompt re-payment of the undisputed amount pending resolution between AIC and RSE of the total amount owed to AIC for remediation of all VC Seller(s) contaminated soil.)

As you are aware, beginning in 2008 RSE contracted with AIC "for construction services on the Cleanup of former VECO properties in Deadhorse, Alaska." Specifically, RSE retained AIC to excavate, haul, store, and thermally remediate contaminated soil from Tracts 2, 22, and 23 in Deadhorse. Billing was done on a time and materials and shift rate basis. The contract included a specific rate for thermal processing of $99 per ton.

Due to the scope of the project, including the amount of soil needing remediation and the extent of the contamination, as well as the limits placed on it by the seasons the work continued into 2010.

F:\506541\8\00216576.DOCX

Exhibit C
Page 1 of 5

Exhibit 2 Page 28 of 32
AIC V. CRUM & FORSTER


Lucus Gamble represented RSE on the project. According to Lucus,

RSE is anxiously awaiting the start of the 2010 excavation season in Deadhorse. As you recall, we wrapped up the 2009 season with residual contamination at Tract 22/23. It is mandatory that we finish the remaining excavations(s) this season ASAP and save time for RSE to report on our efforts by August. We have strict deadline with our clients and would like to begin work in the next month or so.... We would like to begin digging on May 13th. We anticipate about six weeks of work based upon our estimates of 10K cy and our typical dig rate.... Please remember even if digging is relatively slow we must make progress and begin as soon as practical for RSE to meet our deadline. RSE looks forward to working with AIC again this season. [April 14, 2010 email]

No mention was made then regarding completion dates for thermal remediation of the contaminated soil. It was clear, however, that excavation and hauling of contaminated soil from Tract 22/23 needed to be completed by August.

AIC began hauling contaminated material to the SRU May 17, 2010. By June 11, 2010 AIC completed excavation and hauling of contaminated soil; all total it had to excavate and haul a total of 6,075 cubic yards of contaminated soil from Tract 22/23.

Remediation of the contaminated soil was a different matter. RSE knew the soil could not be thermally remediated, or burned, at the same rate it was excavated and hauled. Consequently the project required storage of the contaminated soil in a lined area at AIC's Soil Remediation Unit ("SRU") lot while awaiting remediation. This also meant that all soil excavated in a season could not necessarily be remediated in the same season. As a result, oil excavated in 2009 was stored at the SRU through the winter to be burned in 2010.

AIC began burning contaminated soil for RSE on May 11, 2010 and finished September 19, 2010. During the remediation process AIC encountered issues with the soil that increased the time for remediation and the total tons burned. For instance, during storage the liquid contaminate seeped to the center and/or bottom of the pile. The soil at the bottom and center of the pile had a higher contaminate level than the rest. That soil would also freeze during the winter months. Consequently, in order to remediate the high-contaminate and frozen soil, it had to be burned at a slower rate and/or blended with uncontaminated soil.

Between May 11, 2010 and September 19, 2010 AIC burned 40,187 tons of soil for RSE to complete the remediation of VC Seller(s) contaminated lots. (This does not include soil under the storage liner which had to be burned due to leaking or leaching of contaminate from the storage pile into the ground below. AIC did not begin burning soil

F:\506541\8\00216578.DOCX

Exhibit C
Page 2 of 5

Exhibit 2 Page 29 of 32
AIC V. CRUM & FORSTER



BIRCH HORTON BITTNER & CHEROT
A PROFESSIONAL CORPORATION

Mr. John M. Miller
November 3, 2011
Page 3

under the liner until September 20, 2010 and did not bill RSE for the cost of doing so.) Total charges for remediation total $3,978,513.00 in 2010. AIC received all but $940,532.00.

It is my understanding RSE disputes any charges for remediation taking place after August 31, 2010. There is no basis for the objection in the documentation, including communications regarding the project between AIC and RSE. RSE's objection appears to arise from a telephone conference involving VC Seller(s), RSE, and AIC on August 26, 2010. According to RSE, it advised AIC at that time that all work needed to be completed by August 31 and final charges due by September 6, 2010—a apparently a deadline imposed on RSE by its client. This was consistent with Lucus Gamble's early requirement that all excavation work be done by August. As noted above, AIC completed the excavation and hauling by the middle of June.

RSE currently complains that the final number provided by AIC was 5,000 tons higher than the estimate provided in August. In the August 26 conference call AIC provided its rough estimate of the total amount of soil remaining for remediation—about 2,000 tons. AIC was emphatic that was only a rough estimate. AIC did not and could not promise to complete remediation of all soil by the end of August and was clear about that as well. AIC had no control over either number, but it depended on the actual amount and conditions of the soil to determine how long remediation would take. As noted above, during remediation, AIC found that some of the soil was frozen and some of it was too contaminated to burn just once. In order to remediate the soil it had to be blended with other soil or burned multiple times. Sometimes the blending rate was as high as 60/40. RSE knew these factors from the history of the process.

RSE's reliance on representations at the August 26, 2010 teleconference is belied by the lack of communications between RSE and AIC between August 26 and September 20, 2010 when AIC issued the September Invoice. There is nothing in the records to indicate that RSE cut off the project as of August 31, 2010. There is nothing in the records indicating RSE sought final billing from AIC at or around August 31 or September 6, 2010. There is nothing in the records indicating RSE even sought a status report on the project around that time. AIC representatives are adamant they did not have any communication with RSE representatives between August 26 and September 20. Surely if RSE had such a deadline it would have communicated with AIC at the time of the deadline.

