# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INTERSTATE CONSTRUCTION, LLC., <br><br> Plaintiff, <br><br> v. <br><br> CRUM & FORSTER SPECIALTY INSURANCE COMPANY, INC., <br><br> Defendants. | Case No. 3:14-cv-00126-RRB <br><br> **ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AT DOCKET 15** |

## I. INTRODUCTION

Plaintiff Alaska Interstate Construction, LLC ("AIC") filed the present suit against Defendant Crum & Forster Specialty Insurance Company, Inc ("C&F") as a result of C&F's refusal to provide liability insurance coverage. AIC sought coverage from C&F in response to a lawsuit filed by VC Sellers Reserve ("VC Sellers") in the Superior Court for the State of Alaska ("Underlying Suit"). AIC asserts that its policy from C&F provides coverage for the Underlying Suit and C&F is therefore obligated to both defend and indemnify AIC. C&F has disclaimed any obligation to provide coverage under the suit. AIC moves for summary judgment on this insurance coverage issue at Docket 15. AIC has asked the Court to declare that C&F is obligated to provide a complete defense to AIC in relation to the underlying suit and that C&F is obligated to indemnify AIC for certain potential exposures.

C&F responds at Docket 24 asserting that there is no obligation to provide coverage in the Underlying Suit and makes a cross motion for summary judgment. AIC replies at Docket 26.

## II. BACKGROUND

AIC is a company providing engineering and construction-related services throughout Alaska, including heavy civil construction, bridge building, mining-support, oilfield services, and thermal soil remediation.[1] AIC was approached by Restoration Science and Engineering ("RSE") in the spring of 2008 to provide thermal soil remediation services on the North Slope. RSE had been hired by VC Sellers to clean up three areas in Prudhoe Bay, but lacked the equipment and facilities to perform the remediation work.[2] AIC eventually submitted a proposal to RSE on July 7, 2008, outlining its services and pricing, as well as details on its plant operations and operating parameters.[3] The proposal provided that the price for removing the remediated soil from the AIC yard would be based on time and materials, with the material remediated at a price of $99 per ton.[4] The weight and measurement of the material would be determined based on the calibrated belt scale which was attached to the conveyor belt which transported material from the hopper to the tumbler.

RSE accepted the proposal from AIC without modification, and the remediation project began on August 18, 2008.[5] The amount of contaminated ground water in the material was allegedly

---

[1] Docket 16 at 2.

[2] Docket 16 at 7.

[3] *Id.*

[4] *Id.* at 8.

[5] *Id.* at 8-9.

problematic for AIC, as the "soupy" material had a moisture content that exceeded the operational parameters of AIC's machinery.[6] AIC addressed this problem by reportedly utilizing portions of recently remediated soil to mix in with the contaminated soil, thereby lowering the moisture content of the soil to be remediated. The project was completed on September 19, 2010, but a dispute arose regarding an internal deadline of August 31, 2010, and payment for work after that date.[7] A demand letter was sent by AIC to VC Sellers (through RSE) on November 3, 2011, requesting payment of the final bill and AIC filed suit against RSE on May 29, 2012.[8] In meetings during the suit, VC Sellers raised issue with the alleged revelation of AIC blending remediated and contaminated soil, which they alleged led to inflated charges as material was being weighed and billed each time it was put on the conveyor belt.[9] AIC eventually dropped their lawsuit on January 11, 2013, however VC Sellers responded by filing their own lawsuit on June 14, 2013.[10] VC Sellers has alleged in six causes of action that AIC charged for multiple burning of the same soil, charged for burning soil blended from clean and contaminated material, utilized an uncertified scale, and used a scale that was uncalibrated.[11]

---

[6] *Id.* at 10.

[7] *Id.* at 11.

[8] *Id.* at 11-12.

[9] *Id.* at 12.

[10] *Id.*

[11] *Id.*

Shortly after VC Sellers filed suit, AIC tendered a claim with C&F, who had issued a series of policies to AIC which included a General Liability Policy ("GL"), a Contractors Pollution Liability Policy ("CPL"), and an Errors and Omissions Policy ("E&O").[12] C&F denied AIC's claim and disclaimed any liability, indicating that the allegations of VC Sellers were not "wrongful acts" committed in the course of "professional services."[13] C&F also asserted denial was based on the claim not being reported during the policy period, certain wrongful acts were committed prior to retroactive coverage, and that AIC knew of the wrongful acts prior to policy period.[14] AIC filed the present suit seeking a determination on the existence of coverage.