It is my understanding RSE also contends AIC represented it was done by September 1 and that it was burning soil beneath the storage liner as early as September 6, 2010. RSE knew that was not the case. The records show RSE had no such understanding, and RSE had no reason to believe AIC finished the soil remediation by September 1st or 6th. On September 21, 2010 Lucus wrote to AIC, "It is my understanding from correspondence with Ravi and from AIC's latest invoice

F:\506541\9\00216576.DOCX

Exhibit C
Page 3 of 5

Exhibit 2 Page 30 of 32
AIC V. CRUM & FORSTER



(P11682) that AIC, as of 09/12/2010, is done treating soil associated with Tract 2 and Tract 22/23. Can you please confirm this assumption?" Had AIC represented that it was done and that it was already burning soil under the liner (which AIC agreed not to bill to RSE) by September 6, Lucus Gamble would have stated as much when RSE received the September invoice.

Regardless of all that—the timing imposed on RSE by its clients, the circumstances surrounding VC Seller(s) funding, and the rough estimates provided by AIC; all identified in the August 26, 2010 teleconference—AIC had a contract with **RSE** to remediate the contaminated soil from Tracts 2 and 22/23. AIC contends it is entitled to full compensation for remediation through September 19, 2010 when it burned the last ton of contaminated soil consistent with the contract.

RSE contends it only has to pay AIC for soil remediated through August 31, 2010. It is not clear whether RSE takes this position because it believes that was the end of the contract period (which does not make sense since it was a time and materials contract), or because it believes AIC agreed on August 26, 2010 to terminate the contract on that date regardless of the amount of soil left to remediate (assuming then that AIC took it upon itself to remediate the remaining soil instead of doing so pursuant to the contract with RSE). Neither explanation allows RSE to avoid paying AIC for the full completion of remediation.

As a result of the contract work, RSE caused thousands of cubic yards of contaminated soil to be stockpiled on AIC's property. As of August 31, 2010, thousands of cubic yards of RSE's contaminated soil remained on AIC's lot. As of August 31, 2010 RSE had to either remove the contaminated soil from AIC's lot—if, as it contends now, it absolutely was done and there were no funds available after August 31, 2010—and tell AIC to stop work, or it has to pay AIC for completing the remediation of the contaminated soil as initially agreed. RSE does not get to have all of the contaminated soil remediated and only pay for a select part of it.

After August 31, 2010, regardless of deadlines imposed by its client, RSE would have to either have AIC finish remediating the soil or have it shipped somewhere else for treatment. In this case, AIC finished remediation. RSE knew it continued to remediate after August 31. RSE did nothing to stop AIC from remediating soil, and RSE did nothing to move the soil elsewhere. Allowing RSE to avoid payment to AIC for all remediation work completed after August 31, 2010 would unjustly enrich RSE. RSE could not avoid remediating the soil on AIC's lot. "A person who has been unjustly enriched at the expense of another is required to make restitution to that person." *Alaska Sales and Service, Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 1987). The principle of unjust enrichment compels compensation from RSE to AIC for the benefit conferred on RSE and its client when AIC completed remediation of the contaminated soil. Consequently, AIC is entitled to full compensation of $940,532.00.

F:\506541\8\00216578.DOCX

Exhibit C
Page 4 of 5

Exhibit 2 Page 31 of 32
AIC V. CRUM & FORSTER



**BIRCH HORTON BITTNER & CHEROT**
A PROFESSIONAL CORPORATION

Mr. John M. Miller
November 3, 2011
Page 5

Once again, AIC requests immediate payment of the uncontested portion RSE previously issued to AIC in October 2010 with the remainder due by November 30, 2011. If you[1] wish to discuss this further or have any questions, please do not hesitate to contact me.

Sincerely,

BIRCH HORTON BITTNER & CHEROT

Daniel C. Kent

DCK:alk
Enclosures

---

[1] Jack, I understand from our phone conversation that you have retired and no longer represent any of the parties in this matter, and that you will be immediately forwarding this letter to the trustees or other representatives of VC Seller(s). Therefore, this invitation extends to whomever you may copy this letter. Thank you in advance for making sure this letter gets to the appropriate persons in a timely manner.

F:\506541\8\00216578.DOCX

Exhibit C
Page 5 of 5

Exhibit 2 Page 32 of 32
AIC V. CRUM & FORSTER



August 9, 2013

365 Madison Avenue
P.O. Box 1973
Morristown, NJ 07962-1973
(888) 890-1500
(973) 490-6600
Steve.Battaglia@cfins.com

Via E-mail and Certified Mail – Return Receipt Requested

Deborah Engles
Alaska Interstate Construction, LLC
301 West Northern Lights Boulevard, Suite 600
Anchorage, AK 99503

Re:     *VC Sellers Reserve, LLC v. Alaska Interstate Construction, LLC*, Alaska Superior
        Court at Anchorage No. 3AN-13-7667 CI
        Claim No.:          NJU00544259
        Named Insured:      Alaska Interstate Construction, LLC
        Policy Nos.:        EPK-100301 (effective 12/1/2011 – 5/1/2013) and
                            EPK-101290 (effective 5/1/2013 – 5/1/2014)

Dear Ms. Engles:

Please allow this letter to respond to your tender of defense in this matter. Based on our review
and investigation to date, Crum & Forster Specialty Insurance Company ("Crum & Forster")
must respectfully decline your tender of defense for the reasons discussed below.