### III. STANDARD OF REVIEW

**A.    Applicable Law**

This matter was removed based on diversity of citizenship from the Superior Court for the State of Alaska to the Court pursuant to 28 U.S. Code § 1441. Accordingly, the Court applies Alaska substantive law.[15]

**1.    Insurance Policy Interpretation**

When interpreting an insurance policy, Alaska law instructs courts to look to the language of the disputed provision, other provisions in the policy, extrinsic evidence, and case law interpreting

---

[12] *Id.* at 13.

[13] *Id.*

[14] *Id.*

[15] Farmers Alliance Mutual Ins. Co. v. Miller, 869 F.2d 509, 511 (9th Cir. 1989).

similar provisions.[16] Insurance policies are construed in a manner that honors a lay insured's reasonable expectations.[17] Any ambiguity should be construed in favor of the insured and against the insurer.[18] Also, grants of coverage should be viewed broadly, while exclusions should be viewed narrowly.[19] Yet where a reasonable lay interpretation of the policy would not encompass coverage under the circumstances, there is no ambiguity and therefore no coverage.[20]

### 2. Duties of Insurer

An insurer's duty to defend and its obligation to indemnify are separate and distinct contractual elements, with the duty to defend being broader than the duty to provide coverage.[21] Under Alaska law, an insurer must defend the insured "whenever a complaint states a cause of action within, or potentially within, the policy coverage."[22] The existence of a duty to defend is determined by the factual allegations asserted in the complaint of the underlying litigation.[23] While the duty to defend may also exist where the interpretation of the policy presents an open legal question, this does

---

[16] Allstate Ins. Co. v. Teel, 100 P.3d 2, 4 (Alaska 2004).

[17] State Farm Mut. Auto. Ins. Co. v. Dowdy, 192 P.3d 994, 998 (Alaska 2008).

[18] *Id.*

[19] State Farm Mut. Auto. Ins. Co. v. Houle, 269 P.3d 654, 658 (Alaska 2011).

[20] Makarka ex rel. Makarka v. Great Am. Ins. Co., 14 P.3d 964, 969 (Alaska 2000).

[21] Sauer v. Home Indem. Co., 841 P.2d 176, 180 (Alaska 1992).

[22] Afcan v. Mutual Fire Marine & Inland Ins. Co., 595 P.2d 638, 645 (Alaska 1979).

[23] *Id.* at 644; State, Dep't of Transp. & Pub. Facilities v. State Farm Fire & Cas. Co., 939 P.2d 788, 792 (Alaska 1997).

not mean it arises whenever an insurer and an insured have a dispute over coverage.[24] Where a reasonable lay interpretation of the policy would not encompass coverage under the undisputed facts, there is no duty to defend.[25]

B.  **Summary Judgment**

Summary judgment avoids unnecessary trials when there is no dispute as to the facts in the matter before the court.[26] The evidence of the nonmoving party is to be believed and all reasonable inferences are drawn in his favor.[27] Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[28]

## IV. DISCUSSION

A.  **AIC's Soil Blending and Multiple Burnings of Soil**

AIC is seeking coverage solely under the E&O Policy in this matter.[29] This policy provides for coverage for claims seeking damages caused by "wrongful acts," which the policy defines as "an

---

[24] Makarka, 14 P.3d at 970.

[25] *Id.* at 969.

[26] Northwest Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir.1994) (citation omitted).

[27] Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)).

[28] *Id.* (quoting Fed. R. Civ. P. 56(a)).

[29] Docket 26 at 4.

act, error, or omission in the rendering or failure to render professional services."[30] While the parties may agree that the Underlying Suit alleges generally wrongful acts, they disagree on whether the complaint alleges "wrongful acts" as contemplated under the policy. However, the parties do agree that in order to be characterized as providing "professional services" the activity must involve the "specialized knowledge, mental acumen and judgment" of the people involved.[31] This is further clarification to the policy's definition as "those functions performed [by AIC] that are related to [AIC's] practice as a consultant, engineer, architect, surveyor, laboratory or construction manager."[32] As AIC correctly indicates, the real dispute lies in whether there were wrongful acts done in the "rendering or failure to render professional services."[33]

> Under Alaska law, the term "professional services" includes acts:
> arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill...and in determining whether a particular act is a 'professional service' the court must look not to the title or character of the party performing the act, but to the act itself.[34]

Professionals perform many tasks required to conduct their business that do not constitute professional services, such as making payments on office equipment or administrative tasks.[35] C&F

---

[30] Docket 16, Exhibit 19 at 31.