## NATURE OF THE CLAIM

Plaintiff VC Sellers Reserve, LLC ("VC Sellers") filed suit against Alaska Interstate
Construction, LLC ("AIC") in the lawsuit captioned *VC Sellers Reserve, LLC v. Alaska Interstate
Construction, LLC*, Alaska Superior Court at Anchorage No. 3AN-13-7667 CI (the "Lawsuit").
The complaint ("Complaint") in the Lawsuit includes the following allegations:

In 2008, AIC and Restoration Science and Engineering ("RSE") entered into a contract for AIC to
excavate contaminated soil from VC Sellers's property, transport the soil to AIC's facility,
remediate (burn) the soil at AIC's facility and then return the soil to VC Sellers's property.
RSE entered into the contract as an agent for VC Sellers. The scope of contamination was
unknown when the parties entered into the contract. Accordingly, the contract set per-cubic-yard
or per-ion rates for the work.

The Complaint alleges that AIC performed the contract during the summer seasons of 2008, 2009
and 2010. By the end of the summer of 2009, most of the contaminated soil had been excavated
and remediated. In May 2010, AIC began burning the contaminated soil. It was anticipated that
AIC would complete the job by August 31, 2010 but this did not occur. In October 2010, AIC
sent a final billing that showed charges for burning through September 26, 2010.

Claims toll-free fax (877) 622-6203
www.cfins.com

Exhibit 3 Page 1 of 15
AIC V. CRUM & FORSTER

A billing dispute then arose. By letter of November 3, 2011, AIC's counsel demanded payment of $940,532 and explained the basis for the claim, including that AIC was charging VC Sellers for multiple burns of the same soil or was blending contaminated soil with uncontaminated soil. The Complaint alleges that VC Sellers paid $7,936,148.52 over the life of the contract and was overcharged by approximately $4 million.

The Complaint alleges a claim for breach of contract based on AIC's charges for multiple burnings of the same soil, or charging for remediation of uncontaminated soil that was blended with contaminated soil. It alleges two claims for violation of the Unfair Trade Practices Act ("UTPA"). The first is based on AIC's alleged practices of charging for multiple burnings of the same soil and charging for remediation of uncontaminated soil that is blended with contaminated soil. The second is based on AIC's alleged practice of charging for remediated soil on a per-ton basis by using a scale that was not tested or certified. The Complaint's prayer for relief alleges $4 million in damages for the overcharges, $12 million in trebled damages under the UTPA and attorney fees.

## THE POLICIES

Crum & Forster issued policy number EPK 100301, effective from 12/1/11 to 5/1/13, and Policy number EPK 101290, effective from 5/1/13 to 5/1/14. The policies include Commercial General Liability, Contractors Pollution Liability and Errors & Omissions Liability coverage parts. The policies include the following limits: $2,000,000 General Aggregate; $2,000,000 Products-Completed Operations Aggregate; $2,000,000 Personal & Advertising Injury; $2,000,000 Each Occurrence; $2,000,000 Contractors Pollution Liability Each Pollution Condition; and $2,000,000 Errors & Omissions Coverage Each Claim. The policies are subject to $100,000 self-insured retentions.

The policies include Common Provisions (form nos. EN0020-0511 or EN0020-1212) that provide in part:

### SECTION I - DEFENSE

1. **Commercial General Liability**
   * * *
   a. We have the right and duty to defend the insured against any "suit" seeking "damages" to which this insurance applies. We will pay "defense expenses" with respect to any "suit" against an insured that we defend. However, we have no duty to defend the insured against any "suit" seeking "damages" for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply.

   b. Our right and duty to defend end when we have used up the applicable limit of liability in the payment of judgments or settlements and "defense expenses" included within your Deductible Amount under Insuring Agreements A and B or medical expenses under Insuring Agreement C. "defense expenses" incurred by us under the Commercial General Liability Occurrence Coverage Part or the Commercial General Liability Claims Made Coverage Part will not reduce the Limits

of Insurance, except for "defense expenses" which are included within your Deductible Amount.

\* \* \*

## SECTION V - COMMON EXCLUSIONS

The following exclusions apply to all Coverage Parts attached to this Policy except where specifically noted:

This Policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

\* \* \*

3. **Criminal, Fraudulent Or Dishonest Acts**

   Based upon or arising out of:

   a. Any criminal, fraudulent, or dishonest act, omission or offense committed by the insured. But with respect to only the Errors and Omissions Liability Coverage Part, we shall defend any allegations concerning this item a., against the insured, if such allegations involve a "claim" to which this insurance otherwise applies, until judgment or other final adjudication establishes, or if such insured admits, that such act, omission or offense was committed, or personally acquiesced in, by such insured;

   b. Any act, omission or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage;

   c. The obtaining by the insured of any profit, gain or advantage to which the insured is not legally entitled; or

   d. Violation of the provisions of the Racketeer Influenced and Corrupt Organization Act 18 U.S.C. Sections 1961 et seq. by the insured.

\* \* \*

5. **Expected Or Intended Injury**

   Except as provided in 3. above, based upon or arising out of "bodily injury" or "property damage" or any "pollution condition" that was expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

\* \* \*

## SECTION VI- COMMON CONDITIONS

Exhibit 3 Page 3 of 15
AIC V. CRUM & FORSTER

\* \* \*

5. **Duties In The Event Of A Claim Or Suit**

The duties outlined in this Condition apply only to the following Coverage Parts: Commercial General Liability Occurrence, Commercial General Liability Claims Made, Contractors Pollution Liability Occurrence, Contractors Pollution Liability Claims Made, Errors and Omissions Liability, and Third Party Pollution Liability, respectively:

a. If a "claim" is received by, or "suit" is brought against, any insured, you and any other involved insured must:

(1) Immediately record the specifics of the "claim" or "suit" and the date received;

(2) Notify us, in writing, as soon as practicable of the receipt of the "claim" or the bringing of the "suit";

(3) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(4) Authorize us to obtain records and other information;

(5) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(6) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured.

b. No insured may, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\* \* \*

## SECTION VII-COMMON DEFINITIONS

\* \* \*

6. **"Claim"**:

a. With respect to the Commercial General Liability Occurrence Coverage Part, the Commercial General Liability Claims Made Coverage Part and the Errors and Omissions Liability Coverage Part, means a demand for "damages".