[31] Docket 24 at 17; Docket 26 at 12.

[32] Docket 16, Exhibit 19 at 30.

[33] Docket 16, Exhibit 19 at 31.

[34] *Am. Motorists Ins. Co. v. Republic Ins. Co.*, 830 P.2d 785, 787 (Alaska 1992) (quoting 7A J. Appleman, Insurance Law and Practice § 4504.01 at 309-10). *See also Bank of California v. Opie*, 663 F.2d 977, 981 (9th Cir. 1981).

[35] *Opie*, 663 F.2d at 981.

has pointed to the opinions of courts from several other jurisdiction which have held that billing activities are explicitly not "professional services."[36]

The Court agrees with C&F's position that, in general, billing practices and accurate invoicing to clients are administrative tasks common to many businesses and are therefore not professional services.[37] Additionally, AIC has not refuted C&F's assertion that billing activities are not to be considered professional services within the scope of the policy. Instead, AIC's response is that the Underlying Suit is primarily a dispute involving professional judgment and specialized knowledge, rather than merely a billing action.[38] According to AIC, it is VC Sellers' contention that AIC was not permitted to blend cleaned soil back in with contaminated soil and that doing so was a violation of

---

[36] *Reliance Nat. Ins. Co. v. Sears, Roebuck & Co., Inc.*, 58 Mass. App. Ct. 645, 648, 792 N.E.2d 145, (2003) ("As billing is not a professional service, it does not come within the coverage of a professional liability insurance policy[.]"); *Horizon W., Inc. v. St. Paul Fire & Marine Ins. Co.*, 45 Fed. App. 752, 754 (9th Cir. 2002) ("'Professional Services' under the plain meaning of the policy do not extend to Horizon West's ... billing activities[.]"); *Med. Records. Assocs., Inc. v. A,. Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 514–16 (1st Cir. 1998) ("The bill is an effect of the service provided not part of the service itself."); *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 925 (10th Cir. 2008) (failure to file accurate reimbursement claims with government is not a failure to provide professional services); *Gregg & Valby, L.L.P. v. Great American Insurance Co.*, 316 F. Supp.2d 505, 513–14 (S.D. Tex. 2004) (where setting a price and billing the client were "merely administrative tasks inherent to all businesses," the court found no coverage).

[37] *See PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 766 (9th Cir. 2005) opinion amended on denial of reh'g, No. 03-15728, 2005 WL 553004 (9th Cir. Mar. 10, 2005)(Indicating that valuation and pricing of services do not typically involve professional services unless additional factors are present, such as a broad policy definition or allegations beyond merely inflated invoices).

[38] Docket 25 at 11.

the contractual understanding, regulations, and the UTPA.[39] The overcharging was, by AIC's account, only a byproduct of the decision to blend clean and contaminated soil.[40] The Court disagrees.

Contrary to AIC's assertions, plain reading of the complaint in the Underlying Suit does not raise the issue of whether AIC's blending remediated soil back into contaminated soil or multiple burns of the same soil was permissible or necessary.[41] The Underlying Suit clearly states that it is "AIC's charges" and "AIC's practice of charging" that gives rises to the causes of action.[42] Additionally, the damages sought by VC Sellers in the Underlying Suit, excluding the trebled amount for unfair trade practices, corresponds to the estimates for "AIC's multiple charges and overbillings."[43] VC Sellers is contending that AIC's charges for the addition of already remediated soil–rather than the decision to mix in clean soil–was not permitted.

The Court agrees with AIC that professional judgment and specialized knowledge were involved in AIC's decision to blend additional soil into the soil to be remediated. What AIC has failed to address is how the decision to blend remediated soil back into contaminated soil required that VC Sellers be charged for the new combined weight. If AIC's billing had subtracted or prevented the inclusion of the weight of the blended clean and remediated soil, there would have been no overcharge as VC Sellers alleges in the Underlying Suit. Because the decision to blend the soil and

---

[39] Docket 26 at 9.