Exhibit 3 Page 4 of 15
AIC V. CRUM & FORSTER

    b.  With respect to the Contractors Pollution Liability Occurrence and Claims Made Coverage Parts and the Third Party Pollution Liability Coverage Part, means a request or a demand for "damages" or "cleanup costs". "Claim" also includes any directive, order, or requirement of, court order issued by, or "suit" brought by the Government of the United States, Canada, or any local, State or Provincial Government entity of the United States of America or Canada duly acting under the authority of any law related to the protection of the environment.

7.  "Cleanup costs" means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of any "pollutants".

The cleanup is deemed to be complete, and we will have no further obligation to pay for "cleanup costs" upon final approval from the supervising governmental authority or upon satisfaction of the requirements identified within the American Society of Testing and Materials Guide For Risk Based Corrective Action, which ever first occurs.

"Cleanup costs" does not include a "capital expenditure".

\* \* \*

9.  "Damages" means the monetary amount of any judgment, award or settlement that an insured becomes legally obligated to pay as a result of a "claim" or "suit". "Damages" does not include "cleanup costs", equitable or non-pecuniary relief, disgorgement of profits, sanctions, fines or penalties.

\* \* \*

26.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

30.  "Pollution condition" means the discharge, dispersal, seepage, migration, release, escape, presence or movement of "pollutants".

Two or more "pollution conditions" arising out of the same or related acts of discharge, dispersal, seepage, migration, release, escape or movement of "pollutants" shall be deemed to be a single "pollution condition".

\* \* \*

32.  "Professional services" means those functions performed for others by you or by others on your behalf that are related to your practice as

Exhibit 3 Page 5 of 15
AIC V. CRUM & FORSTER

a consultant, engineer, architect, surveyor, laboratory or construction manager.

33. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

\* \* \*

43. "Wrongful act" means an act, error or omission in the rendering or failure to render "professional services" by any insured covered under the Insuring Agreement of the Errors and Omissions Liability Coverage Part (EN0025).

The Commercial General Liability Occurrence Coverage Part, form EN0021-0211, provides in part:

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

## SECTION I - INSURING AGREEMENTS

1. **Insuring Agreement A - Bodily Injury And Property Damage**

    a. We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "bodily injury" or "property damage" to which this insurance applies. We may, at our discretion, investigate any "occurrence" and settle any "claim" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section I – Defense or Section.

Exhibit 3 Page 6 of 15
AIC V. CRUM & FORSTER

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section I – Defense or Section II – Defense Expenses within the Common Provisions.

**b.** This insurance applies to "bodily injury" and "property damage" only if all of the following conditions are met:

(1) Before the "policy period", no insured had knowledge of any "occurrence" that could reasonably give rise to a "claim" under this Policy;

(2) Neither the "claim" for that "bodily injury" or "property damage", nor the "occurrence" resulting in that "bodily injury" or "property damage" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(3) No fact, incident or circumstance involving an "occurrence" or offense that reasonably would have resulted in a "claim" for that "bodily injury" or "property damage" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(4) That "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(5) That "bodily injury" or "property damage" first occurs during the "policy period"; and

(6) A "claim" for "damages" for that "bodily injury" or "property damage" is made against any insured and reported to us in accordance with the provisions set forth in Section VI Common Conditions, 5. Duties In The Event Of A Claim Or Suit within the Common Provisions.

\* \* \*

## SECTION III -ADDITIONAL CONDITIONS

### 1. Non-Stacking Of Limits Of Insurance

If the Limits of Insurance of more than one Commercial General Liability Occurrence Coverage Part issued by us or any of our affiliated companies applies to the same or related "occurrence" or offense, then the maximum Limit of Insurance under all such Commercial General Liability Occurrence Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Commercial General Liability Occurrence Part and the corresponding deductible for that Coverage Parts.

**2. Continuous or Progressive Damage or Injury**

"Bodily injury" or "property damage" occurring or existing partly before and partly during the "policy period", or "personal and advertising injury" arising out of an offense, or arising out of the first of related offenses, committed partly before and partly during the "policy period", will be deemed to have occurred, existed or been committed before the "policy period".

If the date cannot be determined upon which such "bodily injury" or "property damage" first occurred or existed, or the date cannot be determined upon which such offense, or the first of related offenses was first committed, then, for the purposes of policies issued by us, such "bodily injury" or "property damage" will be deemed to have occurred or existed, and such offense or the first of related offenses will be deemed to have been committed before the "policy period".