[40] *Id.*

[41] Docket 26 at 9.

[42] Docket 16, Exhibit 17 at 9-12.

[43] Id at 9.

the decision to bill for the reused soil are distinct actions, the billing for blending remediated soil back does not require the same specialized knowledge and expertise. Accordingly, the Court finds that AIC's billing for the inclusion of already remediated soil was not a "professional service" and was an administrative function of AIC's business, independent of the professional decision to blend the clean and contaminated soil. The Court therefore finds that causes of action related to charges for multiple burning of same soil or blending of remediated soil are not covered under the E&O Policy and C&F owes no duty to indemnify for these actions.

B.    **Unfair Trade Practice Act Claim for Nonconforming Scale**

While the parties have focused largely on the issue of billing and the decision to blend soil, the overcharges for the remediated soil blending are not the only action giving rise to the Underlying Suit. VC Sellers has also alleged that AIC violated the Unfair Trade Practices Act by charging for remediated soil on a per-ton basis using an uncertified and un-calibrated scale.[44] Specifically, they allege that AIC failed to comply with AS 45.75.080 and underlying regulation 17 AAC 90.920, requiring any scale used in commerce to be registered with the State of Alaska as well as have annual testing and certification.[45] VC Sellers has also alleged that AIC did not properly calibrate the belt scale used to calculate the weight of material remediated.[46]

This cause of action is distinct from the other five causes of action in that it does not arise from AIC's billing actions directly. The decision and practice of how to assess the amount of soil to

---

[44] Docket 16, Exhibit 17 at 12.

[45] *Id.*

[46] *Id.*

be remediated goes to the heart of AIC's business.[47] Additionally, the best and most efficient method for calculating the quantity of soil being remediated naturally utilizes the specialized knowledge and expertise indicative of professional services. Potential issues with state regulations and machinery functionality are also likely to be "major motivations" in seeking this sort of liability insurance as well.[48] A lay interpretation of the policy would find that failing to have an integral piece of equipment properly calibrated or neglecting to have registration and certification from the State are precisely the sort of errors and omissions that would be covered by the E&O Policy. The fact that the belt scale is used in order to calculate the charges for billing does not make this particular issue a billing dispute. Unlike the others, this cause of action is based on AIC's decision on how to conduct its professional services, not how much to charge RSE and VC Sellers. Therefore the sixth cause of action in the Underlying Suit regarding the registration and calibration of the belt scale does allege wrongful acts within the scope of coverage of the policy. As a result, the Court finds that C&F has a potential duty to indemnify as to this cause of action and therefore a duty to defend. Because C&F has duty to defend as to this cause of action, C&F has a duty to defend AIC with regard to all causes of action in the Underlying Suit.

### C. Affirmative Defenses Limiting Coverage

C&F has raised several affirmative defenses, some of which they argue limit any potential coverage under this policy.[49] Because several of these defenses involve questions of fact that are still

---

[47] PMI Mortgage, 394 F.3d at 768.

[48] *Id.*

[49] *See generally* Docket 5 at 5-6.

disputed or have not been established through discovery, the Court declines to conclusively address C&F's duty to indemnify in the Underlying Suit. As discussed above, the Court does find that there is no duty to indemnify for the first five causes of action. Due to admissions of the parties and because the Court finds coverage only as to the sixth cause of action for use of the uncertified belt scale, the defenses are only applicable to coverage of that cause of action under the E&O policy. The Court will address those defenses individually, first those abandoned by C&F, those without merit, those with merit, and finally those which the Court lacks sufficient information to address presently.

Several affirmative defenses have been conceded, both explicitly and implicitly. AIC has admitted that there is no coverage under the GL and CPL policies, seeking coverage only under the E&O policy. As a result, C&F has conceded that affirmative defenses 5(a), 5(b), 5(c), 5(d), and 5(j) no longer apply in this matter. Additionally, C&F made no response to AIC's challenge of the second affirmative defense. C&F removed this case from state court to the Court on grounds of diversity jurisdiction, with no parallel state court action, which allows the Court to provide declaratory relief challenged by the second affirmative defense.[50] The Court therefore finds in favor of AIC as to affirmative defenses 2, 5(a), 5(b), 5(c), 5(d), and 5(j).