\* \* \*

The Contractors Pollution Liability Claims Made Coverage Part, form EN0024-0611, provides in part:

## SECTION I – INSURING AGREEMENT

**1. Contractors Pollution Liability**

a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay:

(1) As "damages" because of a bodily injury" or "property damage"; and

(2) For "cleanup costs"; resulting from a "pollution condition" that was caused by an "occurrence" and to which this insurance applies. We may, at our discretion, investigate any "occurrence" or "pollution condition" and settle any "claim" or "suit" that may result. But the amount we will pay is limited as described in Section IV – Limits of Insurance And Deductible within the Common Provisions.

b. This insurance applies to "bodily injury", "property damage" and "cleanup costs" only if all of the following conditions are met:

(1) Before the "policy period", no insured had knowledge of any "occurrence" or "pollution condition" that could reasonably give rise to a "claim" under this Policy;

(2) Neither the "claim" against you for that "bodily injury", "property damage" or "pollution condition", nor the

Exhibit 3 Page 8 of 15
AIC V. CRUM & FORSTER

"occurrence" resulting in that "bodily injury", "property damage" or that "pollution condition" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(3) No fact, incident or circumstance involving an "occurrence" or "pollution condition" that reasonably would have resulted in a "claim" against you for that "bodily injury" or "property damage" or those "cleanup costs" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(4) The "bodily injury", "property damage" or "cleanup costs" resulted from a "pollution condition" caused by an "occurrence" that took place within the "coverage territory";

(5) The "occurrence" arises out of "your work" performed, or "your product" delivered, on or after the Retroactive Date and before the end of the "policy period";

(6) The "bodily injury", "property damage", or "pollution condition" resulting in "cleanup costs" occurs on or after the Retroactive Date and before the end of the "policy period"; and

(7) A "claim" for "damages" for that "bodily injury" or "property damage", or "cleanup costs" for that "pollution condition" is first made against any insured and reported to us in accordance with the provisions set forth in Section VI - Common Conditions, 5. Duties In the Event Of A Claim Or Suit within the Common Provisions, during the "policy period" or Extended Reporting Period, if applicable, that we provide under Section VIII – Extended Reporting Periods.

* * *

The Errors & Omissions Liability Coverage Part, form EN0025-0611, provides in part:

## SECTION I - INSURING AGREEMENT

1. **Errors And Omissions Liability**

   a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay as "damages" or "cleanup costs" because of a "wrongful act" to which this insurance applies. We may, at our discretion, investigate any incident and settle any "claim" or "suit" that may result. But the amount we will pay is limited as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions.

Exhibit 3 Page 9 of 15
AIC V. CRUM & FORSTER

   **b.** This insurance applies to "claims" for "damages" or "cleanup costs" resulting from a "wrongful act" only if all of the following conditions are met:

    **(1)** Before the "policy period", no insured had knowledge of any "wrongful act" that could reasonably give rise to a "claim" under this Policy.

    **(2)** The "claim" against you resulting from that "wrongful act" was not reported under any policy in effect before the "policy period" nor was disclosed in the application for this Policy;

    **(3)** No fact, incident, circumstance, transaction, advice or decision involved in the rendering or failure to render "professional services" related to a "wrongful act" was reported as a "claim" or potential "claim" against you under any policy in effect before the "policy period" or was disclosed in the application for this Policy;

    **(4)** The "wrongful act" forming the basis of the "claim" was committed on or after the Retroactive Date shown in the Declarations, and before the end of the "policy period";

    **(5)** That the rendering or failure to render "professional services" is caused by a "wrongful act" that took place within the "coverage territory"; and

    **(6)** The "claim" for "damages" or "cleanup costs" is first made against any insured and reported to us in accordance with the provisions set forth in Section VI - Common Conditions, 5. Duties In the Event Of A Claim Or Suit within the Common Provisions, during the "policy period" or Extended Reporting Period, if applicable, that we provide under Section VIII – Extended Reporting Periods.

\* \* \*

The policies are subject to a self-insured retention in form number EN0105-0211 that provides in part:

   **I.** If a corresponding dollar amount is indicated in the **SCHEDULE** shown above, then coverage applicable to those coverage parts will apply in excess of the insured's Self Insured Retention. Our total liability for all "claims" will not exceed the limits of liability as stated in this Policy's Declarations. The Self Insured Retention shall hereafter be referred to as the Retained Limit.

   The Retained Limit, or any part of it, shall not be insured without our acceptance of your prior written notice to us of your intention to insure the Retained Limit.

    A. **Defense Expenses Erode Your Retained Limit**

The Retained Limit applies to payments for "damages", "cleanup costs" and, where applicable, "defense expenses" (excluding salaries of "employees" and office expenses of the insured) incurred by the insured in the investigation, negotiation, settlement and defense of any "claim" or "suit" to which this Policy applies.

In the event that the Aggregate Retained Limit is exhausted by payments for "damages", "cleanup costs" or "defense expenses" to which this insurance applies, the provisions of this endorsement are void and all terms and conditions of the Policy are reinstated to their full force and effect. We will then be obligated to assume charge of the settlement or defense of any "claim" or "suit" against the insured not yet settled, whether or not reported to us.

    B. Indemnification: Any reference to our agreement to pay those sums that the insured becomes legally obligated to pay as "damages" is deleted. Instead, we agree to indemnify an insured for all sums which an insured becomes legally obligated to pay or has paid as "damages" or "cleanup costs" for which coverage is provided by this Policy.

II. A. We do not have the duty to investigate or defend any "occurrence", offense, "wrongful act", "pollution condition", "claim" or "suit" unless and until the Retained Limit is exhausted with respect to that "occurrence", offense, "wrongful act", "pollution condition", "claim" or "suit". However, we may, at our discretion and expense, participate with you in the investigation of any such "occurrence", offense, "wrongful act", "pollution condition" and the defense of any such "claim" of "suit that may result.

    B. Should any "occurrence", offense, "wrongful act", "pollution condition" appear likely to exceed the Retained Limit, no expenses may be incurred on our behalf by an insured or third party claims administrator without our prior written consent.

    C. Should any "claim or "suit" arising from an "occurrence", offense, "wrongful act" or "pollution condition" during the "policy period" be settled for a total amount not exceeding the Retained Limit, we will not be obligated to pay any expenses to you or to anyone else on your behalf.

    D. Payments by others, including but not limited to additional insureds and insurers, cannot be used to settle a "claim" or satisfy a verdict payment owed by you within the Retained Limit.

Exhibit 3 Page 11 of 15
AIC V. CRUM & FORSTER

E. Should the settlement amount including payments for "damages", "cleanup costs" and/or "defense expenses" for any "claim" or "suit" exceed the Retained Limit, we will pay "damages", "cleanup costs" and/or "defense expenses", where applicable, (excluding salaries of "employees" and office expenses of the insured) in excess of the Retained Limit.

\* \* \*

## DENIAL OF TENDER

**A.**   **Commercial General Liability ("CGL") Coverage Part**

As an initial matter, the policies include coverage for "Bodily Injury" and "Personal and Advertising Injury" in form EN0021-0211. We do not understand the tender to be under these provisions; nor do they appear to be implicated. Please advise if we are mistaken in this respect.

The CGL insuring agreement is quoted above. Under this coverage part, coverage depends on, among other things, whether the claim involves "damages" for "property damage" to which the insurance applies. Based on our review of the allegations in the Complaint, there is no duty to defend because there is no allegation seeking "damages" for "property damage." The Complaint alleges that AIC contracted to haul and remediate soils from VC Sellers's site. It alleges that AIC breached its contract by charging for multiple burnings of the same soil or by charging for burning uncontaminated soil blended with VC Sellers's soil. The Complaint alleges that AIC violated the UTPA by charging for multiple burnings of the same soil or for burning clean soil blended with contaminated soil, and by failing to test, certify or calibrate scales. These allegations do not allege claims for "damages" for "property damage." Crum & Forster respectfully declines the tender on this basis.

**B.**   **Contractors Pollution Liability ("CPL") Claims Made Coverage Part**

The CPL coverage insuring agreement is quoted above. The CPL coverage applies to "damages" because of "property damage" and "cleanup costs" resulting from a "pollution condition" that was caused by an "occurrence" and to which the insurance applies. The Complaint does not assert claims or allegations against AIC to pay "damages" because of "property damage" or to pay "cleanup costs" resulting from a "pollution condition." Rather, the Complaint alleges that AIC contracted to excavate, haul, remediate (burn) and then return site soils and overbilled for the work by, *e.g.*, charging for multiple burnings of the same soil. Crum & Forster respectfully declines the tender on this basis.

**C.**   **Errors & Omissions ("E&O") Liability Coverage Part**

The E&O insuring agreement is quoted above. The E&O coverage applies to damages or cleanup costs because of a "wrongful act," *i.e.*, an act, error or omission in rendering, or failing to render, "professional services," which are defined to mean functions related to your practice as a consultant, engineer, architect, surveyor, laboratory or construction manager. The Complaint does not assert claims or allegations against AIC for an error or omission in the performance of a "professional service." Rather, the Complaint alleges that AIC contracted to excavate, haul, remediate (burn) and then return site soils and overbilled for the work by, *e.g.*, charging for multiple burnings of the same soil. Crum & Forster respectfully declines the tender on this basis.

## RESERVATION OF RIGHTS

We also write to provide a reservation of rights under other policy terms and provisions. A "reservation of rights" means that an insurance company reserves the right to deny coverage for a claim in whole or in part.

### A.    The CGL Coverage Part

The CGL coverage part applies to sums the insured becomes legally obligated to pay as "damages" because of "property damage." A further requirement is that the "property damage" must first occur during the "policy period." In addition, it requires that, before the policy period, no insured had knowledge of any "occurrence" that could reasonably give rise to a claim under the policies.

There may be no coverage in whole or in part based on these provisions. For example, but not by way of limitation, the claim for breach of contract may fail to allege a legal obligation to pay. There may be no "occurrence" to the extent VC Sellers is alleging conduct that is not accidental in nature, including violations of the UTPA. As another example, the Complaint alleges that AIC's activities giving rise to the claim occurred between 2008 and 2010, that a billing dispute arose in 2010 and that VC Sellers learned that AIC was charging VC Sellers for multiple burns of the same soil and blending in uncontaminated soil in November 2011. Based on these allegations, and even assuming "property damage," any such "property damage" may not have first occurred during the policy period. Additionally, to the extent that there is an "occurrence," AIC may have had knowledge of any alleged "occurrence" that could give rise to a "claim" prior to either policy. Crum & Forster reserves rights accordingly.

Additional Conditions in the CGL form include the Continuous or Progressive Damage or Injury provision that addresses continuing property damage. Even assuming "property damage," any such "property damage" may have occurred in part before the policy or it may not be possible to determine the date of such "property damage," such that coverage is subject to this provision. The Additional Conditions also include the Non-Stacking Of Limits Of Insurance provision. This provision may apply to the extent that the limits of insurance of more than one Commercial General Liability Occurrence Coverage Part may be implicated. Crum & Forster reserves rights accordingly.

### B.    The CPL Coverage Part

The CPL coverage is claims-made-and-reported coverage meaning that the claim must be made and reported during the same policy period. To the extent this did not occur, there may be no coverage in whole or in part. The claim for breach of contract may fail to allege a legal obligation to pay. In addition, assuming an "occurrence" and a "pollution condition," to the extent that an insured had knowledge of any "occurrence" or "pollution condition" that could reasonably give rise to a claim, there may be no coverage in whole or in part. Crum & Forster reserves rights accordingly.

### C.    E&O Liability Coverage Part

The E&O coverage is claims-made-and-reported coverage meaning that the claim must be made and reported during the same policy period. To the extent this did not occur, there may be no coverage in whole or in part. Crum & Forster reserves rights accordingly.

The E&O Coverage Part includes the following retroactive date: $1MM/$2MM limits: 05/23/09; $2MM/$2MM limits: 05/23/12. Assuming a "wrongful act," this coverage part may not apply, in whole or in part, to the extent that the alleged "wrongful act" was committed prior to the retroactive date. The claim for breach of contract may fail to allege a legal obligation to pay. In addition, the coverage part would not apply to any "wrongful act" known prior to the policy period that could reasonably give rise to a "claim." Crum & Forster reserves rights accordingly.

**D.     Exclusions**

The policies include exclusions for Fraudulent Or Dishonest Acts and for Expected Or Intended Injury, which are quoted above. Such exclusions may apply to the UTPA claims in whole or in part.

The policies include form number EN0107-0211 that provides in part:

> **Section V. Common Exclusions, item 14. Punitive or Multiplied Damages** within the Common Provisions, is deleted in its entirety and replaced with the following:
>
> 14. Punitive Damages or Multiplied Damages
>
> > For punitive, exemplary or the multiplied portion of multiplied damages. However, this exclusion will not apply to punitive damages where allowable by law.

The Complaint pleads treble damages under the UTPA claim. To the extent of UTPA damages, the multiplied portion of such damages are excluded. Crum & Forster reserves rights accordingly.

**D.     Self-Insured Retention**

The policies are subject to a self-insured retention ("SIR") in form number EN0105-0211, quoted above. Under this form, among other things, Crum & Forster has no duty to investigate or defend until the SIR is exhausted. Crum & Forster reserves rights accordingly.

**CONCLUSION**

For the foregoing reasons, Crum & Forster respectfully declines your tender of defense in this matter.

The quoted excerpts from the policy language and any statements herein are not intended to replace the policy language or amend any coverage provided within the policies, but are provided for your convenience to assist you in understanding some of the features of the policies. By reference to specific provisions, Crum & Forster does not waive, but specifically reserves, all rights with regard to exclusions, conditions and policy language not specifically identified herein. Crum & Forster does not intend to waive any defenses, including any defenses that are now or may later become applicable but are not discussed in this letter. Crum & Forster expressly reserves all of its rights under the terms, conditions, definitions, exclusions, limitations of liability and any other provision contained in the policies, or any other ground, that may be found to limit or preclude coverage. At a later date, we may identify other provisions that exclude or limit

Exhibit 3 Page 14 of 15
AIC V. CRUM & FORSTER

coverage. We reserve the right to deny or limit coverage based on any additional policy provisions.

If you disagree with Crum & Forster's conclusions and/or believe that Crum & Forster has misstated or omitted facts that may be relevant, please let us know. In addition, if you believe there are any materials or information that would change our conclusion, we ask that you please forward them to us so that we may consider them. Likewise, if the Complaint is amended or if new or additional allegations are made, we ask that you please forward the same to us for consideration.

Sincerely,

Steven Battaglia
Claim Examiner
Direct Line: (973) 490-6575
E-mail: steve.battaglia@cfins.com

sb

Exhibit 3 Page 15 of 15
AIC V. CRUM & FORSTER

# BIRCH HORTON BITTNER & CHEROT
1127 WEST SEVENTH AVENUE • ANCHORAGE, ALASKA 99501-3301 • TELEPHONE 907.276.1550 • FACSIMILE 907.276.3680    A PROFESSIONAL CORPORATION

HAL R. HORTON (1944 - 1996)

JENNIFER C. ALEXANDER        MAX D. GARNER        AMY W. LIMERES        OF COUNSEL        1156 CONNECTICUT AVE. N.W.
RONALD G. BIRCH**            DAVID KARL GROSS     JAMES H. LISTER*†◊     WILLIAM P. HORN*            SUITE 1200
WILLIAM H. BITTNER           STEPHEN H. HUTCHINGS MITCHI V. McNABB       TIMOTHY J. PETUMENOS   WASHINGTON, D.C. 20036
KATHRYN A. BLACK             CORTNEY H. KITCHEN   ELIZABETH H. ROSS**    KENNETH V. VASSAR      TELEPHONE 202.659.5800
SUZANNE CHEROT               THOMAS F. KLINKNER   CARISSA D. SIEBENECK*◊                        FACSIMILE 202.659.1027
ADAM W. COOK                 DAVID E. LAMPP*†     AARON D. SPERBECK
JON M. DEVORE**              STANLEY T. LEWIS     MOLLY C. WELLS                                ** D.C. AND ALASKA BAR
DOUGLAS S. FULLER*                                                                             † MARYLAND BAR
                                                                                               ◊ VIRGINIA BAR
                                                                                               * D.C. BAR
                                                                                               ALL OTHERS ALASKA BAR

WRITER'S DIRECT DIAL 907.263.7267 • WRITER'S DIRECT FAX 907.276.3680 • dgross@bhb.com

April 2, 2014

Steven Battaglia
Crum & Forster
305 Madison Avenue
Post Office Box 1973
Morristown, NJ 07962-1973

RE:    Insured: Alaska Interstate Construction, LLC
       Claim Number: NJU00544259
       Our File No.: 506, 541.42

Dear Mr. Battaglia:

Please be advised that I represent the interests of Alaska Interstate Construction, LLC ("AIC") in relation to the above-referenced matter. I am in receipt of your letter dated August 9, 2013, in which you denied the tender made by AIC related to the lawsuit filed by VC Sellers Reserve, LLC ("VC"). At this point, AIC has just surpassed the self insured retention (Endorsement EN0105-0211) and would therefore like to discuss your coverage decision, and in so doing, focus your attention on the claims made pursuant to Alaska's Unfair Trade Practices Act ("UTPA"), as well as the claims for fraud and misrepresentation.

The Errors and Omissions Liability Coverage Part (Endorsement EN0025-0611) provided by Crum & Forster Specialty Insurance Company ("C&F") will pay for all damages AIC becomes liable for as a result of its wrongful acts, including the costs of defense. The policy defines "wrongful act" broadly to include any error or omission in the course of rendering professional services. In fact, the policy specifically states that it will defend AIC against all allegations of fraud and dishonesty. The complaint in this matter alleges fraud (third cause of action), misrepresentation (fourth cause of action) and unfair and deceptive conduct (fifth and sixth causes of action). With this in mind, the policy clearly provides coverage.

The only basis you provided for denying the tender under the Errors and Omissions part of the policy was the suggestion that the claim asserted against AIC was based solely on a breach of contract theory. However, such a statement materially misconstrues the allegations made in the Complaint. Looking at the four corners of the Complaint, VC alleges the following: (1) AIC engaged in fraudulent conduct by mixing

Exhibit 4 Page 1 of 2
AIC V. CRUM & FORSTER

clean soil with the contaminated soil in order to fraudulently inflate the price, (2) AIC re-burned soil that had already been remediated in order to fraudulently inflate the price, (3) AIC misrepresented to VC the amount of clean soil being remediated in an effort to overbill for its professional services, (4) AIC engaged in unfair and deceptive conduct by charging for the remediation of clean soil, (5) AIC engaged in unfair and deceptive conduct for charging for the remediation of remediated soil, (6) AIC engaged in unfair and deceptive conduct by using an uncertified scale for calculating the amounts owed, and (7) AIC engaged in unfair and deceptive conduct by using an un-calibrated scale for calculating the amounts owed.  All of these allegations are properly characterized as "wrongful acts" and therefore they are covered under the policy.

With this letter, I would again demand that C&F promptly accept the tender of defense and begin covering the defense costs being incurred.  Your prompt attention to this matter would be appreciated.

Very truly yours,

BIRCH HORTON BITTNER & CHEROT

David Karl Gross

DKG:alk

F:\506541\42\00381380.DOCX



SOHA
&
LANG

Geoffrey Bedell    Michael O'Clair
Donna Chamberlin    Paul Rosner
Mark Conforti    Susannah Sharp
Mary R. DeYoung    Steven Soha
Christine Dinsdale    Nathaniel J.R. Smith
Misty Edmundson    Gary Sparling
Tyna Ek    R. Lind Stapley
Megan E. Graves    Karen Southworth Weaver
Pamela Lang

SCANNED

May 12, 2014

RECEIVED

MAY 15 2014

Birch Horton Bittner & Cherot

David Karl Gross
Birch Horton Bittner & Cherot
1127 West Seventh Avenue
Anchorage, Alaska 99501-3301

Re:    Insured: Alaska Interstate Construction
       Claim no.: NJU544259
       Your File no.: 506,541.42

Dear Mr. Gross:

This letter is in response to your letter of April 2, 2014 directed to Steven Battaglia. Mr. Battaglia is no longer handling this matter and I have been requested to communicate to you a response on behalf of Crum & Forster.

Your letter advises that your client, Alaska Interstate Construction, LLC ("AIC"), has now surpassed the self-insured retention under Endorsement EN0105-0211. Your letter also challenges the August 9, 2013 denial of the tender of *VC Sellers Reserve, LLC v. Alaska Interstate Construction, LLC.* Specifically, your letter states: "the only basis you provided for denying the tender under the Errors and Omissions part of the policy was the suggestion that the claim asserted against AIC was based solely on a breach of contract theory."

The foregoing statement misconstrues the basis for the denial of the tender under the Error and Omissions liability coverage part of the AIC Policies. As stated in our letter, the E&O coverage applies to damages or cleanup costs because of a "wrongful act." "Wrongful act" is defined in the policy as "an act, error or omission in the rendering or failure to render 'professional services' by any insured . . . ." In turn, "professional services" is defined in the policy to mean "those functions performed for others by you or by others on your behalf that are related to your practice as a consultant, engineer, architect, surveyor, laboratory or construction manager." As pointed out in our prior letter, the Complaint makes no allegations or claims against AIC for an error or omission in the performance of its duties as a consultant, engineer, architect, surveyor, laboratory or construction manager. Rather, the Complaint merely alleges that AIC contracted to excavate, haul, remediate and then return site soils, and that AIC overbilled for the work.

*Attorneys at Law*
*A Professional Service Corporation*
*1325 Fourth Avenue, Suite 2000*
*Seattle, WA 98101-2570*
*Telephone (206) 624-1800 Fax (206) 624-3585*

1900.00041 gd144j31hg

Exhibit 5 Page 1 of 2
AIC V. CRUM & FORSTER

Steven Soha
May 12, 2014
Page 2

This was the basis of the denial of the tender. We hope that this clarifies your understanding. If you have any further questions, feel free to call me at your convenience.

Very truly yours,

SOHA & LANG, P.S.

Steven Soha

SPS:dll

STATE OF ALASKA
DEPARTMENT OF COMMERCE, COMMUNITY,
AND ECONOMIC DEVELOPMENT
DIVISION OF INSURANCE
PO BOX 110805
JUNEAU, ALASKA 99811-0805



PRIORITY MAIL
UNITED STATES POSTAL SERVICE
Visit us at usps.com

Label 107R, January 2008

7004 0550 0001 2305 6057

CARMINE SCAGLIONE
305 MADISON AVE
MORRISTOWN, NJ 07960

Priority Mail
ComBasPrice

02 1R
0002007539
MAILED FROM ZIPCODE 99801

UNITED STATES POSTAGE
$15.97°
JUN 05 2014