As to the first affirmative defense, AIC has argued that there is an insurance contract in place, that C&F breached the terms of the contract, and that AIC has been damaged as a result of the breach. Additionally, AIC has also asserted, in response to the third affirmative defense, that it immediately tendered the Underlying Suit to C&F upon receipt, promptly filed suit for a judicial

---

[50] Aetna Cas. and Sur. Co. v. Merritt, 974 F.2d 1196, 1198-99 (9th Cir. 1992).

determination of its rights under the policy and never acted in a manner to indicate relinquishment of its right. C&F's only response to these assertions is that AIC has not shown that there are no set of facts under which these defenses may apply and that due to a lack of discovery on these issues, they should be preserved for C&F's rights as to the question of indemnity. However, C&F has itself also asked the Court to address the question of indemnity by cross-motion. As C&F has also put the question of indemnity at issue presently and failed to specifically dispute the facts AIC has argued, the Court also finds the first and third affirmative defenses to be without merit. Additionally, the arguments underlying affirmative defense 5(f) has been fully discussed above. The Court has found that the allegations in the sixth cause of action in the Underlying Suit constitute wrongful acts under the policy if proven. Therefore, the Court also finds in favor of AIC as to affirmative defenses 1, 3, and 5(f).

The Court does find merit in affirmative defense 5(k), which argues for the exclusion of coverage for punitive, exemplary, or multiplied portion of damages. AIC concedes that affirmative defense 5(k) does apply for the coverage of the multiplied damages, which may exist for the sixth cause of action brought under the Unfair Trade Practices Act. However, AIC points out that the policy does provide coverage for "punitive damages where allowed by law."[51] C&F does not refute this clarification and so the Court finds that affirmative defense 5(k) eliminates C&F's duty to indemnify for the multiplied portion of any treble damages under the UTPA, but not punitive damages awarded under the sixth cause of action. The Court also finds merit in affirmative defense

---

[51] Docket 16, Exhibit 19 at 66.

5(g), which excludes coverage for claims where the "wrongful act," if proven, was committed prior to the retroactive date of the policy. The retroactive date in this matter according the the declaration page in the policy is May 23, 2009. Therefore, the Court finds that there is no coverage for the use of the allegedly uncertified and uncalibrated belt scale which occurred prior to May 23, 2009. The Court therefore finds in favor of C&F on affirmative defense 5(g) and in part 5(k).

While the Court has been able to address many of the affirmative defenses raised by C&F, based on the current facts and pleadings the Court is unable to render judgment on others. Specifically, affirmative defenses 4, 5(e), 5(g), 5(h), 5(i), and 6. These defenses are all fact intensive and deal with the intent, knowledge, and timing of actions by AIC. The Court also finds that not only may there be facts in dispute between the parties, but there have been insufficient pleadings addressing these defenses in terms of the only remaining applicable cause of action: the use of the allegedly uncertified and uncalibrated belt scale. The Court therefore declines to address affirmative defenses 4, 5(e), 5(g), 5(h), 5(i), and 6 at this time.

## V. CONCLUSION

In summation, the Court finds that C&F has no duty to indemnify AIC as to the first five causes of action in the Underlying Suit. However, C&F does have a potential duty to indemnify AIC as to the sixth cause of action in the Underlying Suit, and therefore C&F has a duty to defend AIC in the Underlying Suit in its entirety. Where indemnification remains in question, the Court finds in favor of AIC as to affirmative defenses 1, 2, 3, 5(a), 5(b), 5(c), 5(d), 5(f), 5(j), and in part 5(k). Additionally, the Court finds in favor of C&F on affirmative defense 5(g) and in part 5(k). The Court reaches no decision on affirmative defenses 4, 5(e), 5(g), 5(h), 5(i), and 6 at this time.

In light of the foregoing, the Court DENIES IN PART and GRANTS IN PART Plaintiff's Motion for Summary Judgment at **Docket 15.** Additionally, to the extent that Defendant cross-moves for summary judgment at Docket 24, those requests also are DENIED IN PART and GRANTED IN PART as discussed herein.

**IT IS SO ORDERED** this 23rd day of December, 2014.

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE